0001

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MARYLAND

2

3     WYNDHOLME VILLAGE, LLC, et al.,    *

4        Plaintiffs/Counter-Defendants   *

5                          * CIVIL ACTION

6     vs.              * NO:  L01-3809

7                          *

8     NADIF OF WYNDHOLME, LLC, et al.,   *

9        Defendants/Counter-Plaintiffs.  * (Pages 1-154)

10    * * * * * * * * * * * * * * * * * * * * * * * *

11

12         The deposition of CURTIS C. COON was

13    taken on Wednesday, January 8, 2003, commencing at

14    10:16 a.m., at the Law Offices of Curtis C. Coon,

15    LLC, Suite 105, 305 West Chesapeake Avenue, Towson,

16    Maryland, 21204, before Jennifer Burghardt, Notary

17    Public.

18

19    * * * * * * * * * * * * * * * * * * * * * * * *

20    Reported by:

0025

1   was explained to me, was that its construction
2   financing had fallen through due to the proposed
3   lender having somehow or another the whistle blown
4   on it for matters that were no way related to
5   Wyndholme Village and basically closing its doors
6   within a day or two before the thing was supposed
7   to be funded.
8       So the construction financing had been
9   the focus of the Wyndholme Village project from the
10  time that I was introduced up to the time of this
11  meeting as being the primary long-term goal.  And
12  what Zukerman and Fisher -- and, as I say, I don't
13  think Quinn said a whole lot, but he was there.
14  What Zukerman and Fisher were doing was showing
15  that they had the financial strength, the
16  wherewithal to make absolutely certain that this
17  financing would be available, to the point where I
18  recall very, very clearly, because it impressed me
19  as being a basis to move forward -- knowing as much
20  as I'm a lawyer that nothing means anything unless
21  people are willing to perform -- when they said

0026

1   that if they had to, they could write a check for

2   it, you know.

3        There was talk about different

4   alternatives in terms of going forward, but the

5   basic proposition was that they had the strength to

6   go forward and make a loan for a, what subsequently

7   became a super priority loan.  Also, there was some

8   concern raised by Stuart Fisher, Neil Fisher.  I

9   believe it was he who raised the question that they

10  wanted to feel as though Mr. Lancelotta was himself

11  not in a position where he couldn't afford to keep

12  his own house in order.  So there was some

13  discussion about that as well at that meeting.  And

14  I believe that it was there or shortly thereafter

15  that talk was had with the Fisher side of the table

16  about making some sort of a loan also to

17  Mr. Lancelotta individually.  Their concern was he

18  was the point guy, he was going to be the guy on

19  the site, and they did not want him to be in a

20  situation where he was having his house foreclosed

21  or what-have-you.

0027

1       Also, I think there was -- there were
2   questions raised about putting together a package
3   with the Seventh Day Adventist Church, because that
4   parcel that I mentioned earlier in my testimony in
5   response to your question of what was the project,
6   it included -- the concept included that parcel,
7   because it provided additional land that would
8   support the concentrated development of the
9   Wyndholme Village convent and regime.  In other
10  words, a number of units that could be built was
11  enhanced greatly by having I think it was parking
12  was going to take place over there.
13      Q.  Was that --
14      A.  In general, that's what the topic of
15  discussion was at that meeting.
16      Q.  Question on that parcel.  Was that parcel
17  immediately adjacent to the parcels that had
18  already been assembled?
19      A.  No.
20      Q.  Across the street?
21      A.  Across the street.

0028

1       Q.  What did -- did the acronym NADIF,

2   N-A-D-I-F, come up during that conversation?

3       A.  I can't be sure.

4       Q.  Okay.

5       A.  I don't -- I don't know.

6       Q.  Well, what did Mr. Fisher or

7   Mr. Zukerman tell you about their ability to come

8   up with the funding?  You said that they could

9   write a check if they had to.  What did they tell

10   you to substantiate that statement?

