1

1  IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MARYLAND

3

4  WYNDHOLME VILLAGE, LLC, et al :

5  Plaintiffs/Counterdefendants  :

6   Vs.                  : CIVIL ACTION NO.

7  NADIF OF WYNDHOLME, LLC, et al:   L01-3809

8  Defendants/Counterplaintiffs  :

9

10

11       Deposition of JOHN R. QUINN, taken on

12  Friday, March 14, 2003, at 10:13 a.m., at the law

13  offices of Tydings & Rosenberg, LLC, 100 E. Pratt

14  Street, 26th Floor, Baltimore, Maryland, before

15  Bonnie L. Russo, Notary Public.

16         -------------------------

17

18

19

20  Reported by:

21  Bonnie L. Russo

97

1   in Maryland?

2       A. Yes.

3       Q. Where and for what purpose?

4       A. I met him at the Ritz Carlton site and I

5   don't remember but I think it was about putting

6   equity in the Ritz Carlton deal.

7       Q. Now, returning to Exhibit 3, look at

8   page 4 if you would, please.

9           Maybe before we do that have you ever

10  met with Mr. Berkowitz here in Maryland?

11      A. No.

12      Q. Do you know whose signature it is for

13  Gotham Q Venture 1, LLC?

14          Do you know who signed?

15          Do you know whether that's Mr.

16  Berkowitz's signature?

17      A. I see.  I don't know.

18      Q. Do you know who Gotham Partners, LP is?

19      A. No.

20      Q. Do you know what Gotham Q Venture 1, LLC

21  is?

98

1    A. I don't think it was ever formed. It
2    was an entity that was intended to be formed.
3    Q. How do you know it was never formed?
4    A. I said I don't think it was ever formed.
5    I'm not sure.
6    Q. Why do you say that?
7    A. I don't know why I said it. Maybe it
8    was formed. I don't know if it was formed.
9    Q. Who is Section H Partners, LP?
10   A. Where is that?
11   Q. You see agreed and accepted. To the
12   right of that.
13   A. I don't know.
14   Q. How about DPB Corp?
15   A. Don't know.
16   Q. Now, what is Mountainbrook Trust?
17   A. Mountainbrook Trust was -- is Howard
18   Zukerman's trust.
19   Q. When you say trust where was that trust
20   formed?
21   A. I have no idea.

99

1    Q. Do you know who formed it?

2    A. No.

3    Q. Do you know whether Mr. Berkowitz had a

4    relationship to Mountainbrook Trust?

5    A. Don't know.

6    Q. How about Jolipenny II Trust?

7       Do you know what that is?

8    A. That would be my son.

9    Q. And it says John Quinn there. Is that

10   your son?

11   A. Yes.

12   Q. And that's who you referred to earlier

13   as J?

14   A. Yes.

15   Q. And what is the Jolipenny II Trust?

16   A. It was -- I believe it was going to be a

17   trust to do this transaction of which I don't

18   believe it ever got formed.

19   Q. How would that transaction supposed to

20   work?

21   A. You mean as far as percentages?

100

1   Q. Yes.

2   A. Gotham would have got 50 percent of the

3   company. And then probably it was thirds after

4   that of 50 percent.

5   Q. And how did the Jolipenny II Trust

6   specifically work?

7   A. I don't think it had -- I think it would

8   just be formed to do this. Again, I never got

9   involved in these kinds of details. I never

10  understood that. Never.

11  Q. How is Mr. Fisher going to get

12  compensated for his efforts with regard to this

13  transaction?

14  A. He would have probably put it to some

15  kind of trust himself.

16  Q. I don't see Mr. Fisher's name in this

17  document. How would he or perhaps --

18  A. It would have probably -- if his name

19  isn't in something you can rest assured he didn't

20  sign it behind the scenes. He is in and wherever

21  he directs us to give our piece of whatever we

101

1  earn it's a side agreement or a different
2  agreement.
3      Q. So is it your belief that there is a
4  side agreement someplace by which Mr. Fisher or
5  someone that he would designate would receive
6  part remuneration or compensation?
7      A. It would be some type of an agreement
8  that he would get compensated X. Or not him.
9  Whoever he designates to do it.
10     Q. Have you known him to designate anybody
11 other than TJ?
12     A. No.
13     Q. Have you ever seen any of the signed
14 agreements?
15     A. No.
16     Q. Do you know who has possession of the
17 signed agreements?
18     A. Fisher probably has all this
19 paperwork. Neil Fisher has that.
20     Q. Why was your son John put into the deal?
21     A. Why?

102

1    Q. Yes. What was he bringing to the table

2    so to say?

3    A. He is a builder, developer. That's what

4    I do with the family. I don't put nothing in my

5    name.

6    Q. And why is that?

7    A. Read the newspapers.

8    Q. What do you mean by read the newspapers?

9    A. Look what they write about me. They

10   don't write nice things so why would I want to be

11   involved in anything anymore?

12   Q. So if I understand what you are saying

13   with regard to this, would John have been acting

14   as your agent?

15   A. No. He acts for himself. Not my agent.

16   He has his own company. Does his own business.

17   Does his own financing. He is very successful.

18   Q. Did he put any money into this

19   transaction?

20   A. No.

21   Q. Did he put any effort into this

103

1   transaction?

2      A. No.

3      Q. Was John Quinn, that is your son, you

4   referred to as J, was his name on this deal in

5   place of yours?

6      A. Was his name in place of mine? When it

7   started out it was mine. As I got gunned down I

8   would give it to him.

9      Q. How would you get compensated for your

10  input into the transaction?

11     A. We would have to see where it would take

12  me. I get a consultant fee. I get -- plus it

13  was never specific. I have been with Neil for 20

14  years and all I know the compensation was always

15  right.

16     Q. Neil would get his money through a side

17  agreement. Was there a side agreement that you

18  had with any person?

19     A. No. Oral agreements.

20     Q. This John Quinn is your son that you

21  referred to as J?

104

1      A. That's the trust they would have formed.

2      Q. After the signing of what is in Exhibit

3   2 do you have any -- that is the August

4   agreement, did you have any specific contact with

5   the project or any involvement in it?

6      A. This one?

7      Q. Yes. Referring to Exhibit 2, yes, the

8   Wyndholme project?

9      A. Yes. I told you it was minimum after

10   this.

11      Q. What was that minimum involvement?

12      A. Stop by, say hello. How are things

13   going?

14      Q. Who would you say hello to, Mr.

15   Lancelotta?

16      A. Or some of the deaf people.

17      Q. Did you have any specific recollection

18   of any contact with Mr. Lancelotta?

19      A. I don't remember when but I met him. I

20   saw him and said hello.

21      Q. When you said say hello to the deaf