0001

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MARYLAND

2

3   WYNDHOLME VILLIAGE, LLC., et al.,   *

4     Plaintiffs/Counter-Defendants,   *

5                        * CIVIL ACTION

6    vs.              * NO. L01-3809

7                         *

8   NADIF OF WYNDHOLME, LLC., et al.,   * VOLUME I

9     Defendants/Counter-Plaintiffs.   * (Pages 1-256)

10   * * * * * * * * * * * * * * * * * * * * * * * *

11

12        The deposition of JAMES M. LANCELOTTA was

13   taken on Thursday, January 16, 2003, commencing at

14   10:00 a.m., at Tydings & Rosenberg, 100 East Pratt

15   Street, Suite 2600, Baltimore, Maryland 21202,

16   before Alfred A. Betz, Notary Public.

17

18   * * * * * * * * * * * * * * * * * * * * * * * *

19   Reported by:

20        Alfred A. Betz,

21        Registered Merit Reporter

0104

1   their source of funding?

2       A.  Oh, geez, let's see.  Mr. Fisher said

3   that NADIF of Wyndholme, he said we set up our

4   company separately for E. Kennedy but NADIF is a

5   fund, it has millions and millions of dollars

6   available all the time in it, so -- and Mr.

7   Pilevsky is a principal of NADIF of Wyndholme, he

8   said we're building a Ritz-Carlton in Coconut

9   Grove, we're working on the tallest building in the

10  world to be built in Florida, showing me turncoats

11  for 500 million.

12      Q.  He said that Mr. Pilevsky was a principal

13  of NADIF of Wyndholme?

14      A.  No, no.  NADIF.  NADIF.  There's no NADIF

15  of Wyndholme yet.

16      Q.  Right.  What did you understand NADIF to

17  mean?

18      A.  North American Doctors.  They gave me a

19  business card.  Fisher was the CEO.  He told me

20  Jack Quinn was the experienced development -- the

21  reason they were so successful was because of the

0105

1  expertise of each person. Whenever I was directing

2  questions, whatever area of expertise that lied in,

3  to talk to that individual.

4      Q. What was Jack's expertise?

5      A. Developer. He told me about projects he

6  had done. They meant nothing to me on Long Island.

7  He built part of Yankee Stadium, I think.

8      Q. And what about Mr. Zukerman?

9      A. Zukerman? He was the ex-CFO of a major

10  publicly traded company and he was supposedly a

11  wizard with numbers. And he was the one that would

12  set up the financial, review the financial returns

13  for the NADIF group, and that was his job. He was

14  the finance. He was the money guy. All the monies

15  would go through him.

16     Q. Did Gotham enter the picture at that

17  point?

18     A. That day?

19     Q. That day?

20     A. No.

21     Q. When did you first hear the name Gotham?

0115

1      A.  As I told you, Mr. Fisher said he had
2   many access to cash, millions, from all different
3   avenues or sources.  I guess they didn't know who
4   they were going to use yet.
5      Q.  The gist of this provision is that
6   whatever the entity would be, it would either
7   facilitate a commitment for the construction
8   financing or -- and I'll quote in the middle of the
9   page -- in the event that a recognized lending
10  institution is not willing to issue such a
11  commitment, end quote, then whatever the entity is
12  would actually make the construction loan?
13     A.  As I told you, the whole thing with them
14  was if they didn't provide the cash necessary to
15  build the first phase, there was no sense joining
16  partners.  We were stuck in the mud.
17     Q.  This is consistent with your recollection
18  of the initial meeting with these folks?
19     A.  Oh, yeah.  It was consistent the whole
20  time.
21     Q.  But it would also be consistent of your

0245

1   A.  Right.

2   Q.  Was that correct?

3   A.  Yes.  They wouldn't take it.

4   Q.  Is that right?

5   A.  Yeah.  I didn't have the financial

6   wherewithal for them, plus -- they wouldn't take

7   it.

