1

1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3

4    WYNDHOLME VILLAGE, LLC, et al :

5    Plaintiffs/Counterdefendants  :

6      Vs.                  : CIVIL ACTION NO.

7    NADIF OF WYNDHOLME, LLC, et al:    L01-3809

8    Defendants/Counterplaintiffs  :

9

10

11         Deposition of JOHN R. QUINN, taken on

12    Friday, March 14, 2003, at 10:13 a.m., at the law

13    offices of Tydings & Rosenberg, LLC, 100 E. Pratt

14    Street, 26th Floor, Baltimore, Maryland, before

15    Bonnie L. Russo, Notary Public.

16           ------------------------

17

18

19

20    Reported by:

21    Bonnie L. Russo

1    in Maryland?

2        A.  Yes.

3        Q.  Where and for what purpose?

4        A.  I met him at the Ritz Carlton site and I

5    don't remember but I think it was about putting

6    equity in the Ritz Carlton deal.

7        Q.  Now, returning to Exhibit 3, look at

8    page 4 if you would, please.

9            Maybe before we do that have you ever

10    met with Mr. Berkowitz here in Maryland?

11        A.  No.

12        Q.  Do you know whose signature it is for

13    Gotham Q Venture 1, LLC?

14            Do you know who signed?

15            Do you know whether that's Mr.

16    Berkowitz's signature?

17        A.  I see.  I don't know.

18        Q.  Do you know who Gotham Partners, LP is?

19        A.  No.

20        Q.  Do you know what Gotham Q Venture 1, LLC

21    is?

98

1      A.  I don't think it was ever formed.  It

2   was an entity that was intended to be formed.

3      Q.  How do you know it was never formed?

4      A.  I said I don't think it was ever formed.

5   I'm not sure.

6      Q.  Why do you say that?

7      A.  I don't know why I said it.  Maybe it

8   was formed.  I don't know if it was formed.

9      Q.  Who is Section H Partners, LP?

10      A.  Where is that?

11      Q.  You see agreed and accepted.  To the

12   right of that.

13      A.  I don't know.

14      Q.  How about DPB Corp?

15      A.  Don't know.

16      Q.  Now, what is Mountainbrook Trust?

17      A.  Mountainbrook Trust was -- is Howard

18   Zukerman's trust.

19      Q.  When you say trust where was that trust

20   formed?

21      A.  I have no idea.

99

1     Q. Do you know who formed it?

2     A. No.

3     Q. Do you know whether Mr. Berkowitz had a

4    relationship to Mountainbrook Trust?

5     A. Don't know.

6     Q. How about Jolipenny II Trust?

7       Do you know what that is?

8     A. That would be my son.

9     Q. And it says John Quinn there. Is that

10    your son?

11     A. Yes.

12     Q. And that's who you referred to earlier

13    as J?

14     A. Yes.

15     Q. And what is the Jolipenny II Trust?

16     A. It was -- I believe it was going to be a

17    trust to do this transaction of which I don't

18    believe it ever got formed.

19     Q. How would that transaction supposed to

20    work?

21     A. You mean as far as percentages?

1    Q.  Yes.

2    A.  Gotham would have got 50 percent of the

3    company.  And then probably it was thirds after

4    that of 50 percent.

5    Q.  And how did the Jolipenny II Trust

6    specifically work?

7    A.  I don't think it had -- I think it would

8    just be formed to do this.  Again, I never got

9    involved in these kinds of details.  I never

10    understood that.  Never.

11    Q.  How is Mr. Fisher going to get

12    compensated for his efforts with regard to this

13    transaction?

14    A.  He would have probably put it to some

15    kind of trust himself.

16    Q.  I don't see Mr. Fisher's name in this

17    document.  How would he or perhaps --

18    A.  It would have probably -- if his name

19    isn't in something you can rest assured he didn't

20    sign it behind the scenes.  He is in and wherever

21    he directs us to give our piece of whatever we

101

1    earn it's a side agreement or a different

2    agreement.

3        Q.  So is it your belief that there is a

4    side agreement someplace by which Mr. Fisher or

5    someone that he would designate would receive

6    part remuneration or compensation?

7        A.  It would be some type of an agreement

8    that he would get compensated X.  Or not him.

9    Whoever he designates to do it.

10        Q.  Have you known him to designate anybody

11    other than TJ?