11       A.  At that point there was not a great deal

12   of substantiation in terms of things like financial

13   statements, here's a copy of my bank account with

14   10 million or whatever in it, none of that.  But

15   what it was was, look at what we've done, you know,

16   and you've read about us, we're doing the

17   Ritz-Carlton.

18           Mr. Fisher I found to be quite a

19   loquacious individual who described himself to be

20   very successful -- not just himself, but himself as

21   a representative of the organization, which I knew

0029

1   at that time to be primarily related to a Pilevsky

2   fellow in New York. And the success story that was

3   told was quite impressive, because it included the

4   Ritz-Carlton Hotel here in Baltimore, which I had

5   read about in the papers as being something that

6   was coming along at that time. He had mentioned

7   successful, large scale real estate developments in

8   other parts of the United States, and I recall them

9   to be along the Atlantic Coast in various places.

10  I thought he mentioned something in the Carolinas

11  and some Florida developments as well. But it was

12  -- also said that, I believe, he was either a juris

13  doctorate or a lawyer. That this group, Quinn,

14  Zukerman, Fisher, had been together. This was not

15  -- they were not -- I mean, it's not the first

16  thing they were doing as a group.

17       Mr. Rubenstein asked several questions

18  about their capabilities. I don't recall all the

19  questions he asked, but he asked several questions

20  about how, things like how soon they could get the

21  money, how -- I mean, they were this nature. I'm

0030

1   not trying to state exactly what he asked, but he
2   was the one that was pressing them on their ability
3   to perform. I did not represent the debtor. I was
4   not there to make those judgments for the debtor.
5   I was there as Mr. Lancelotta's attorney. It came
6   clear that another component of this proposition
7   was going to be that their group was going to own
8   part of the project, and they wanted 10 percent, if
9   I remember correctly, at the placement of the super
10  priority, and they wanted to have half the project
11  once they got the construction financing.
12      Q.  That last point, 10 percent and then half
13  if they got construction financing, you believe
14  that was part of the initial discussion, the
15  conceptual discussion you had?
16      A.  I can't be a hundred percent clear that
17  that was specifically stated to those exact
18  percentages at the first meeting. I cannot. I can
19  say that there was discussion that they would be an
20  equity participant for sure and that their terms
21  were going to be terms that were going to be more

0031

1   -- well, let me back up. My experience with
2   bankruptcy is that when you look for a lender in
3   real estate bankruptcy, you got to
4       Expect a good one of these: Receiving
5   high interest rates, lots of points or whatever,
6   and that sort of thing.
7       The Fisher, Zukerman crowd came in
8   saying, we're going to make you a more, somewhat
9   more reasonable loan, but we're going to take a
10  fairly significant equity position. That was their
11  I guess you call it modus operandi in terms of
12  getting their compensation. It was clear that it
13  wasn't going to be one where they wanted to soak up
14  all the money in interest. And they came in also
15  saying, and I'm sure this was the first meeting,
16  that they were very, very interested in making an
17  investment in Baltimore. You know, they had this
18  Ritz-Carlton thing. They said, look, you know, you
19  may think we're just in this for a big commercial
20  glitz. We're not. We feel a responsibility to the
21  community. We want to be part of the Baltimore

0032

1   community. This thing with -- if we can make some

2   money and lend money on a project that's going to

3   establish the first significant community for the

4   deaf, why, that's great, that's what we're looking

5   for.

6       They did not make a proposition of making

7   this an eleemosynary loan, but they did express

8   their interest in this loan as opposed to other

9   loans. It was kind of a question of, well, why

10  this project and not a different project?

11  And their answer was, because we have an interest

12  in doing something that will highlight our concern

13  about the community, and this was an opportunity

14  they felt would help them do that.

15      Q. Okay. In terms of where their money was

16  coming from, you mentioned a Mr. Pilevsky?

17      A. I thought it was Pilevsky or something

18  like -- Phillip was the first name. I never met

19  the man. Pilevsky, Pilvesky.

20      Q. Mr. P?

21      A. You can call him Mr. P. I don't know

0033

1    that I ever dealt with that individual per se.

2        Q.  Did the name Gotham come up at all during

3    that initial discussion; do you recall?

4        A.  Can't say for sure.

5        Q.  How about North American Doctors

6    Investment Fund, which would have the acronym

7    NADIF?  I think you testified before you don't

8    recall?