8   Q.  Okay.  Do you recall whether it was

9   necessary that Leeds be satisfied that First

10  Mariner or somebody was going to come up with money

11  on this thing in September?  I mean, keep in mind

12  that the bankruptcy, there was going to be a

13  reconvening of the hearing.

14   A.  You're hitting a key point.  They had to

15  believe, I mean everybody believed Fisher and crowd

16  and group were going to provide the money.

17  Regardless, whether either from a bank, here,

18  there, Pilevsky's pocket.  I don't know.  I mean, I

19  can't, in my mind now just common sense tells me

20  how in God's name would the bankruptcy court let

21  this thing go forward if they didn't think he had

0246

1   the wherewithal.  You might say why did he have the
2   wherewithal?  Anybody that puts $2 million on the
3   table, that tells me I don't have to go check them
4   out.  Somebody's putting $2 million, which they
5   have, over there.
6       Q.  But the term presented to the Court
7   wasn't a NADIF term sheet, it was a First Mariner
8   term sheet, right?
9       A.  The court, the thing doesn't say anything
10  about what kind of term sheet it has -- I told you
11  this term sheet, this is a broad interpretation.
12  This is addressed to me, it's not even addressed to
13  NADIF.  I mean, so the Court saw that.  Christ,
14  they saw my name on there, didn't they?
15          MR. SCHULMAN:  I'm going to instruct the
16  witness to watch --
17      A.  I apologize.
18          MR. SAMMONS:  It's getting a little late.
19          MR. SCHULMAN:  -- I would say his
20  colorful emphasis.
21      Q.  But your understanding of the venture

0318

1   representatives of NADIF had not contacted those

2   institutions about funding?

3       A.  No.  If they said they did, I can't

4   dispute that.

5       Q.  The next sentence says, "Although Gotham

6   was prepared to partially collateralize the loan,

7   that was not enough for the institutions."

8       Is that a correct statement?  Do you

9   remember any conversations about Gotham partially

10  collateralizing the loan?

11      A.  I'll say it again.  If I did what I was

12  supposed to do, the $7 million was supposed to be

13  there.  How they did it was not my concern.

14      Q.  But, do you recall being involved in

15  discussions where you understood somebody else

16  was providing the funding but Gotham would

17  provid some collateralization for the funding?

18      A.  I'll say it again.  You know, that was

19  not my concern.

20      Q.  Well, my question is do you recall being

21  involved in such discussions?  Were you aware

0319

1    that Gotham offered to collateralize loans from

2    other lending institutions in order to get the deal

3    done?

4        A.  It says it right here.  I mean this is

5    what you're telling me here.  It was "prepared

6    to partially collateralize."  To refer to the

7    previous exhibit, you know, if they would fully

8    guarantee or pledge securities they would --

9    there might be an opportunity to finance this

10   transaction.

11       Q.  But my question is specific to this

12   sentence I just read, where Mr. Fisher tells you

13   that Gotham was prepared to partially collateralize

14   the loan.  And my question is, do you recall that

15   being a fact?  Did you know at the time that Gotham

16   was prepared to partially collateralize the loan,

17   notwithstanding the fact that Gotham had made it

18   clear that they weren't going to be involved in

19   this project?

20           MR. SCHULMAN:  Objection.

21           THE WITNESS:  I don't know how to answer

0320

1   that. I'm going by what Fisher told me here. If

2   somebody told me that Gotham had $500 million,

3   however they got me the $7 million was their

4   business.

5         BY MR. SAMMONS:

6     Q. Well, let me ask you this question then.

7   Do you believe that Mr. Fisher was telling you

8   the truth when he said that Gotham was prepared

9   to partially collateralize the loan?

10    A. I have no reason to doubt what you're

11  saying. You know, I couldn't verify it either way.

12  If you ask me that question today, my answer might

13  be different.

14    Q. Well, what is your answer today?

15    A. I don't know if I would believe Fisher

16  today. Because based on the information I've seen,

17  he didn't have the authority to say this anyway.

18  That was news to me.

19    Q. Didn't have the authority to --

20    A. He said he was never a member of NADIF.

21  I always thought he was the managing partner who