12        A.  No.

13        Q.  Have you ever seen any of the signed

14    agreements?

15        A.  No.

16        Q.  Do you know who has possession of the

17    signed agreements?

18        A.  Fisher probably has all this

19    paperwork.  Neil Fisher has that.

20        Q.  Why was your son John put into the deal?

21        A.  Why?

1    Q.  Yes.  What was he bringing to the table

2    so to say?

3    A.  He is a builder, developer.  That's what

4    I do with the family.  I don't put nothing in my

5    name.

6    Q.  And why is that?

7    A.  Read the newspapers.

8    Q.  What do you mean by read the newspapers?

9    A.  Look what they write about me.  They

10    don't write nice things so why would I want to be

11    involved in anything anymore?

12    Q.  So if I understand what you are saying

13    with regard to this, would John have been acting

14    as your agent?

15    A.  No.  He acts for himself.  Not my agent.

16    He has his own company.  Does his own business.

17    Does his own financing.  He is very successful.

18    Q.  Did he put any money into this

19    transaction?

20    A.  No.

21    Q.  Did he put any effort into this

103

1    transaction?

2        A.  No.

3        Q.  Was John Quinn, that is your son, you

4    referred to as J, was his name on this deal in

5    place of yours?

6        A.  Was his name in place of mine?  When it

7    started out it was mine.  As I got gunned down I

8    would give it to him.

9        Q.  How would you get compensated for your

10    input into the transaction?

11        A.  We would have to see where it would take

12    me.  I get a consultant fee.  I get -- plus it

13    was never specific.  I have been with Neil for 20

14    years and all I know the compensation was always

15    right.

16        Q.  Neil would get his money through a side

17    agreement.  Was there a side agreement that you

18    had with any person?

19        A.  No.  Oral agreements.

20        Q.  This John Quinn is your son that you

21    referred to as J?

104

1     A.  That's the trust they would have formed.

2     Q.  After the signing of what is in Exhibit

3  2 do you have any -- that is the August

4  agreement, did you have any specific contact with

5  the project or any involvement in it?

6     A.  This one?

7     Q.  Yes.  Referring to Exhibit 2, yes, the

8  Wyndholme project?

9     A.  Yes.  I told you it was minimum after

10  this.

11     Q.  What was that minimum involvement?

12     A.  Stop by, say hello.  How are things

13  going?

14     Q.  Who would you say hello to, Mr.

15  Lancelotta?

16     A.  Or some of the deaf people.

17     Q.  Did you have any specific recollection

18  of any contact with Mr. Lancelotta?

19     A.  I don't remember when but I met him.  I

20  saw him and said hello.

21     Q.  When you said say hello to the deaf

123

1    of property where the Ritz is going.  Not keeping

2    it.  Getting an option to buy it.

3        Q.  The we you are referring to is whom?

4        A.  My son, Neil Fisher, and whoever his

5    people are.

6        Q.  And who owns that property at present?

7        A.  It's owned by the company that owns the

8    Ritz.  Dean Adler and his company own it.

9        Q.  What was the amount of the fee that you

10   received?

11       A.  Several hundred thousand.

12       Q.  And was that divided -- how was that

13   divided?

14       A.  I don't remember.  It went into the

15   business.

16       Q.  What was that business?

17       A.  I don't remember.

18       Q.  Did Fisher receive any of it?

19       A.  I don't know if he did or didn't.

20   Whatever he did or whatever he got is up to him.

21       Q.  Do you know how much Fisher got out of

124

1    that transaction?

2        A.  No.

3        Q.  Do you know how much his wife got out of

4    the transaction, if anything?

5        A.  No.

6        Q.  Who would know that?

7        A.  Fisher.

8        Q.  What did the other participants get out

9    of the transaction?  That is in terms of this

10    commission?

11        A.  Nothing.  You wound up having an option

12    -- right now my son has the option on that piece

13    of property with his wife, with Neil Fisher's

14    wife.

15        Q.  You mentioned there was several $100,000

16    was the amount of the commission.  What did you

17    mean by several $100,000?

18        A.  I don't remember the amount.

19        Q.  Well, was it --

20        A.  I never paid attention to that.

21        Q.  Was it 200,000 or 900,000?

125

1        A. I don't know.  Ask Fisher what he got.

2        Q. I am asking what the overall commission

3     was.  Do you know approximately what it was?