9        A.  What came up was -- what came up was --

10   whether it was the first meeting or within a short

11   time thereafter, I cannot recall specifically.  But

12   what came up was, and the way it was explained to

13   me was, by Mr. Fisher was a doctors fund.  I don't

14   think he said North American whatever whatever

15   whatever, but he said he had a doctors fund that

16   had, I think he said, hundreds of millions of

17   dollars, and this was the basis on which he was

18   drawing the conclusion that the organization, that

19   they -- as I put it together looking back -- but

20   you're asking a different question.  So let me back

21   up.

0034

1    At that time did I know it was NADIF
2    per se? I don't know. But it was either at that
3    meeting or shortly thereafter that he explained he
4    had a doctors fund, which is what I believe turned
5    out to be NADIF. And I have to also say that there
6    was reference to Gotham at a fairly early stage in
7    this, and I thought that they were generically
8    referring to New York City. I didn't realize that
9    Gotham was the name of an entity until some time
10   much later. I thought they were talking about
11   Gotham as being an infinity type term to describe
12   their business associates who work out of New York.
13      Q. Okay. Let me call your attention on
14   Exhibit 1 to page six, first of all, at the bottom
15   of the page. And just I'll make a representation
16   to you that you can explore it further if you
17   choose, but on paragraph nine, which starts on the
18   bottom of page six, has a -- lists a series of
19   representations that Mr. Lancelotta says were made
20   to him in a meeting with Mr. Fisher, and then
21   paragraph 10 on page nine refers to a meeting with

0035

1   you and others on June the 8th where he says these

2   representations were repeated. So I just want to

3   go down some of these representations and see if

4   they are consistent with your recollection.

5       A.  Go ahead.

6       Q.  And the first question I have is on page

7   seven at the top of the page. He says, Mr. Fisher

8   -- and I'll just read it and get your comment on

9   it.

10          "Fisher told me they were successful

11  developers and had the financial resources and

12  strength to fund a loan of millions of dollars to

13  Wyndholme Village for the completion of the

14  development of the property for the project."

15          Is that consistent with what you recall

16  being said at the meeting?

17      A.  That is definitely consistent with what I

18  recall being said.

19      Q.  Okay. Next sentence says, "He told me

20  that they were individuals who were developing the

21  inner harbor Ritz-Carlton and arranged $40 million

0036

1    for Richard Swirnow to complete the inner harbor

2    project."

3        Is that also consistent with what he

4    told you?

5        A. Totally consistent, except that I do not

6    recall an amount of money being mentioned. I'm not

7    saying I recall no amount. I'm just saying I can't

8    say if he said 40 million or whatever he said, but

9    I'm absolutely certain that direct reference was

10   made to the Ritz-Carlton and the dimensions of that

11   project.

12       Q. I want to drop down about three lines and

13   read the next one. It says, "Fisher, in the

14   presence of Quinn and Zukerman, told me that the

15   three of them were principals of North American

16   Doctors Investment Fund, which Fisher told me had

17   assets in excess of $500 million and in which

18   Pilevsky" -- there's the name -- "was a major

19   investor."

20       Do you recall that being said in your

21   presence at the meeting later that day?

0037

1    A.  I guess what I'm learning is I'm not as
2    good at remembering dollar numbers as I thought,
3    because, I mean, I just don't recall the number 500
4    million.  My impression was that it was hundreds
5    and hundreds of millions.  It could have been 500.
6    It could have been 300.  It could have been 700.
7    The impression I would have drawn from it would
8    have been exactly the same as the impression I have
9    today, which is they had all the money in the
10   world, so-to-speak, and could write a check for
11   this project.
12       Now, as I also said, North American
13   Doctors Investment Fund, I do believe that is what
14   the doctors fund turned out to be.  I don't have a
15   perfect recollection of hearing that term, North
16   American Doctors Investment Fund, at that meeting.
17   Q.  All right.  The next sentence says,
18   "Fisher told me that North American Doctors
19   Investment Fund would be able to obtain the
20   millions of dollars required to pay off the
21   existing debt and to finance the completion of the

0038

1   project."

2        I gather from your prior testimony that

3   that's consistent with what you heard at your

4   meeting that day, except for the identification

5   specifically of that source?