4        A. I don't think it was a commission.  It

5     was just a fee.  It was say hi.  This is what you

6     want to take over this.  This is what you pay

7     me.  That's what it had to be at that time.  I

8     don't remember what.

9        Q. Of that fee Fisher received some amount

10     but you don't know what, as I understand what you

11     are saying; is that correct?

12        A. I don't know who got the money.

13        Q. Did your son receive any of the money?

14        A. Probably.

15        Q. And who else besides your son?

16        A. I don't know.

17        Q. You said the money went into a business?

18        A. I'm not sure where it went.  I just told

19     you it was some money that was made there. Where

20     it went that's not what I do.

21        Q. You mentioned TJ Fisher and your son

126

1    John have an option on the property or had an

2    option on the property?

3        A.  Yes.

4        Q.  Do they still have the option?

5        A.  No.

6        Q.  What happened?

7        A.  They sold their interest.

8        Q.  Who did they sell it to?

9        A.  Ed Gianesca.

10       Q.  Who is that?

11       A.  The guy that is running the job over

12    there.

13       Q.  For the Ritz?

14       A.  Yeah.

15       Q.  And what did they sell their option to

16    them for?

17       A.  You mean why did he sell it?

18       Q.  Yes.  As I understand, there was an

19    option?

20       A.  Yes.  To get out -- with all the

21    newspaper articles here and everything we didn't

127

1      need -- when this deal closes any money put in by

2      anybody is supposed to come out of it.  So we

3      didn't take a loss.

4          Q.  What monies did you put into it?

5          A.  I don't know.

6          Q.  Who would have that information?

7          A.  Neil.

8          Q.  And what about -- would your son know?

9      Do you know what your son and TJ Fisher received

10     for signing over their option?

11         A.  No.

12         Q.  Have you ever discussed that with your

13     son?

14         A.  No.

15         Q.  How were you to get something out of the

16     Ritz Carlton project for your efforts?

17             MR. SAMMONS:  Let me object.  I can't

18     imagine how this is getting relevant to our case.

19             MR. SCHULMAN:  You will find out one

20     day.

21             MR. SAMMONS:  Taking the Ritz Carlton

128

1    all the way down?  I don't see any reason to go

2    any further.

3          Answer his question.

4          MR. SCHULMAN:  Are you going to instruct

5    him?  As long as I am not being abusive, and I am

6    not being abusive --

7          MR. SAMMONS:  Not in terms of your

8    style.  Your questions are well framed.  I don't

9    have any problems with the questions.  There has

10    to be some relevance to all of this before it's

11    proper and subject to discovery.

12          THE WITNESS:  What was the question?

13          MR. SCHULMAN:  Can you read the

14    question?

15          (The record was read as requested.)

16          THE WITNESS:  My son takes very good

17    care of me.

18          BY MR. SCHULMAN:

19    Q.  How did your son take care of you with

20    regard to the Ritz Carlton projects?

21    A.  I don't think he has ever taken care of

129

1    me anything specific.  I have a home that I live

2    in that he owns.  He pays my car.  Pays my

3    expenses.  I help him wherever I can.

4        Q.  Have you ever declared bankruptcy?

5        A.  Pardon me?

6        Q.  Have you ever declared bankruptcy?

7        A.  Yes.

8        Q.  Where and when?

9        A.  I declared bankruptcy twice.  Both in

10    New York and I don't remember the dates.

11        Q.  Do you remember the year?

12        A.  No.

13        Q.  Do you remember what court?

14        A.  No.

15        Q.  Do you know whether it was a broker?

16        A.  I don't know.

17        Q.  Do you know what lawyers -- did any

18    lawyers assist you?

19        A.  I don't remember who they were.

20        Q.  Why did you declare bankruptcy the first

21    time?

1  A. Why? I guess I had a lot of financial

2 problems.

3  Q. In general terms what were the nature of

4 the financial problems?

5  A. I don't remember.

6  Q. What about the second time?

7  A. Same thing.

8  Q. Do you know how many years ago you last

9 declared bankruptcy?

10  A. Maybe three.

11  Q. Do you know why you declared bankruptcy

12 three years ago?