6        A.  Right.  I think yes, yes.  And my earlier

7   testimony when you asked what were the components

8   of this, one of the things that was talked about in

9   terms of how to get to the point of doing a

10  construction loan, one of the mechanics of it had

11  to do with what to do with the existing liens and

12  the existing loans.  I didn't really get into that

13  in my earlier answer, but seeing what you just

14  quoted to me reminds me that that was part of what

15  was needed or viewed as being needed to make a

16  development work, was to deal with the existing

17  lenders.

18       Q.  Next sentence reads, "Fisher also told me

19  that if NADIF could not obtain financing from a

20  third party, NADIF had more than enough assets to

21  make the loan itself."

0039

1   Is that consistent with what you heard
2   in your meeting that day?
3       A.  I believe it is, yes.
4       Q.  On that point, at that time was it your
5   understanding from what you heard from Fisher that
6   the concept was that they could obtain financing,
7   they could get it from some third party?  That was
8   the principal objective, and if that failed, then
9   they could provide it themselves, is that correct,
10  as opposed to doing it initially with NADIF's money
11  or whatever money these folks actually controlled?
12      A.  It was my impression that they could do
13  it either way.  That they could do it either way,
14  and that they might try to obtain it elsewhere, but
15  that it didn't really matter whether it came from
16  elsewhere or them.  I think the reason for getting
17  it from elsewhere got back in part to this issue
18  about getting a good rate and that kind of thing.
19  And I think -- I think what they -- it was it
20  didn't really matter whether it was them or someone
21  else. One way or the other, the money was going to

0040

1  be there.

2      Q.  All right.  Flip over to page eight if

3  you would, please.  Five lines down there's a

4  sentence that reads as follows, six lines, I

5      Guess:  "He told me that he was the Chief

6  Executive Officer of North American Doctors

7  Investment Fund, Inc., and would be the Chief

8  Executive Officer of NADIF of Wyndholme, LLC."

9      Do you recall discussions of that topic

10 or those topics during your meeting?

11     A.  I recall that he was -- I recall that Mr.

12 Zukerman was the Chief Financial Officer and that

13 Mr. Fisher -- I take it this sentence is relating

14 to Mr. Fisher?

15     Q.  Is relating to Mr. Fisher, yes.  I'm

16 sorry.

17     A.  -- was not a financial officer, but

18 a -- whether he actually said Chief Executive

19 Officer at that meeting, I can't recall, but what

20 his position was that was explained to me was he

21 was the guy that had the authority to do the deal.

0041

1      Q.  Okay.

2      A.  That's the impression I was left with. I

3  have searched my files looking for my notes for

4  that meeting, and I want the record to be clear

5  that I'm testifying without any notes about that

6  meeting.  I cannot find any notes about that

7  meeting, and I spent hours yesterday looking

8  through my records.  But I just want to be very

9  careful and say that I was left with the impression

10  that he was the top dog, if you will.  Whether it

11  was the top dog or the Chief Executive Officer of

12  North American Doctors Investment Fund, Inc., you

13  know, I didn't carry that appellation around with

14  me, but I had the definite impression Mr. Fisher

15  was among the people involved in this loan.  Mr.

16  Fisher was the one that had the ability to make the

17  call, the business judgment decisions.  That Mr.

18  Zukerman was the one who was a financial officer

19  and Mr. Zukerman had -- you know, I think he even

20  showed up at the meeting with one of those green

21  graph paper accounting sheets to take notes on or

0042

1   whatever.  You know, it was clear he was the

2   accountant.  And Mr. Quinn, I never really got a

3   good explanation of where he fit in.

4       Q.  So, just to make sure I understand, you

5   perceived that Mr. Fisher had the authority to act

6   on behalf of whomever it was that they were

7   referring to when they talked about their funding

8   capabilities.  Is that a fair statement?

9       A.  Yes.

10      Q.  All right.  Now, at the time that -- at

11  that first meeting you talked about an initial

12  infusion of cash that I gather ultimately became

13  the 750 thousand dollar super priority

14  lien/loan.  Is that what happened ultimately on

15  that issue?

16      A.  That did ultimately occur.

17      Q.  Do you recall whether that dollar amount

18  was on the table at the time of your initial

19  discussions on this topic?

20      A.  I don't recall the exact dollar amount.

21      Q.  Okay.  Do you recall -- was there a