13  A. Yes. I had a problem.

14  Q. What was the problem?

15  A. I owed the government about -- some

16 serious money.

17  Q. What was the nature of that money?

18  A. I don't know what it was over the years.

19 I just owed the money. Taxes.

20  Q. Do you know were there any tax liens

21 ever recorded against you to your knowledge?

131

1       A. I imagine a lot of them. A lot of liens

2   against me. I don't know what they are but there

3   were a lot of liens. That's what forced me into

4   these situations.

5       Q. 17 Hollow Way is owned by your son John?

6       A. No. Yes.

7       Q. I believe you said you lived at Middle

8   Cross Lane for 19 years?

9       A. Yes.

10      Q. Was that sold at foreclosure?

11      A. Yes.

12      Q. What year?

13      A. Five or six years ago. Seven years ago.

14      Q. Who was the foreclosing party?

15      A. The bank.

16      Q. What bank?

17      A. Don't remember. It wasn't a bank. It

18  was someone that bought the note from the bank.

19      Q. Was it -- what bank was it?

20      A. I think CitiBank sold the note to

21  someone else and then someone else bought it and

132

1    they foreclosed.

2        Q.  Was the last foreclosure before or after

3    you became involved in the Ritz Carlton project?

4        A.  Before.

5        Q.  Do you have any cars in your own name?

6        A.  No.

7        Q.  Do you own any property in your own

8    name?

9        A.  No.

10       Q.  When is the last time you owned any --

11          MR. GOLDBERG:   I'm going to object.

12          MR. SCHULMAN:  I ask the witness to step

13    out and I will put it on the record.

14          MR. GOLDBERG:  That's fine.

15          MR. SCHULMAN:  Do you want to step out

16    so we can discuss this.

17           (The witness was excused from the

18    conference room.)

19          MR. SCHULMAN:  First of all, it should

20    be Mr. Sammons' objection.  You can't do two.

21          MR. GOLDBERG:  I don't think there is

133

1   such a rule in depositions.

2       MR. SAMMONS:  I object.  Right now the

3   only things you are asking are -- the only

4   possible relevance of what you are asking would

5   be relating to any possible attempt that you may

6   have sometime down the road to collect on a

7   judgment.  This guy's current assets are not

8   relevant to this litigation.

9       MR. SCHULMAN:  A central issue in this

10  litigation is the allegation that these guys came

11  in and said we can write a check for $7 million

12  if we want to.  We contend they were frauds.

13  This guy has been through bankruptcies.  He has

14  no assets.  He has been less than candid in this

15  deposition, at least I suspect.  I can't believe

16  he doesn't remember all this stuff.

17      I think I am entitled to establish the

18  absence of any assets and I am getting there and

19  I think that's why you shouldn't interrupt at

20  this juncture.

21      MR. GOLDBERG:  I can object any time I

134

1     want to make a valid objection.

2          MR. SCHULMAN:  Please lower your voice.

3          MR. SAMMONS:  I don't know of any

4     allegation in this case that Mr. Quinn ever

5     represented that he was going to put up any money

6     or that he personally had the wherewithal to put

7     up any money.  There is not an allegation to that

8     effect in this case.

9          MR. SCHULMAN:  There certainly is.

10          MR. SAMMONS:  There certainly is not.

11     The allegations in this case are in an affidavit

12     and in a complaint.  Open them up and show me

13     where that is alleged.

14          MR. SCHULMAN:  He is holding himself out

15     as a successful developer.

16          MR. SAMMONS:  Sounds like he was

17     successful.

18          MR. SCHULMAN:  Doesn't own any property.

19     Doesn't do this.  He has these scams. Declaring

20     bankruptcy like Fisher is declaring and not

21     putting the assets down.

135

1          MR. SAMMONS:  Like your client.

2          MR. SCHULMAN:  Look --

3          MR. SAMMONS:  There is no allegation in

4     this case that Jack Quinn ever said that he had

5     money or that he would put up money.

6          MR. SCHULMAN:  Lower your voice.  I

7     don't want to get -- you guys are getting

8     heated.  I don't want to get on a tangent.

9          If you instruct him not to answer we

10     will get a magistrate to decide that.  Tell him

11     not to answer.  That's fine.  I don't think he

12     has any personal property.  That is relevant to

13     this case.  It is arguably relevant to lead to

14     discoverable evidence.

15          MR. SAMMONS:  What he has today has no

16     relevance to 1999.

17          MR. SCHULMAN:  He said three, four years

18     ago.

19          MR. GOLDBERG:  Collectability if you

20     should ever get a judgment and --

21          MR. SCHULMAN:  These guys don't have

136

1    money.  How can you say that with a straight

2    face?

3        Don't point your finger.

4        MR. GOLDBERG:  I will point my finger

5    and raise my voice if I want.

6        MR. SCHULMAN:  Let's take a break.

7    When you calm down I will come back.

8        MR. GOLDBERG:  I'm calm.

9        MR. SCHULMAN:  No, you are not.  I am

10    walking to the men's room and I will be back when

11    you calm down.  I will take the whole seven hours

12    with this guy.

13        MR. SAMMONS:  Should we take a lunch

14    break?

15        MR. SCHULMAN:  How many interruptions we

16    will get?  I want to keep going.

17        I will go to the men's room.  I will

18    continue this line of questioning.  If you

19    instruct him not to answer, that's fine.

20        (A short recess was taken.)

21        BY MR. SCHULMAN:

137

1    Q.  Let me start the question over again.

2        When was the last time you owned any

3    personal property?

4        MR. SAMMONS:  I object to the

5    question.  I instruct the witness not to answer.

6        BY MR. SCHULMAN:

7    Q.  Did you own any personal property as of

8    the date when Exhibit 2 was signed?

9        MR. SAMMONS:  Objection.  You can

10   answer.

11       THE WITNESS:  No.

12       BY MR. SCHULMAN:

13   Q.  Did you own any personal property as of

14   July 8, 1999, the date reflected on the first

15   page of Exhibit 1?

16       MR. SAMMONS:  Objection.  You can

17   answer.

18       THE WITNESS:  No.

19       BY MR. SCHULMAN:

20   Q.  Did you own any real property as of July

21   8, 1999?

138

1          MR. SAMMONS:  Objection.  You may

2    answer.

3          THE WITNESS:  No.

4            BY MR. SCHULMAN:

5        Q.  Did you own any real property as of the

6    time Exhibit 2 was signed?

7          MR. SAMMONS:  Objection.

8          THE WITNESS:  No.

9            BY MR. SCHULMAN:

10       Q.  Did you file your last bankruptcy -- I

11    think you may have answered this already.  I

12    understood you to state that you filed your last

13    bankruptcy before Exhibit 2 was signed; is that

14    correct?

15       A.  Yes.

16       Q.  Do you know how long before?

17       A.  No.

18       Q.  Do you know whether you had filed your

19    last bankruptcy before July 8 of 1999?

20       A.  Yes.

21       Q.  And your answer is that it was before

195

1      Q.  Where is he located now?

2      A.  Don't know.

3      Q.  Where did he reside the last you knew?

4      A.  Brookville.

5      Q.  Have you retained copies of your tax

6   returns in the past five years?

7      A.  No.

8      Q.  Have you filed tax returns with the

9   United States Government in the past five years?

10        MR. SAMMONS:  Objection.  I instruct him

11   not to answer.

12        MR. SCHULMAN:  What is the basis of the

13   privilege?

14        MR. SAMMONS:  It is not a privilege.

15   It has nothing to do with this case.  Fundamental

16   issue has to be marginally limited to the subject

17   of the litigation.

18        BY MR. SCHULMAN:

19      Q.  Did you file tax returns for the tax

20   years 1999?

21      A.  I don't think so.

196

1        Q.  Did you file federal tax returns that

2    year?

3        A.  I don't think so.

4        Q.  What about state return?

5        A.  I don't think I filed any returns.

6        Q.  When was the last time you filed a

7    federal tax return?

8        A.  Don't know.

9        Q.  Are you able to approximate?

10        A.  No idea.

11        Q.  Do you know who paid TJ Fisher any

12    monies concerning the Ritz Carlton project?

13        A.  Don't know.

14        Q.  Do you know whether it was any entity

15    associated with Richard Swinno?

16        A.  No, it wasn't.

17        Q.  Did you own the building in which the

18    computer company was housed?

19        MR. SAMMONS:  Objection to the form of

20    the question.  Him personally?  Mr. Quinn

21    personally?