# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

## Civil Action No. L01-3809

_____

## WYNDHOLME VILLAGE, LLC, et al.

### Plaintiffs and Counterdefendants

### v.

## NADIF OF WYNDHOLME, LLC, et al.

### Defendants and Counterplaintiffs

_____

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

William C. Sammons, Bar No. 02366
Stephen M. Goldberg, Bar No. 01156
  Tydings & Rosenberg LLP
  100 East Pratt Street
  26th Floor
  Baltimore, Maryland  21202
  (410) 752-9700

Attorneys for Defendants and
Counterplaintiffs

_____

#348933

## Table of Contents

INTRODUCTION ................................................................................................ 1

FACTS .............................................................................................................. 2

STANDARD OF REVIEW .............................................................................. 13

ARGUMENT ................................................................................................... 13

   I.    THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR
       SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' FRAUD
       CLAIM. ................................................................................................ 13

       A.    Fisher's Alleged Statements Regarding Financing For The
             Wyndholme Project Are Not Actionable. ............................... 14

             1.    Fisher's alleged statements were made before a contract was
                  entered into between the parties regarding a term that is
                  explicitly addressed in the contract. ........................... 15

             2.    The plaintiffs did not rely on Fisher's alleged statements. ...... 18

           B.    The Plaintiffs Cannot Prove That The Defendants Intended To
             Defraud The Plaintiffs At The Time That The Parties Entered Into
             The August Venture Agreement. ........................................... 19

           C.    The Plaintiffs Cannot Sustain A Cause Of Action For Fraud By
             Omission Because The Defendants Had No Duty To Disclose Quinn's
             Conviction. ....................................................................... 24

           D.    The Statements That Fisher Allegedly Made Regarding The
             Experience And Success Of The Defendants In The Industry Were
             Statements Of Opinion And Not Statements Of Material Fact, And
             The Plaintiffs Did Not Rely On The Alleged Statements. ............ 25

           E.    The Plaintiffs Cannot Prove That They Were Damaged As A Result
             Of Their Reliance On The Defendants' Alleged Misrepresentations. 27

  II.   THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR
       SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' BREACH
       OF CONTRACT COUNT. ................................................................... 29

     **A.**     **Even If NADIF's Failure To Obtain Construction Financing From A Third Party Was A Breach Of The August Venture Agreement, The August Venture Agreement Provided For The Plaintiff's Remedy. .. 29**

     **B.**     **The Plaintiffs Are Estopped From Bringing Their Breach Of Contract Claim Against NADIF .............................................................................. 32**

**III.**  **THE COURT SHOULD DISMISS THE PLAINTIFFS' DAMAGE CLAIMS BECAUSE THEY ARE SPECULATIVE AND NOT SUPPORTED BY THE EVIDENCE ........................................................................................ 34**

     **A.**     **The Plaintiffs' Lost Income Claim Is A Speculative Claim For Lost Profits That Cannot Be Determined With Any Reasonable Degree Of Certainty. .............................................................................................. 34**

     **B.**     **The Plaintiffs' Other Claimed Damages Are Unsupported By The Evidence. ............................................................................................. 37**

**IV.**  **THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' EQUITABLE CLAIMS. ............................................................................ 38**

     **A.**     **The Plaintiffs Are Not Entitled To The Rescission Remedy. .............. 38**

          **1.**     **The plaintiffs waived their right to seek rescission of the August Venture Agreement. ........................................................ 38**

          **2.**     **The plaintiffs are collaterally estopped from challenging NADIF's lien because it was judicially created and authorized. ................................................................................. 40**

          **3.**     **To the extent that rescission of the NADIF lien is sought, Leeds is a necessary party. ................................................................. 43**

     **B.**     **The Court Should Deny The Plaintiffs' Request For A Constructive Trust And Receivership Because The Remedies Are Extreme And Duplicative, And Because The Plaintiffs Are Unlikely To Prevail On The Merits Of Their Fraud Claim. ......................................................... 44**

**CONCLUSION ............................................................................................................ 45**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **WYNDHOLME VILLAGE, LLC,** *et al.* | * | |
| **Plaintiffs and Counterdefendants** | * | |
| **v.** | * | **CIVIL ACTION NO.  L01-3809** |
| **NADIF OF WYNDHOLME, LLC,** *et al.* | * | |
| **Defendants and Counterplaintiffs** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

NADIF of Wyndholme, LLC ("NADIF"), WVI, LLC ("WVI"), John R. "Jack" Quinn ("Quinn"), and Howard "Rusty" Zukerman ("Zukerman"), some of the defendants[1] ("defendants"), have moved for summary judgment on all claims brought by Wyndholme Village, LLC ("Wyndholme Village"), James M. Lancelotta ("Lancelotta") and Katherine A. Lancelotta ("Mrs. Lancelotta"), (the "plaintiffs"), in the above case. This memorandum will explain why summary judgment against the plaintiffs is now required.

## INTRODUCTION

The disputes in this case center on a failed real estate development in Baltimore City known as Wyndholme Village. Wyndholme Village, the "vision" of plaintiff Lancelotta, was to be a retirement community for the deaf and hard-of-hearing community. For more than four years, Lancelotta attempted to persuade institutional and private investors to provide the funding necessary to bring his "vision" to fruition, approaching more than 30 prospective investors/lenders between September 1998 and

---

[1]     A fifth defendant, Stuart Cornelius ("Neil") Fisher has filed a suggestion of bankruptcy, and this action has been stayed as to him.  Mr. Fisher is not represented by counsel in this action.

June 1999.  Only one of those 30-plus prospects invested in Lancelotta's "vision."  That one was a development group consisting of the defendants in this case.  In August 1999, NADIF entered into an agreement with Lancelotta and Wyndholme Village and, consistent with obligations undertaken in that agreement, it and WVI provided funds, as loans, to the project exceeding $2 million.  In spite of that infusion of cash, the project did not go forward and not one penny has been repaid.

Lancelotta, and the other plaintiffs, have now sued NADIF and WVI, ironically the <u>only</u> investors who were willing to run the risk of investing in Lancelotta's "vision," claiming that Lancelotta was misled when he agreed to take their money, and that the defendants never really intended to go forward with the project but, rather, intentionally caused the project to fail.  Aside from the absurdity of the premise that the defendants would put up $2 million for the purpose of making the project fail, the plaintiffs' claims are legally flawed.[2]

Discovery is now over, and although the plaintiffs will attempt to create a smoke screen using <u>ad hominem</u> attacks on the individual defendants and manufactured assertions of reliance on precontract negotiations, an objective review of the record in this case will make clear that the plaintiffs simply do not have a claim.  There are only a few material facts in this case, and they will be undisputed.  Thus, the defendants are entitled to judgment as a matter of law.

## FACTS

In 1995, Lancelotta began assembling property for the creation of Wyndholme

---

[2]     For more than two years, the plaintiffs pursued a claim for fraud and this memorandum focuses primarily on that claim.  In April 2003, the Court granted the plaintiffs' motion to amend their complaint to add claims for breach of contract, rescission, and other equitable remedies.  For reasons already advanced in the defendants' opposition to the plaintiffs' motion to amend, <u>see</u> Electronic Filing Document No. 56, and as will be amplified below, summary judgment is also appropriate on those added counts.

Village.  See Bankruptcy Hearing 1/11/00 Transcript, attached as Exhibit 1, at 201-202.

By 1996, Baltimore City had approved the plans to build Wyndholme Village, and

Lancelotta had begun the development process.  See Amended Complaint ¶ 6.  Lancelotta

intended Wyndholme Village to be a retirement community primarily for the deaf and

hard-of-hearing seniors.  Id. at ¶ 7.

As of September 1998, the Wyndholme Village property was subject to a first lien

held by purchase money lender Leeds Federal Savings Bank ("Leeds"), a second lien in

favor of Metropolitan Bank & Trust ("Metropolitan"), and a third lien in favor of a site

development firm that had performed work on the project.  Id. at ¶ 8.  Having assembled

the land (with borrowed funds), Lancelotta needed significant financial backing to carry

the project forward.  See James Lancelotta Deposition Transcript, attached as Exhibit 2,

at 32–34, and Curtis Coon Deposition Transcript, attached as Exhibit 3, at 23.

By late March 1999, the Metropolitan loan was in default, and it had filed for

foreclosure.  See Amended Complaint ¶ 10.  Unable to raise the capital to pay off the

existing secured loans and bring the project to fruition, Lancelotta caused Wyndholme

Village to file for protection under Chapter 11 of the United States Bankruptcy Code on

the day of the Metropolitan foreclosure sale.  Id. and Exhibit 2 at 72-74.  With the

Metropolitan foreclosure automatically stayed, Lancelotta continued his efforts to obtain

funding with a view towards reorganizing Wyndholme Village and coming out of

bankruptcy with a viable source of financing.  Id.  By the time Wyndholme filed for

bankruptcy protection in March 1999, Lancelotta had approached at least 19 prospective

lenders/investors, and he approached at least another 11 by June 1999.  See List of

Funding Requests, attached as Exhibit 4.

In May or June 1999, a broker introduced Lancelotta to Phillip Pilevsky ("Pilevsky"), a New York real estate developer/investor.  See Exhibit 2 at 94-98. Lancelotta met with Pilevsky in Pilevsky's New York office, explained his project, outlined what he believed to be the economics, and urged Pilevsky to provide the needed funding.  Id.  Pilevsky was interested.  Id.  He asked defendants Fisher, Quinn, and Zukerman, with whom he had worked in the past, to meet with Lancelotta and to make an assessment as to whether he, Pilevsky, should invest in Lancelotta's project.  Id.  The three of them met with Lancelotta in Baltimore on June 8, 1999, at the Wyndholme Village site and, later that day, met with Lancelotta and his two Baltimore attorneys, Curtis Coon (Lancelotta's personal attorney) and Howard Rubenstein (Wyndholme Village's bankruptcy attorney) at Rubenstein's office.  Id. at 108.

The parties came away from those meetings with an outline of a business deal prepared by Lancelotta.  See Outline of Business Deal, attached as Exhibit 5 and Howard Rubenstein Deposition Transcript, attached as Exhibit 6, at 19-20.  Based on that outline, and accepting its accuracy for the purpose of this motion, the principal points of understanding apparently were that:

> ▸ Pilevsky, referred to as "PHI" in Lancelotta's contemporaneous summary, would lend $750,000 to Wyndholme Village to take care of its immediate cash needs.

> ▸ The parties would request the bankruptcy court to approve a "super-priority lien," that is, a lien on the Wyndholme Village property that would come ahead of the three existing liens, to secure the $750,000 loan.

➤    PHI would "cause funding of a construction loan" for the project.[3]

➤    Entities controlled by Lancelotta would be the general contractor and the broker/sales agent on the project and would be compensated for those efforts.

➤    The parties (that is Lancelotta on the one hand, and Pilevsky's entity on the other) would split the proceeds of the project 50/50 after repaying all obligations (with the $750,000 loan being the first priority payment).

See Exhibit 5.  Having reached an agreement in principle, the parties set out to negotiate the specifics and the terms of a written agreement that would have to be approved by the Bankruptcy Court.  See Exhibit 2 at 120-121.  The parties anticipated that Pilevsky would form a single-purpose entity that would be the vehicle through which he and his associates would do business related to Lancelotta and Wyndholme Village.  See Amended Complaint ¶ 12.  And on July 2, 1999, Fisher caused the creation of defendant NADIF of Wyndholme, LLC, to be that entity.  See NADIF LLC Formation Records, attached as Exhibit 7.

The deposition record in this case contains at least 8 drafts of agreements, and other writings reflecting changes in drafts, exchanged between the parties as they negotiated the first venture agreement.  See Williams C. Sammons Affidavit, attached as Exhibit 8.[4]  Both sides were represented by experienced counsel.  See Exhibit 3 at 48-52.

There were many issues addressed in the negotiations but, central to the plaintiffs'

_____

[3]        The quotation comes from Lancelotta's summary, Exhibit 5.  It is unclear, and likely disputed, how much, if any, of the construction financing was to be provided by PHI, based on the initial discussions. As discussed fully below, however, the issue is not material because the obligation of Pilevsky's investment group to provide funding ultimately disappeared from the deal.

[4]        References in those drafts suggest that there were many other versions that, for reasons that are unclear and probably unimportant, are no longer around and are not included in the record.  See Exhibit 8.

claims in this case, was the provision regarding construction financing for the project. A June 30 draft of the parties' agreement required NADIF to obtain the construction financing from a third party or, alternatively, to guarantee the loan or to have an affiliate make the loan. See Draft of July Agreement, attached as Exhibit 9, ¶ 9. Negotiations continued, and on July 8, 1999, NADIF and Wyndholme Village signed an agreement that contained language regarding construction financing similar to that found in the June 30 draft. See July Agreement, attached as Exhibit 10, ¶ 9.

In order to be effective--binding and enforceable--the July Agreement had to be submitted to and approved by the Bankruptcy Court. See Exhibit 6 at 36. A hearing was held on August 4, 1999, at which the July Agreement was presented to the Bankruptcy Court for its approval. See Bankruptcy Hearing 8/4/99 Transcript, attached as Exhibit 11, at 13. The two principal creditors, Leeds and Metropolitan, attended and strenuously objected to the creation of the super priority lien and to the July Agreement. Id. at 18-32. The Court adjourned the proceeding without approving the agreement. Id. at 95-96.

At about the same time, Pilevsky decided not to go forward with the Wyndholme Village project. See Exhibit 2 at 230-31. He advised Fisher of his intention to withdraw from the deal, and Fisher advised Lancelotta. Id. Fisher, Quinn, and Zukerman sought a new financial backer for the project and, through mutual business contacts, they were introduced to Gotham Partners LLP ("Gotham"), a New York-based hedge fund. See Stephen Garchik Deposition Transcript, attached as Exhibit 12, at 25-26, 40.[5] Zukerman prepared a summary of the Wyndholme Village project and delivered it to Stephen Garchik, a Maryland based consultant for Gotham. See Zukerman Memorandum to

---

[5] Among the investors in Gotham were members of the Rockefeller family, entertainment mogul David Ovitz, and members of the Ziff and Ackman families, both substantial New York area real estate investors. Exhibit 12 at 63-64.

Gotham, attached as Exhibit 13, and Exhibit 12 at 145. Gotham decided to participate in the deal. <u>See</u> Exhibit 12 at 122.

With a new financial backer for the project, and the July Agreement having been rejected by the secured creditors, the parties began to negotiate a new agreement. <u>See</u> Exhibit 3 at 83-85. As was true of the June-July negotiations, the record reveals multiple drafts of the agreement being negotiated in August of 1999. <u>See</u> Exhibit 8. The August drafts were quite different from the July Venture Agreement. For instance, and of particular importance to this case, was the complete elimination of language requiring NADIF (or its affiliates) either to guaranty or to provide directly any construction funding for the project. Thus, a draft dated August 13, 1999, limited NADIF's obligation to "exercise its good faith efforts to cause a commitment or term sheet to be issued for construction financing." <u>See</u> Draft of the August Venture Agreement, attached as Exhibit 14, at ¶ 10. Appearing for the first time was language that dealt with the relationship between construction financing and the parties' respective interest in the project. <u>Id</u>. The August 13 draft proposed that NADIF would get 50% of the project, even if it was unable to obtain the term sheet or commitment. <u>Id</u>. While that provision was subsequently dropped, the point here is that the <u>deal was changing</u>. The parties continued to negotiate, with the language regarding the construction financing and the conditions under which NADIF would be entitled to receive a 50% interest in the project, being the principal points of contention. <u>See, e.g.</u>, Coon Letter to Fraga dated 8/17/99, attached as Exhibit 15 and Exhibit 3 at 108-110. In order to deal with the Metropolitan objection and to relieve financial pressure, the parties began to make arrangements for a friendly entity to purchase the Metropolitan loan, renegotiate its terms, and forebear from

collection efforts.   See Exhibit 14 ¶ 23, Exhibit 2 at 223, and Exhibit 6 at 51.

Lancelotta, Quinn, Zukerman, and Fisher met all day on August 30, 1999, to

negotiate a final deal.   See Exhibit 2 at 202-205.  Both sides continued to be represented

by counsel.  Id.   Drafts and redrafts were prepared.  Id.   Finally, in the early morning

hours of August 31, 1999, the parties entered into an agreement to finalize their

arrangement.   See August Venture Agreement, attached as Exhibit 16, and Exhibit 2 at

202-205.  That agreement was different in many respects from the July Agreement.

Terms new to the deal included: (a) NADIF would loan Lancelotta $100,000, personally;

(b) NADIF would provide an unsecured loan to the Wyndholme Village project in the

amount of $150,000, and would make other advances to the project as required; and (c)

WVI (an entity to be created by Gotham) would purchase the Metropolitan loan, reduce

the interest rate applicable to the loan, and modify its terms to delay Wyndholme

Village's repayment obligations.   See Exhibit 16 ¶¶ 4, 23, and Exhibit 1 at 240-41.  The

basic premise of a $750,000 loan secured by super-priority lien continued to be central to

the deal, and in consideration for making the super priority loan and the other loans

described above, NADIF would receive a 10% ownership interest in Wyndholme.  See

Exhibit 16 at 1 and ¶ 2, and Exhibit 2 at 147-48.

Most significantly, with respect to the funding of the construction loan, the

August Venture Agreement provided that NADIF's 10% ownership interest in

Wyndholme would be increased to 50% if NADIF "cause[d] a commitment or term sheet

to be issued for construction financing and the initial funding under such construction

loan which must commence funding within 120 days following the funding of the

Wyndholme Loan."  See Exhibit 16 the final "Whereas" Clause, and ¶ 10.  In other

words, the parties' final agreement no longer obligated NADIF either to guaranty financing or to provide financing through an affiliate. Moreover, the agreement provided for what would happen in the event that NADIF was unable to secure the term sheet or commitment--it would not be entitled to 50% of the project but, rather, its interest would remain at 10%.[6]

After execution of the agreement, WVI purchased the Metropolitan loan for $1,250,000, and the parties met with representatives of First Mariner Bank to discuss its interest in providing financing for the project. See Exhibit 12 at 99 and Exhibit 2 at 226, 237. First Mariner was encouraged, and it issued a "term sheet" indicating that it would provide construction financing in the amount of $10 million, subject to a variety of conditions, including obtaining the participation of other lenders in the loan. See First Mariner Term Sheet, attached as Exhibit 17, Bankruptcy Hearing 9/21/99 Transcript, attached as Exhibit 18, at 101, and Exhibit 2 at 239-40.[7]

Armed with a term sheet from First Mariner[8], on September 21, 1999, the parties attended a hearing before Bankruptcy Court Judge Stephen Derby and presented the August Venture Agreement for his approval. See Exhibit 18 at 101. Mr. Rubenstein, Wyndholme Village's counsel, advised the Court that the August Venture Agreement was a substitute for the earlier July agreement and urged its approval. Id. at 103. Leeds withdrew its prior objections. Id. [9] On September 22, 1999, Judge Derby entered an order approving the August Venture Agreement, including approving the creation of the

---

[6]    Paragraph 10 also called for NADIF to obtain a commitment or term sheet for phase IB construction (assuming that phase IA had proceeded as planned) and that, if it did not get that commitment or term sheet, its equity share of the project would be reduced from 50% to 25%. Id. at ¶ 10.

[7]    NADIF had also earlier obtained a term sheet from Heller Financial. See Exhibit 1 at 256-57.

[8]    NADIF had already submitted one other term sheet to the Bankruptcy Court at the August 1, 1999 hearing. See Exhibit 11 at 15 and Exhibit 1 at 257.

[9]    The loan held by the other early objector, Metropolitan, had been bought by WVI, the entity set up by Gotham for that purpose. See Exhibit 2 at 226.

super-priority lien in favor of NADIF to secure the $750,000 loan.  <u>See</u> Order Approving

Debtor's Motion for Post-Petition Financing, attached as Exhibit 19.

    For the next two months, Lancelotta dealt exclusively with First Mariner in an

attempt to finalize a construction loan.  <u>See</u> Exhibit 1 at 212.  He was so confident that

First Mariner would provide the funding that he instructed the defendants "not to contact

their other financial source."  <u>Id</u>. at 211-12.  On November 19, 1999, First Mariner

advised Lancelotta that it was unlikely that it would make the loan.  <u>See</u> First Mariner

Letter to Lancelotta, attached as Exhibit 20.  The reason for the bank's reluctance was the

fact that Lancelotta and his related entities had several loans with First Mariner and First

Mariner was unwilling to move forward on the construction loan for Wyndholme Village

unless and until Lancelotta "took care of" his prior existing loans.  <u>Id</u>.  Although

Lancelotta tried, he was unable to do so before the Bankruptcy Court's next hearing on

January 11, 2000.  <u>See</u> Exhibit 2 at 281-82.

    When First Mariner announced that it was not going to provide the construction

loan, NADIF (principally through Zukerman and Gotham's representative, Garchik)

approached several other lenders in an effort to obtain the financing.  <u>See, e.g.</u>, Exhibit 2

at 314-15 and 473; Wachovia Letter, attached as Exhibit 21; Mercantile Letter, attached

as Exhibit 22; and Exhibit 12 at 129-30.  As Lancelotta himself later testified, at least 10-

12 prospective lenders were contacted.  <u>See</u> Exhibit 1 at 212, and 258-59.  Zukerman

even went to Gotham and asked it to put up a $2 million letter of credit to entice a bank to

provide the needed funds.  <u>See</u> Exhibit 12 at 129-30.  Gotham was willing to do it, but

expected to be compensated for extending its credit.  <u>Id</u>.  Lancelotta rejected the idea.  <u>Id</u>.

    On January 11, 2000, the parties returned to the Bankruptcy Court to report that

they had not yet been able to obtain funding.  <u>See</u> Exhibit 1 at 260.  At that hearing, both Zukerman and Lancelotta testified concerning their efforts to obtain construction financing.  <u>Id</u>. at 14, and 256-59.  Lancelotta made it clear that, under the parties' agreement, NADIF was not, itself, obligated to provide funding for the project. <u>Id</u>. at 232.

Some time after that hearing, the parties began discussions regarding alternate methods of going forward, but nothing could be worked out.  <u>See</u> Exhibit 2 at 337-38. NADIF even offered to take a reduced dollar amount in return for being released and let out of the deal.  <u>Id</u>.

In the summer of 2000, Wyndholme Village proposed a plan of reorganization to the Bankruptcy Court, with financing to be provided by a Chicago investor.  <u>See</u> Plan of Reorganization, attached as Exhibit 23.  The proposed reorganization called for the payment of the NADIF and WVI loans in full, two years after they released their liens on the property.  <u>See</u> Exhibit 2 at 353-54.  NADIF and WVI supported the plan, voting in favor of it.  <u>See</u> Ballot, attached as Exhibit 24.  Ultimately, however, the Chicago investor decided not to fund the plan and the reorganization failed.  <u>See</u> Exhibit 2 at 345-46.

In March 2001, Leeds received court approval to foreclose on its lien and it initiated the first of several foreclosure actions.  <u>See</u> Notice of Leeds Foreclosure, attached as Exhibit 25 and Exhibit 2 at 359.  NADIF was the successful bidder at the first Leeds foreclosure sale, but it did not close on its purchase, forfeiting its $125,000 deposit. <u>See</u> Exhibit 12 at 94-95.  Macfadden of Wyndholme, LLC, an entity controlled by James Macfadden (a businessman and member of the draft committee) and Lancelotta, was the successful bidder at the second Leeds foreclosure sale, but, it, too, was unable to close

and forfeited $125,000 its deposit.  See Exhibit 2 at 383.[10]

Ultimately, in December 2002, NADIF foreclosed on its super priority lien and sold the property at auction to Leeds.  See Order to Docket [NADIF] Foreclosure, attached as Exhibit 26.  That sale has been ratified over the objections of Lancelotta and the ratification is currently on appeal to the Court of Special Appeals.  See Order Ratifying Foreclosure, attached as Exhibit 27.

On October 29, 2001, Lancelotta filed this action, on his own behalf and on behalf of his wife[11] and Wyndholme Village, claiming that they had been defrauded.  The essence of the claimed fraud is that NADIF (principally through Fisher) promised to provide the construction financing for the project and not only failed to provide that funding, but never intended to provide it and intended only to "get control of the property" and sell it "at a profit."  Amended Compl. ¶ 16.  But, as shown above and will be discussed below, NADIF was not obligated to provide the construction financing for Lancelotta's project, and the claim that NADIF did not provide the financing in order to "get control" of the Wyndholme Village property, to be charitable, is bizarre.  Other than Lancelotta's creative speculation, there is nothing in this record to even suggest such a scenario.  Moreover, his damage theory is so speculative as to warrant dismissal as a matter of law.

---

[10]     James MacFadden had also submitted a bid at the first Leeds foreclosure sale, and he and Lancelotta were in discussions prior to that first sale regarding forming a partnership to develop the property.  See Exhibit 2 at 360-63.

[11]     Katherine Lancelotta is named as a plaintiff solely because she signed several of the loan documents at issue in this case, allegedly in reliance on her husband.  See Exhibit 2 at 9-10.

## STANDARD OF REVIEW

Under Rule 56(c), a court must grant the moving party summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  Although the court must consider the facts in the light most favorable to the nonmoving party, where no rational trier of fact would find for the nonmoving party, there is no genuine issue for trial and summary judgment is warranted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Though the burden of proof rests initially with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial" rather than resting upon the bald assertions of its pleadings.  Fed. R. Civ. P. 56(e); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

And in the case of fraud, where a plaintiff must prove fraud by clear and convincing evidence, the Court should take into account the heightened standard of proof in ruling on a motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986); Travel Committee, Inc. v. Pan American World Airways, Inc., 91 Md. App. 123, 178 (1992).

## ARGUMENT

I.    **THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' FRAUD CLAIM.**

To sustain a claim for fraud, there must be proof that (i) the defendant made a false representation of a material fact, (ii) the defendant knew the representation was

false, (iii) the defendant made the false representation for the purpose of defrauding the plaintiff, (iv) the defendant justifiably relied upon the misrepresentation, and (v) the plaintiff suffered damages by relying upon the misrepresentation.  Gross v. Sussex, 332 Md. 247, 257 (1993); Travel Committee, Inc. v. Pan American World Airways, Inc., 91 Md. App. 123, 178 (1992).  The conclusory and unsupported allegations made by the plaintiffs are not legally sufficient to prove fraud.

According to the amended complaint, and as developed in discovery, the alleged representations on which Lancelotta allegedly relied were that

- ▸    NADIF would provide construction funding (if other sources were not available).  Amended Complaint ¶ 12.

- ▸    North American Doctors Investment Fund had access to $500 million and could provide the financing, if necessary.  Id.

- ▸    Fisher and his colleagues were reputable and successful developers with financial wherewithal.  Id.

In addition, the plaintiffs assert that the defendants failed to disclose that Quinn had a "conviction for real estate fraud."  Id.  None of these alleged statements or omissions is actionable.

### A.    Fisher's Alleged Statements Regarding Financing For The Wyndholme Project Are Not Actionable.

Central to the plaintiffs' claim is that "Fisher told Lancelotta that [North American Doctors' Investment Fund] of which he was CEO had assets in excess of $500 million and "that if NADIF could not obtain financing from a third party, NADIF had more than enough assets to make the loan itself."  See Amended Complaint ¶ 12.  The plaintiffs refer to this as NADIF's "pledge to finance the project."  Id. ¶ 14.  For the

reasons discussed below, even assuming for the sake of this motion that the statements

were made by Fisher, the plaintiffs cannot prove fraud by relying on those alleged

representations.

>    **1.    Fisher's alleged statements were made before a contract was
>           entered into between the parties regarding a term that is
>           explicitly addressed in the contract.**

This Court has routinely held that reliance on oral statements in the face of

contradictory contract terms is unjustified.  Wooton Enterprises, Inc. v. Subaru of

America, Inc., 134 F. Supp. 2d 698, 715 (D. Md. 2001) (reliance not reasonable when

written agreement supercedes prior oral statements); Hannon v. Exxon Company, U.S.A.,

54 F. Supp 2d 485, 498 (D. Md. 1999); (same) Stroh Brewery Co. v. Allegheny Beer

Distributors, 989 F. Supp. 740, 744 (D. Md. 1996) (same).

In this case, the parties addressed the issue of whether NADIF was required to

provide the construction loan financing for the project in the August Venture Agreement,

Exhibit 16, and that agreement is unequivocal on the issue --NADIF had no contractual

obligation to provide the construction financing for the project.  NADIF's sole obligation

was to arrange for the issuance of a commitment or term sheet by a third party and, if it

did not, it would forfeit the right to receive an additional 40% membership interest in

Wyndholme Village."  See Exhibit 16 at 1, ¶ 10; discussion at 10-11, supra.  Thus, the

plaintiffs' principal claim of fraud--that the defendants promised to provide construction

financing and reneged--is flatly contrary to the controlling agreement.

Any doubt that the parties did not intend that NADIF would provide funding for

the project is dispelled by a review of the parties' negotiations leading up to the signing

of the August Venture Agreement.  The parties started with an understanding that "PHI"

or Mr. Philip Pilevsky, through a single purpose entity, would obtain, provide or guarantee construction financing.  See Exhibit 5.[12]  NADIF was created and became that entity.  See Exhibit 7.  Thereafter, with each side represented by counsel, the parties negotiated the provisions of the July Agreement, addressing NADIF's obligation to find or provide construction funding.  Multiple drafts were generated and, on July 8, 1999, the parties signed an agreement that required NADIF to do that which the plaintiff now claims NADIF represented it would do--guarantee the construction loan or obtain funding for the loan through one of its affiliates in the event that NADIF could not successfully procure financing through a third party.  See Exhibit 10 ¶ 9.  But Wyndholme's other creditors objected to the terms of the July Agreement and the Bankruptcy Court never approved that agreement.  See Exhibit 11 at 11-32, 95-96.  Negotiations continued and ultimately, the parties chose to delete the provision regarding guarantees and affiliate financing, and it does not appear in the August Venture Agreement.  See Exhibit 16.  In short, the deal changed.

Given this history, and other evidence including Lancelotta's own testimony in the Bankruptcy Court, discussed below, the plaintiffs' claim that they relied on NADIF's "pledge to finance the project" by providing the construction financing is an outright fabrication.  If Lancelotta did, in fact, believe that NADIF would in the end provide the construction financing, that belief and any reliance on that belief was, as a matter of law, unjustified.

This Court dismissed similar claims in Wooton Enterprises, Hannon, and Stroh

---

[12]    Considering the entry on Mr. Lancelotta's summary, Exhibit 5, it is possible that Fisher said something about providing construction financing, although unlikely that he referred to "NADIF," which had not been formed.  At the time, as Lancelotta well knew, Fisher and his colleagues were representing Mr. Pilevsky and it was he who was providing the funding.  See Exhibit 2 at 94-98 and Exhibit 5.

Brewery.  In each of those cases, the plaintiffs claimed that they relied on oral

representations of the defendant that were inconsistent with the terms of a written

contract, and the Court dismissed the plaintiffs' fraud claims on those grounds.[13]  In

Wooten Enterprises, the plaintiff claimed that it renewed its franchise agreement and

made capital improvements based on the defendant's pre-contract, oral representations

that it would provide the plaintiff with a certain amount of product to sell each month.

See Wooton Enterprises, 134 F. Supp. 2d at 715.  In Hannon, the plaintiff claimed that

the defendant misrepresented its obligations under the agreement, and in reliance on the

misrepresentation, the plaintiff incurred substantial costs attempting to start an alterative

business at a new location.  See Hannon, 54 F. Supp. 2d at 498.  In Stroh Brewery Co.,

the plaintiff allegedly relied on the defendant's oral approval of a prospective distribution

buyer, when the contract stated that approval must be in writing.  See Stroh Brewery Co.,

989 F. Supp. at 744.  Each of those cases involved a commercial contract negotiated by

sophisticated business people, and, in each of the cases, the Court held that the plaintiff's

reliance on the defendant's oral statements that were in conflict with the applicable

agreement was unjustified.

As was true of the plaintiffs in those cases, Lancelotta is a sophisticated

businessman, and he negotiated a commercial deal with the assistance of two respected

Baltimore lawyers.  He testified in his deposition that he has conducted business in the

real estate industry since at least 1975.  See Exhibit 2 at 15.  Once Lancelotta signed the

August Venture Agreement, he was not entitled to rely on the alleged representations of

---

[13]    Also appropriate in the context of this case is this Court's admonition that "[w]here a controversy
concerns purely economic losses allegedly caused by statements made during the course of a contractual
relationship between businessmen, contract law--not tort law--provides the rule of decision by which the
case is to be governed." Architectural Systems, Inc. v. Gilbane Building Co., 779 F. Supp. 820, 821 (D.
Md. 1991).

Fisher regarding NADIF's obligations to provide construction financing. He was obligated to look only to the parties' agreement, and any reliance on the defendant Fisher's purported "pledge to finance the project" made during the course of pre-contract negotiations was unjustified. Accordingly, the Court should dismiss the plaintiffs' fraud claim based on these alleged representations.

**2.    The plaintiffs did not rely on Fisher's alleged statements.**

An essential element of the cause of action for fraud is that the plaintiffs actually relied on the alleged misrepresentation. See Gross v. Sussex, 332 Md. 247, 257 (1993); Travel Committee, Inc. v. Pan American World Airways, Inc., 91 Md. App. 123, 178 (1992). It is clear from the record in this case not only that any reliance by Lancelotta on the alleged precontractual discussions would have been unjustified but that he, in fact, did not rely on those representations. Any debate on that issue is resolved by Lancelotta's own sworn testimony before the Bankruptcy Court that NADIF never represented to him that it would finance the Wyndholme project. According to Lancelotta:

> Well to be clear on that, NADIF never had any intention at
> all of funding a construction loan. They were the
> instrument to locate the construction loan, not to fund it.
>
>            *       *       *
>
> No, I was never under the opinion [NADIF] would issue
> the commitment.

See Exhibit 1 at 232, 234. [14] This unequivocal testimony is compelling evidence that Lancelotta either lied to the Bankruptcy Court or is lying to this Court. NADIF did not "pledge to finance" the Wyndholme project and Lancelotta clearly knew that none of the statements by Fisher committed NADIF to provide the

---

[14]    Since Lancelotta knew that the North American Doctors Fund was never the source of the funding, the amount of its assets was immaterial. Id.

construction financing.[15]

> **B.     The Plaintiffs Cannot Prove That The Defendants Intended To Defraud The Plaintiffs At The Time That The Parties Entered Into The August Venture Agreement.**

Even if Fisher represented that NADIF would provide construction financing and, even if Lancelotta is deemed to have reasonably relied on the representations notwithstanding the unambiguous agreement to the contrary, the statements cannot be actionable unless they were knowingly false when made.  "Maryland courts have emphasized that fraud exists only when the speaker had (i) intent to defraud, and (ii) knowledge that his statement was false <u>at the time it was made</u>."  <u>Froelich v. Erickson</u>, 96 F. Supp. 2d. 507 (D. Md. 2000) (emphasis added) (citing <u>Miller v. Fairchild Industries, Inc.</u>, 97 Md. App. 324, 343-44 (1993)).

Based on the history of the parties' negotiations, it is possible that Fisher said that the entity to be formed (subsequently NADIF) would provide construction funding, if necessary.  The original deal summary by Lancelotta makes reference to it (referring to "PHI"), Exhibit 5, and the parties' July Venture Agreement so provided.  <u>See</u> Exhibit 10 at ¶ 9.  Thus the plaintiff may be able to prove that the statement, or something like it, was made.[16]  But the most it would show is that Fisher made a promise to do something in the future--have a third party provide construction loan financing--that did not materialize.  The plaintiffs cannot sustain a cause of action for fraud on this basis.  <u>See</u> <u>Fred Menke's Car Store v. Volvo North America</u>, 698 F. Supp. 1287 (D. Md. 1987)

---

[15]     Other evidence demonstrating that Lancelotta knew that NADIF was not obligated to provide funding include Lancelotta's chronology describing the deal, <u>see</u> Exhibit 28 (describing the deal as one where <u>if</u> NADIF obtained financing then it would get a 50% interest); and Wyndholme Village's Motion to approve the August Venture Agreement (parties to seek "the commitment for construction financing from a mutually acceptable institutional construction lender"), <u>see</u> Motion for Post-Petition Financing, attached as Exhibit 29, at 4.

(granting defendant's summary judgment motion because the plaintiff's fraud claim rested on the defendant's promise to do something in the future).

The plaintiffs have no proof that Fisher knew at the time the statements were made that they were false. Without reference to any specific facts, the plaintiffs baldly allege that the statements were false and that NADIF made the alleged misrepresentations regarding financing for the "sole purpose" of obtaining control of the Wyndholme property in order to sell it and realize a profit of $6.2 million. See Amended Complaint ¶ 16.[17] However, there is not a scintilla of evidence in the record to support the allegation. The plaintiffs merely speculate on a motive.

To the contrary, the undisputed facts demonstrate that NADIF and WVI performed their contractual obligations and risk losing in excess of $2 million on the transaction. WVI purchased the Metropolitan loan for $1,250,000. See Exhibit 12 at 98-99. NADIF lent Wyndholme $750,000 on a secured super-priority basis and it advanced over $150,000 in additional unsecured funds to Wyndholme, and $100,000 to Lancelotta and his wife. Id. The record is also clear that from September through December 1999, NADIF representatives worked with Mr. Lancelotta and others to obtain financing, see Exhibit 2 at 314-315 and 473, Exhibit 21, Exhibit 23, and Exhibit 1 at 258-259; that from February through at least May 2000, NADIF and Lancelotta, through counsel, attempted to negotiate an unwinding of their relationships; see Exhibit 2 at 337-338; that from July to December 2000, NADIF supported Lancelotta's efforts to reorganize Wyndholme Village, with NADIF not being a participant in the reorganization, Id.; and that NADIF

---

[17]    This allegation is highly suspect given the Bankruptcy Court's oral ruling made on February 11, 2000 that, at that time, the property had a fair market value of only $5.5 million. Considering that the principle amounts secured by the NADIF, Leeds, and WVI (formerly Metropolitan) liens on the property equaled $4,975,000, before interest, the absurdity of Wyndholme's argument is patent. See Amended Complaint ¶¶ 8, 15.

waited until December 2002, more than three years after obtaining its lien, to foreclose, see Exhibit 26. For the plaintiffs to argue in the face of these incontrovertible facts that NADIF intended, ab initio, to "kill" the deal for the sole purpose of taking control of the project is absurd. [18]

When asked at his deposition what evidence he had of NADIF's alleged nefarious motive, Lancelotta could point to only three things: (a) that NADIF did not fund the construction loan; (b) that NADIF bid at the first foreclosure sale conducted by the second lien holder, Leeds; and (c) that the defendants "made no appreciable efforts to find financing."

The first point has been fully addressed: there was no such promise, and the assertion that the defendants did not ultimately perform a promise is not evidence of their lack of intent to perform it.

As to the second point, it is true that NADIF was the successful bidder at a foreclosure sale in April 2001 (almost two years after the representation was allegedly made). See Exhibit 12 at 94-95. But NADIF was unable to find financing, so it defaulted and lost its $125,000 deposit--hardly evidence of intent to take over the property for a profit. Id. Moreover, Lancelotta also attempted to acquire the property at the first Leeds auction by making arrangements with another bidder, James Macfadden, who was outbid by NADIF. See Exhibit 2 at 360-63. And Macfadden and Lancelotta, jointly, were

---

[18]     In its current summary judgment posture, this case is also not unlike Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). There, the plaintiff hypothesized a conspiracy that simply made no economic sense. The Supreme Court held that, under those circumstances, the theory could not go to a jury, and affirmed summary judgment against the plaintiff. Here, the plaintiffs' fraud theory simply makes no economic sense. Why would the defendants invest $2 million, spend months working with Lancelotta, spend months trying to settle with Lancelotta, support Lancelotta's reorganization plan, and then wait over three years to foreclose, if its intent all along was to stall the project?

successful with their bid at the second Leeds auction, as "Macfadden of Wyndholme."[19]
See Exhibit 2 at 383.  The foreclosure auction, then, cannot be evidence of any fraudulent
motive on the part of NADIF.  And, in any event, it is disingenuous at best for Lancelotta
to argue that NADIF's attempt to buy the project at auction evidences intent to defraud
when Lancelotta (through Macfadden) was trying to do the same thing.

Finally, Lancelotta's assertion that he is "not aware of any appreciable effort by
NADIF" to obtain financing for the project stands in direct contradiction to Lancelotta's
testimony in the Bankruptcy Court.  On January 11, 2000,[20] Lancelotta testified, under
oath, that Zukerman had submitted a financing packet to "a good 10 or 12 [lenders]."  See
Exhibit 1 at 259.  And when Zukerman persuaded Gotham to provide credit
enhancements sufficient to persuade one lender to provide financing, the deal fell through
because Lancelotta did not want to incur the additional cost.  See Exhibit 12 at 129-30.

In his deposition, Lancelotta admitted that the reason he now makes the assertion
that NADIF did not make "appreciable efforts" to find financing was because the
financing did not materialize.  Exhibit 2 at 475-76.  Unfortunately for the plaintiffs, this
alleged failure to perform only amounts to a breach of contract claim.  See Fred Menke's
Car Store, 698 F. Supp. at 1293 (stating that a fraud in the inducement claim "is different
from a suit for breach of contract in that '[t]he gist of the fraud in such cases is not the
failure to perform . . . .'").  Moreover, the record in this case shows that Lancelotta
"requested that [NADIF] not contact their other financial resources," while he explored
financing opportunities with a local bank, First Mariner.  See Exhibit 1 at 212.  Given this

---

[19]    Ultimately, Macfadden of Wyndholme, LLC defaulted and the property was again reset for sale.
[20]    Lancelotta acknowledged in testimony before the Bankruptcy Court that term sheets had been
obtained from Walter Heller Financial and First Mariner Bank.  See Exhibit 1 at 256-57 and Exhibit 18 at
101.

testimony and the incontrovertible fact that NADIF did contact numerous prospective lenders and obtained term sheet from two of them, it is apparent that Lancelotta's current litigation position, that NADIF never made any appreciable efforts to find financing, is pure fabrication, and no intent to defraud may be inferred.

The plaintiffs' allegations of fraudulent intent in this case are much closer to the plaintiff's "self-serving, conclusory allegations" in Fred Menke's Car Store v. Volvo North America, 698 F. Supp. 1287, 1294 (D. Md. 1987). There the plaintiff claimed that the manufacturer's representative told him that any qualified franchise purchaser would be approved, without regard to the facilities proposed by the purchaser. The defendant later turned down a purchaser because of the facilities proposed. The court held that the plaintiff presented no evidence showing that at the time the defendant made the representation the defendant did not intend to honor it. The court further found that, in the negotiations leading up the execution of the agreement between the parties, the defendant had always coupled discussions of approval of a purchaser with discussions of acceptable facilities. Fred Menke's Car Store, 698 F. Supp. at 1294.

In this case, even assuming that Fisher made the alleged representations and even taking the next questionable step of assuming that the August Venture Agreement required NADIF to provide financing, the plaintiffs have still failed to present any evidence that NADIF did not intend to do just that at the time the contract was entered into between the parties. Moreover, both the language and the negotiations for the August Venture Agreement make it clear that the parties plainly anticipated that NADIF might not be able to procure financing. Thus, the fraud claim should fail.

**C.     The Plaintiffs Cannot Sustain A Cause Of Action For Fraud By
          Omission Because The Defendants Had No Duty To Disclose Quinn's
          Conviction.**

The plaintiffs also claim that the defendants committed fraud by not revealing that

Quinn had a "conviction for securities fraud in his background."[21]  Amended Complaint

¶¶  3, 16.  But Maryland law is clear that, in the absence of a duty to provide information,

such as a fiduciary duty, the failure to disclose does not give rise to a claim for fraud.

Wootton Enterprises, Inc. v. Subaru of America, Inc., 134 F. Supp. 2d 698, 716 (D. Md.

2001); Architectural Systems, Inc. v. Gilbane Building Company, 779 F. Supp. 820, 822

(D. Md. 1991).  Nowhere in the amended complaint, do the plaintiffs allege that NADIF

had any special duty to disclose information to them, and clearly no fiduciary relationship

existed between the parties.  See Parker v. Columbia Bank, 91 Md. App. 346, 368 (1992)

(stating that no fiduciary relationship exists between a creditor and debtor).  This was a

commercial transaction between business people, negotiated at arms length with the

assistance and advice of attorneys.  None of the parties had any obligation to disclose any

negative information.  See Westinghouse Elec. Corp. v. Garrett Corp., 437 F. Supp. 1301,

affirmed, 601 F.2d 155 (D. Md. 1991) (holding that "silence is not actionable where the

parties are equally sophisticated and where [a party] can reasonable be expected to obtain

and evaluate the facts for himself.").  This Court should not allow Lancelotta to now use

his lack of diligence as a basis for a fraud claim.

---

[21]     At deposition, Quinn acknowledged that he pled guilty to a misdemeanor involving a
condominium project in about 1987--fourteen years before meeting Lancelotta.  See John R. "Jack" Quinn
Deposition Transcript, attached as Exhibit 30, at 159-60.

**D.    The Statements That Fisher Allegedly Made Regarding The Experience And Success Of The Defendants In The Industry Were Statements Of Opinion And Not Statements Of Material Fact, And The Plaintiffs Did Not Rely On The Alleged Statements.**

In the amended complaint, the plaintiffs allege that Fisher held himself, Quinn and Zukerman, out as successful and knowledgeable in real estate matters.  See Amended Complaint ¶¶ 12, 14.[22]  For the reasons discussed below, these alleged statements are not actionable under the plaintiffs' fraud claim.

The statements, even if made as alleged, are clearly simply expressions of opinion and puffery and analogous to the statements attributed to the defendant in Layton v. AAMCO Transmissions, Inc., 717 F. Supp. 368, 371 (D. Md. 1989) and found legally insufficient to support a fraud claim.  The statements at issue in Layton concerned "(1) AAMCO's good reputation in the industry, (2) its excellence in the transmission field, (3) its valuable good will, and (4) plaintiffs' probabilities of success as owners of an AAMCO franchise."  Fisher's statements, like those of AAMCO, are not actionable.

The defendants expect the plaintiffs to present the Court with a list of bankruptcies, failed projects, and litigation in which Fisher and Quinn have been involved, and to cite Zukerman's recent tax problems, all as evidence of the fact that the defendants were not successful developers, as allegedly advertised.  But the record (and even the plaintiffs' own allegations) shows that Fisher and Quinn were, separately and together, involved in scores of large development projects, some with entities that had far more assets than the plaintiffs, such as Gotham and Pilevsky.  See Exhibit 2 at 97

---

[22]      In his deposition, Lancelotta testified that Fisher told him that they were successful because each had expertise indifferent areas.  See Exhibit 2 at 103-104.  He said that Quinn had expertise as a developer, that Zuckerman had expertise with financial issues, that he knew the ins and outs of bankruptcy; that the three had been involved in multiple real estate deals around the country.  Id.  There is nothing in the record suggesting that these statements were false.

(Pilevsky told Lancelotta that he was working with Fisher, Quinn, and Zuckerman on the Ritz Carlton deal), and Exhibit 12 at 28-34.  Thus, whether the defendants were "successful and reputable" was and is a matter of opinion, and a fraud claim can only be based upon a fact, something "susceptible of exact knowledge."  Wong v. Aragona, 815 F. Supp. 889, 893 (D. Md. 1993).[23]

Moreover, even if negative information about Fisher, Quinn and Zukerman had been disclosed to Lancelotta, it cannot be credibly argued that it would have made a difference.[24]  In the very newspaper articles attached to the affidavit filed with the Complaint, quoted statements made by Lancelotta are positive proof that Fisher's so-called "checkered past" had absolutely no impact on Lancelotta's opinion of Fisher.  The Baltimore Sun, in an article published on October 22, 1999, quoted Lancelotta as saying:

> Neil Fisher has treated me like gold . . . He's a tough businessman, but he's fair and he's come through with the money we need to get moving, and he's never asked me for a dime.  I'm thrilled to be working with him.

See Baltimore Sun Article dated 11/30/99, attached as Exhibit 31.

And, after a series of negative articles about Fisher in the Baltimore Sun informing Lancelotta of the details of its investigation, the Baltimore Sun reported on November 22, 1999, that Lancelotta considered Fisher to be "our white knight" and said he "doesn't care" about Fisher's past because "Neil is for real."  See Baltimore Sun Article dated 11/22/99, attached as Exhibit 32, at 8 of 10.  In light of these statements by Lancelotta, there is no doubt that Lancelotta's confidence in Fisher, Quinn, Zukerman was not shaken by the negative publicity and that

---

[23]     It is questionable whether much of the so-called negative information about Fisher, Quinn, and Zuckerman is even admissible.
[24]     Zukerman's guilty plea on tax charges did not occur until after the execution of the August Venture Agreement and bankruptcy proceedings and is therefore irrelevant.

their respective backgrounds did not cause Lancelotta to reconsider doing

business with any of them.  Accordingly, Lancelotta wrote First Mariner to assure

the bank that Fisher's past would not have any affect on the project.  See

Lancelotta Letter to First Mariner, attached as Exhibit 33.

Clearly, these issues had no bearing on the project, and had these issues

been important to Lancelotta in the first place, he would have conducted due

diligence on the defendants, which Lancelotta had the right and opportunity, if not

the obligation, to do.  Yet he chose not to do it.  The truth is that Lancelotta was

desperate, and he would have done business with anyone who put up a million

dollars.  In fact, Lancelotta testified, "[a]nybody that puts $2 million on the table,

that tells me I don't have to go check them out."  See Exhibit 2 at 246.  Thus, the

plaintiffs relied on the fact that the defendants came up with $2 million, not on

any alleged fraud.  The Court should dismiss the fraud claim that is based on these

alleged "misrepresentations."

> **E.    The Plaintiffs Cannot Prove That They Were Damaged As A Result Of Their Reliance On The Defendants' Alleged Misrepresentations.**

In order to prove fraud, the plaintiffs must show that their reliance on the

defendants' alleged misrepresentations directly lead to their damages.  See Blue Circle

Atlantic, Inc. v. Falcon Materials, Inc., 760 F. Supp. 516 (D. Md. 1991), affirmed, 960

F.2d 145 (4th Cir. 1991).  The plaintiffs have failed to propose any credible theory that

their claimed damages are attributable to reliance on the defendants' alleged

misrepresentations.

In the amended complaint, the plaintiffs claim that "[a]s a proximate consequence

of the Defendants' purposeful misrepresentations and omissions, Plaintiffs lost other

Case 1:01-cv-03809-BEL    Document 71-2    Filed 08/11/2003    Page 31 of 49

financing that was available to them to pay off the existing debt and to finance the

completion of the project."  Amended Complaint ¶ 18.  Discovery has shown that, in fact,

the plaintiffs had no other financing available to them at the time that they entered into

the August Venture Agreement with NADIF.[25]

     This Court dismissed a similar claim in <u>Blue Circle Atlantic</u> for just that reason.

There, the counter-plaintiff claimed that a cement manufacturer made the fraudulent

representation that its product would be the same as the previous owner's product.  In a

deposition, the counter-plaintiff testified that there were no other cement manufacturers

available who could supply what the company needed.  Based on this, the Court held that

the counter-plaintiff was not damaged by its reliance on the misrepresentations of the

cement manufacturer, that its damages resulted from the fact that there were no other

alternatives.  <u>Id</u>. at 520.  As was the case in <u>Blue Circle Atlantic</u>, the Wyndholme Village

project had no other viable financing alternatives.  It was in bankruptcy.  It had

approached numerous lenders without any success, and the lack of lender interest is what

drove Wyndholme into bankruptcy.  NADIF was Wyndholme's only viable alternative

and, thus, the Court should dismiss the plaintiffs' fraud for want of proximately caused

damages.[26]

---

[25]    In discovery, the only missed financing opportunity Lancelotta could identify was with a prospect named Frank Laport.  <u>See</u> Exhibit 2 at 74-75.  But Lancelotta makes it clear in his deposition (i) that Lancelotta and Laport never reached either an oral or a written deal; (ii) that when Lancelotta and Laport attempted a deal a mere five months later it did not go through; and (iii) that Lancelotta did not know the source for Laport's potential funding of a deal.  <u>Id.</u> at 344 and 346.  Thus, the plaintiffs can present no evidence showing that Laport was in any better position to find construction financing for the Wyndholme project.

[26]    The specifics of the alleged damages claimed by Lancelotta are discussed in part III below.  The point here is that a claim of fraud requires proof of damages proximately caused by the fraud and, under the teachings of <u>Blue Circle Atlantic</u>, there can be no such damages in this case.

#348933                                    

## II.    THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' BREACH OF CONTRACT COUNT.

The recently amended complaint purports to add a breach of contract count by adding the words "breach of contract" to the title of the only count in the original complaint, which claimed fraud.  However, this new, retitled count identifies neither the contract nor the breach.  As a result, it is not clear exactly what the plaintiffs are alleging with respect to breach of contract.  If the plaintiffs are alleging that NADIF breached an obligation to fund the construction loan, as claimed in ¶ 16 of the amended complaint, then the claim must fail because, as fully discussed above, the August Venture Agreement does not require NADIF to fund the construction phases of the project.  See discussion at 15-18, supra.  If the plaintiffs are alleging that NADIF's failure to obtain construction financing from a third party was a breach of the August Venture Agreement,[27] that argument, too, must fail for the reasons below.

### A.    Even If NADIF's Failure To Obtain Construction Financing From A Third Party Was A Breach Of The August Venture Agreement, The August Venture Agreement Provided For The Plaintiff's Remedy.

The August Venture Agreement expressly addresses what would happen if NADIF was unable to secure the term sheet or commitment for construction financing.  It states that, if NADIF obtained financing, it would receive an additional 40% ownership interest in Wyndholme for its efforts and, if not, its ownership interest would be limited to 10%.  Thus, even if NADIF was contractually required to find the construction financing for the project, the contract clearly provided for a remedy should it be unable to do so, and "[i]t is a fundamental principle of contract law that it is 'improper for the court

---

[27]    NADIF is the only defendant that was a party to the August Venture Agreement.  Aside from all the other reasons addressed here, then, summary judgment is required on the contact claim against the other defendants, none of whom was a party to the agreement.

to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" <u>Calomiris v. Woods</u>, 353 Md. 425 (1999); <u>Holzman v. Blum</u>, 125 Md. App. 602 (1999).

This outcome is also consistent with the parties' negotiations of the August Venture Agreement.  Discussions of NADIF's obligation to obtain financing for the Wyndholme project were coupled with discussions regarding the amount of NADIF's ownership interest in Wyndholme.  Thus, both parties understood that if NADIF was not successful in obtaining financing for Phase IA of the project, the remedy would be that its ownership interest would be limited to 10%, as opposed to 50%.  This understanding is further reflected in earlier drafts of the August Venture Agreement.  One of the earliest drafts of the August Venture Agreement by NADIF states, "[t]he obtaining of the Construction Loan Commitment/Term Sheet is not a condition precedent to the issuance of NADIF's fifty percent (50%) membership interest in Wyndholme." <u>See</u> Exhibit 14 ¶ 10.  Lancelotta commented in a handwritten note stating, "Construction loan required for 50% ownership." <u>See</u> Lancelotta's Comments on Draft August Venture Agreement, attached as Exhibit 34.  A letter from Lancelotta's attorney to NADIF's attorney, dated August 17, 1999, reflects Lancelotta's comments, <u>see</u> Exhibit 15, and in the draft of the agreement circulated on August 24, 1999, the language of paragraph 10 is modified to state that the construction loan is a precondition to NADIF's 50% ownership interest. <u>See</u> Draft of August Venture Agreement dated 8/24/99, attached as Exhibit 35.  Less than a week later and a day before the parties signed the final agreement, the parties amended the language to include a "Whereas" clause that stated that NADIF owned 10% of Wyndholme and would become the owner of an additional 40% if it met the condition

precedent of obtaining the financing described in paragraph 10. See Exhibit 16 at 1 and ¶10. What is clear from these negotiations is that NADIF's ownership interest in Wyndholme was tied to its success in finding financing, such that if it did not, its ownership interest would be limited to 10%.

The percentage ownership contingency is further reflected in other parts of the August Venture Agreement. For example, paragraph 10 of the August Venture Agreement states that should NADIF be unable to find financing for Phase 1B of the project (which would not happen unless Phase IA had been constructed, giving NADIF its 50% interest), NADIF's ownership interest would be reduced from 50% to 25%. See Exhibit 16 ¶ 10. Additionally, paragraph 24 of the August Venture Agreement states that the operating agreement will be amended to reflect NADIF's 50% ownership interest "upon the initial funding of Phase 1A." Id. at ¶ 24. These provisions show that the parties anticipated that, despite its efforts and resources, NADIF might not be able to find financing, and that the appropriate remedy under those circumstances was a reduced ownership interest.

Lancelotta now wants this Court to save him from the hardship of a business deal that he negotiated, with the assistance of counsel, by finding a breach and awarding damages from the lack of funding. But the terms of the August Venture Agreement are clear, the only consequence to flow from NADIF's failure to find funding is that its equity interest in the project would be limited to 10%. Thus, the Court should dismiss the plaintiffs' breach of contract count, or alternatively, find that the plaintiffs' damages are limited to a ruling that NADIF's ownership interest in Wyndholme is 10%.

**B.    The Plaintiffs Are Estopped From Bringing Their Breach Of Contract Claim Against NADIF.**

Even assuming that NADIF's failure to obtain third party financing breached the August Venture Agreement, NADIF is not liable to the plaintiffs because Lancelotta engaged in actions that made it difficult for the defendants to perform.  In short, NADIF's nonperformance is excused and the plaintiffs are prevented from bringing a breach of contract claim against NADIF on the basis of equitable estoppel.

Equitable estoppel is:

> [T]he voluntary conduct of a party whereby he is absolutely precluded both in law and equity, from asserting rights which might perhaps have otherwise existed, . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse . . .

Chevy Chase Bank, F.S.B. v. Chaires, 350 Md. 716, 737 (1998)(quoting Knill v. Knill, 306 Md. 527 (1986).  It "may arise even where there is no intent to mislead . . .." Id. at 738 (quoting Grimberg v. Marth, 338 Md. 546 (1995).  The elements of equitable estoppel are (1) voluntary conduct; (2) reliance; and (3) detriment.  Id.  Lancelotta engaged in voluntary conduct on which the defendants relied to their detriment causing them allegedly to breach the August Venture Agreement.

Lancelotta engaged in voluntary conduct satisfying the first element of equitable estoppel when he instructed the defendants not to pursue financing outside of First Mariner, and when he failed to comply with First Mariner's lending requirements.  At the September 21, 1999, Bankruptcy Court hearing, the parties presented the Court with a term sheet for construction financing from First Mariner, as required by the August

Venture Agreement.  <u>See</u> Exhibit 18 at 101, Exhibit 17, and Exhibit 16 ¶ 10.  Lancelotta was so confident that First Mariner would provide the funding that he instructed the defendants to "not contact their other financial sources."  <u>See</u> Exhibit 1 at 212.  He admitted to the Bankruptcy Court that even he "believe[d] [he] made a mistake at this point."  It was not until November 19, 1999, that First Mariner informed the parties that in order to proceed with an application for financing, Lancelotta would have to reduce the bank's exposure on Lancelotta's other loans with the bank.  <u>See</u> Exhibit 20.  However, even in this letter, First Mariner continued to express an interest in making the loan.  <u>Id</u>. Lancelotta was unable to comply with First Mariner's request, and on December 5, 1999, a little more than one month before Lancelotta claims NADIF breached and three months after the parties' search for financing began, Lancelotta asked Zukerman if his lender contacts could move fast if First Mariner did not come through with the financing.  <u>See</u> Exhibit 1 at 214.

Based on Lancelotta's instructions, the defendants did not gear up to find financing until months into the parties' August Venture Agreement.  <u>See</u> Exhibit 1 at 214 Lancelotta testified in the Bankruptcy Court that as soon as he became uncomfortable with First Mariner, he informed Zukerman, and Zukerman responded, "we'll get these packets [funding brochures] out immediately."  <u>Id</u>.  Thus, the defendants satisfy the second element of equitable estoppel.

With respect to the third and final element, it is obvious that the defendants relied to their detriment on Lancelotta's actions, because they are now being charged with breaching their obligation to obtain financing for the Wyndholme project.  Given Lancelotta's admission that he was, in fact, the likely cause of NADIF's inability to find

financing, it would be inequitable to hold NADIF liable for millions of dollars in damages for the plaintiffs' breach of contract claim, and the Court should accordingly dismiss the claim.

### III.    THE COURT SHOULD DISMISS THE PLAINTIFFS' DAMAGE CLAIMS BECAUSE THEY ARE SPECULATIVE AND NOT SUPPORTED BY THE EVIDENCE.

In the defendants' interrogatories to the plaintiffs, the defendants asked the plaintiffs to "[d]escribe and itemize each element of damage, [and] state the basis for and method of computing the damages . . ." See Lancelotta's Interrogatory Responses, attached as Exhibit 36, Request No. 16.  Lancelotta, the only plaintiff who responded in substance, responded that the plaintiffs had suffered four categories of damages: (1) loss of income to Lancelotta from January 19, 2000 to September 19, 2002, totaling $560,050; (2) unpaid, accrued interest on all of the Wyndholme and Lancelotta loans for the same time period, totaling over $1.2 million; (3) legal and accounting fees, totaling $155,000; and (4) overhead to maintain Wyndholme from January 19, 2000 to September 19, 2002 (the date of the answers), totaling $97,400.  Id. at Response to Request No. 16.  For the reasons discussed below, these damages are speculative, as a matter of law, are unsupported by the evidence, and provide another basis on which the defendants are now entitled to judgment.[28]

### A.    The Plaintiffs' Lost Income Claim Is A Speculative Claim For Lost Profits That Cannot Be Determined With Any Reasonable Degree Of Certainty.

Lancelotta testified that his lost income claim was based on what he would have

---

[28]      Both Wyndholme Village and Mrs. Lancelotta have adopted Lancelotta's damages as their own. See Wyndholme's Interrogatory Responses attached as Exhibit 37, No. 23 and Mrs. Lancelotta's Interrogatory Responses, attached as Exhibit 38, No. 14.  No separate damages have been claimed by either of those plaintiffs.

earned had the project gone forward from (a) a company named JLANCE, which may have been the construction manager on the project, and (b) as real estate commissions on unit sales.  But, as Lancelotta's deposition revealed, getting to those losses requires going through layers and layers of assumptions and speculations.

First, JLANCE was a company set up by Lancelotta solely for the Wyndholme project.  Exhibit 2 at 455.  Under the August Venture Agreement, JLANCE was to have served as the construction manager on the project, unless removed by NADIF, and would have received fees based on a percentage of the "hard costs" of the project.  See Exhibit 16 ¶ 24e.  As a start-up, however, it had no history, no expense records, and no records demonstrating what Lancelotta may have earned, had JLANCE in fact been the construction manager, and had the project been successfully completed.  The Maryland courts have routinely held that the "loss of profits from a business which has not yet gone into operation may not be recovered because they are merely speculative and incapable of being ascertained with the requisite degree of certainty."  John D. Copanos & Sons v. McDade Rig., 43 Md. App. 204, 207 (1979); see also Evergreen Amusmt. Corp. v. Milstead, 206 Md. 610, 618 (1954) (stating that "[o]n the basis of past history, a reasonable prediction can be made as to its future).  There is nothing, beyond pure speculation, to determine what Lancelotta lost.

Second, Lancelotta makes a multitude of unsubstantiated assumptions in order to reach the conclusion that he is entitled to damages based on income from JLANCE and/or unit sales commissions from January 19, 2000 to September 19, 2002.  For instance, not only does he assume that Phase 1A and Phase 1B of the project would have been completed on schedule, but he also assumes that its successful completion would

have inspired another unidentified, third party to fund Phase 2 of the project.  <u>See</u>

Exhibit 2 at 442-44.  He makes these assumptions despite the fact that NADIF was only

contractually required to seek financing for Phases 1A and 1B of the Wyndholme project.

He further assumes that based on the successful operation of the project beyond Phases

1A and 1B, that JLANCE would have collected 5% of the guaranteed maximum price of

the construction contract as the project's construction manager.  <u>Id</u>. at 446-451.  This,

despite that fact that the price negotiated could have been lower, and the fact that the two

additional Phase 2 towers had not even been designed yet.  <u>Id</u>.  He also assumes that he

would have met the minimum unit sales requirement for Phases 1A and 1B, and that he

would have continued to meet the minimum unit sales requirement for Phase 2 without

any consideration of market conditions.  <u>Id</u>. at 450-452.  Then, he purports to estimate the

amount of income he would draw from another company, Lancelotta & Associates, based

on the profits of JLANCE and unit sale commissions deposited into Lancelotta and

Associates from JLANCE, without any documents, or numbers for that matter, reflecting

or estimating the costs of running each business, and all the while admitting that the

actual amount of his draw might differ for a myriad of reasons, including tax

considerations.  <u>Id</u>. at 453-58.  And all of these assumptions, designed to lead the Court to

the conclusion that the project could have ultimately been a success, are made against the

backdrop of a project that had been rejected time and time again by financial institutions

that, presumably, saw no economic viability in the project.

 The fact is that the plaintiffs', or Lancelotta's, lost income claim rests on a series

of building block assumptions, none of which can be substantiated by evidence.  Thus,

the plaintiffs' lost income claim is speculative, and the Court should dismiss it as such.

**B.      The Plaintiffs' Other Claimed Damages Are Unsupported By
The Evidence.**

The remaining damages claimed by the plaintiffs include unpaid, accrued interest
rate payments on loans to Wyndholme and the Lancelotta, legal and accounting fees, and
Wyndholme's overhead expenses.  These claimed damages are not supported by the
evidence.

First, with respect to accrued interest, Lancelotta testified that all of the interest
remains unpaid; thus, the plaintiffs have not incurred this damage.  See Exhibit 2 at
420-26.  Furthermore, if the plaintiffs were successful in their liability claims against
NADIF and WVI, then Wyndholme and the Lancelottas presumably would not owe any
of the interest related to the NADIF and WVI loans.  Thus, this damage claim is a non
sequitor.[29]

Second, with respect to Wyndholme's overhead expenses, the plaintiffs have
failed to provide any evidence of the actual amounts incurred or the source of funding to
pay the amounts.  Id. at 426-27.  It is, therefore, entirely possible that monies advanced
by the defendants were used to pay some of these expenses.[30]  Moreover, Lancelotta
testified that these costs would be absorbed into the construction budget.  See Exhibit 2 at
427.  Thus, the damage claim is duplicative.

Third, with respect to the legal and accounting fees, the plaintiffs have failed to
provide any evidence, (e.g., bills or invoices), tending to support a claim for fees, despite
the defendants' repeated requests for these records.  See Exhibit 2 at 429-34.  It is also
clear that almost half of these fees involve legal fees for this litigation, and such fees are

---

[29]      Moreover, the plaintiffs cannot prove that Wyndholme had other viable sources of financing, thus,
they cannot collect damages for fraud.  See Section IE, supra.

[30]      Through NADIF, Gotham disbursed $50,000 to Lancelotta on 1/4/00 for marketing and
operations.  See Gotham Cash Receipts and Disbursements, attached as Exhibit 39.

clearly non-recoverable under the American Rule for the recovery of legal fees.[31]  See

Exhibit 36, Response to Request No. 16.

      Because the plaintiffs have not, and cannot, prove damages that are not based on

speculation, unsupported assumptions, and conjecture, this Court should dismiss all of the

plaintiffs' claims.[32]

## IV.    THE COURT SHOULD GRANT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISS THE PLAINTIFFS' EQUITABLE CLAIMS.

    **A.    The Plaintiffs Are Not Entitled To The Rescission Remedy.**

        **1.    The plaintiffs waived their right to seek rescission of the August Venture Agreement.[33]**

      Assuming, arguendo, that one or more of the plaintiffs had at some point the right

to rescind the August Venture Agreement pursuant to which Wyndholme Village sought

and obtained the Bankruptcy Court's approval of the NADIF super priority lien, the

plaintiffs have waived the right for at least two reasons.  First, under Maryland law, when

a party to a contract discovers that he or she may have a claim for fraud or breach of

contract, that party has a right either to retain the contract and collect damages or rescind

the contract. See Merritt v. Craig, 130 Md. App. 352, 365, 746 A.2d 923, 931 (2000).

"'These rights [are] inconsistent and mutually exclusive, and the discovery [of the

breach] put[s] the purchaser to a prompt election.'" Id. (quoting Wolin v. Zenith Homes,

Inc., 219 Md. 242, 251 (1959), cert. denied, 362 U.S. 831 (1959).  More than eighteen

---

[31]      In his response to the defendants' interrogatories, Lancelotta noted $75,000 for legal fees incurred as a result of the current litigation.

[32]      The plaintiffs' claims for punitive damages should be dismissed for the additional reason that the plaintiffs have not alleged and cannot prove the requisite "malice" under Maryland law.

[33]      In discussing rescission, the plaintiffs variously identify the agreement to be rescinded as one dated "August 31, 1999," and one dated "September 2, 1999."  Amended Complaint ¶ 19.  For the purpose of this motion, the defendants assume that these are misstatements by the plaintiffs and that the plaintiffs, in fact, intend to refer to the August Venture Agreement dated August 30, 1999.

months ago, the plaintiffs filed the original complaint, alleging fraud and seeking

damages.  At that time the plaintiffs were aware of the facts upon which they now seek

rescission, but failed to bring such a claim or to notify the defendants that they might

seek to pursue such a claim.  The election by the plaintiffs to do so now comes too late.

See Baumel v. Rosen, 412 F.2d 571, 574 (D. Md. 1969) (substantial delay in bringing

rescission claim constitutes a waiver).

Second, the plaintiffs failed to allege or prove that they tendered, or even offered

to tender, to the defendants all of the consideration and benefits received by them under

the contract.  Under Maryland law, tender is a necessary precondition to seeking the

equitable remedy of rescission.  Merritt v. Craig, 130 Md. App. 352, 360 (Md. App.

(2000) ("Rescission requires, at a minimum . . . an unconditional willingness to return to

the other party both the consideration that was given and any benefits received."), see

also Ray v. Citifinancial, Inc., 228 F. Supp. 2d 664, 667-68 (D. Md. 2002), Benjamin v.

Erk, 138 Md. App. 459, 482, cert. denied, 364 Md. 461 (2001), and Lazorcak v.

Feuerstein, 273 Md. 69, 75-76 (1974).  In paragraph 15 of the amended complaint, the

plaintiffs acknowledge that "NADIF lent the $750,000 to Plaintiffs," and in his

deposition, Lancelotta acknowledged that NADIF lent Wyndholme Village another

$150,000 (unsecured), lent plaintiff, James Lancelotta, $100,000, paid over $1 million to

acquire the Metropolitan Bank loan.  See Exhibit 2 at 423-24, 426, and Exhibit 12 at 99.

The purpose of rescission is to put the parties back in a status quo position.  An absolute

requirement for rescission, then, is that the party seeking rescission repay the amounts

received by it from the defendant under the contract.  Indeed, if the plaintiffs are prepared

to repay NADIF and WVI the money that they put into the project, then a rescission of

the parties' agreement would be an acceptable result for the defendants.

But there is nothing in the record that even suggests that such a tender has been made and, obviously, it could not be made. Plaintiff Wyndholme Village has only this case as an asset, and plaintiff James Lancelotta has publicly stated that he can no longer even "get a charge card." See Exhibit 32 at 1.

On these grounds the Court should grant the defendant's motion for summary judgment as to the rescission claim.

>    2.    **The plaintiffs are collaterally estopped from challenging NADIF's lien because it was judicially created and authorized.**

The NADIF lien was created by order of the Bankruptcy Court and any attempt to modify that order should be brought (and should have been brought years ago) in that court. "[A] challenge for error may be directed to the ordering court or a higher court, as the rules provide, but it may not be made collaterally unless it is based on the original court's lack of jurisdiction. These principles are firm and long standing." Spartan Mills v. Bank of America Illinois, 112 F.3d 1251, 1255 (4th Cir. 1997) (quoting Celotex Corp. v. Edwards, 514 U.S. 300, 305-07, 115 S. Ct. 1493, 1498, 131 L. Ed.2d 403 (1995)).

Spartan Mills is instructive. There, a bank had sold the equipment of a bankruptcy debtor pursuant to an order of the bankruptcy court. The plaintiff, another creditor, filed a federal district court action against the bank seeking the proceeds and claiming that it had a superior lien to that of the bank. In granting summary judgment to the defendant bank, the district court held that the plaintiff was collaterally estopped from relitigating the issue of priority lien position because the bankruptcy court had already decided that same issue. See Spartan Mills, 112 F.3d at 1254. The court further held that the 'determination[] of the validity, extent, or priority of liens' was at the heart of [the]

bankruptcy case and '[a]ll of the corporation's Chapter 11 financing was dependant on the bank's first lien position, and the later sale of the estate's assets could not have been completed if a valid claim of possessory lien had been interposed.'"  Id.

The plaintiffs here seek to challenge the validity of the August Venture Agreement, which reflects the parties' agreement to grant NADIF a priority lien on the Wyndholme property.  But the Bankruptcy Court approved the August Venture Agreement, and, as in Spartan Mills, the Bankruptcy Court approved and authorized the lien that is the subject of the proceedings.  Wyndholme Village could not have continued with its reorganization efforts without the Bankruptcy Court's approval.  Indeed, all of the financing for the Wyndholme project was dependent on the Bankruptcy Court's approval of the August Venture Agreement and the granting of the super priority lien in favor of NADIF.

Moreover, in affirming the district court's opinion in Spartan Mills, the Fourth Circuit further reasoned that the plaintiff had an opportunity to challenge the bankruptcy court's order either by objecting to or appealing the order and failed to do so.  Id. at 1256.  Again, as in Spartan Mills, Wyndholme Village had the option of challenging the 1999 bankruptcy court order.  Not only could it have objected to or appealed the order, but it could have filed a motion pursuant to Federal Rule of Civil Procedure 60.  That rule states in part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

Wyndholme Village never filed such a motion.

Not only did Wyndholme Village fail to appeal from or file a motion challenging the 1999 Bankruptcy Court Order, the plaintiffs voluntarily entered into a Consent Order on October 16, 2000 (the "Consent Order") that permitted either NADIF or WVI to foreclose on their respective liens in the event that the plaintiffs failed to comply with the negotiated terms of repayment.  <u>See</u> Consent Order, attached as Exhibit 40.  The Consent Order is a final order that Wyndholme has never attempted to appeal or challenge. Moreover, on April 14, 2003, the Bankruptcy Court reaffirmed the validity and enforceability of NADIF's lien in responding to Wyndholme's attack on the Consent Order by arguing that NADIF's foreclosure sale should be stayed by Wyndholme Village's bankruptcy filing.  <u>See</u> Judge Derby's Order Regarding the Validity of NADIF's Lien, attached as Exhibit 41.  Judge Derby, the same judge who approved the August Venture Agreement and granted the super priority lien in favor of NADIF in 1999, held that he would take no action that would invalidate NADIF's foreclosure proceedings.  <u>Id</u>.

The Circuit Court of Maryland for Baltimore City has also declined to intervene to stop NADIF's foreclosure sale on the grounds that to do so would constitute an impermissible collateral attack on the 1999 Bankruptcy Court Order.  <u>See</u> Baltimore City Circuit Order Regarding the Validity of NADIF's Lien, attached as Exhibit 42.  It too held that if Wyndholme wanted to challenge the validity of the August Venture Agreement and subsequent liens on the basis of fraud, the proper course of action would have been for it to have filed a motion in the Bankruptcy Court.  <u>Id</u>.  Since this order, the Circuit Court has ratified the sale of the property over the plaintiffs' objections.  <u>See</u> Exhibit 26.

Multiple courts have determined that the plaintiffs are collaterally estopped from challenging the validity of the NADIF lien, and this Court should do the same and dismiss the plaintiffs' rescission claim on this basis.

### 3. To the extent that rescission of the NADIF lien is sought, Leeds is a necessary party.

Leeds purchased the Wyndholme Village Property at foreclosure pursuant to the NADIF lien on December 3, 2002, and the sale was ratified and confirmed over the objections of Wyndholme Village.  See Exhibit 26.  As the contract purchaser at the sale, Leeds Federal now holds equitable title to the Wyndholme Village property.  If the plaintiffs are allowed to rescind the August Venture Agreement, and NADIF's lien, the effect will be to eliminate Leeds' equitable interest, as a contract purchaser.

Federal Rule of Civil Procedure 19 requires that indispensable persons be joined in litigation pending before the federal court.  See International Paper Co. v. Denkman Associates, 116 F.3d 134 (5th Cir. 1997).  In International Paper, the Fifth Circuit affirmed the trial court's dismissal of the case based on the finding that a person who owned part of the land at issue was an indispensable party to the lawsuit.  As in International Paper, Leeds Federal holds an equity interest in the Wyndholme Village property and, as such, must be joined in this lawsuit if the rescission remedy is permitted to go forward.  The failure of the plaintiffs to include Leeds, a necessary party, in this litigation is another reason to grant the defendants' motion for summary judgment on the rescission claim.

**B.**     **The Court Should Deny The Plaintiffs' Request For A Constructive Trust And Receivership Because The Remedies Are Extreme, And Because The Plaintiffs Are Unlikely To Prevail On The Merits Of Their Fraud Claim.**

The amended complaint added counts requesting the imposition of a constructive trust and the appointment of a receiver. Both remedies are sought with respect to the proceeds of the NADIF foreclosure sale. In either case, the plaintiffs would have this Court exercise control over the distribution of the proceeds. There are many several why this is inappropriate.

The first is that the proceeds are already under the control of the Circuit Court, which has procedures in place to protect those who purport to have claims in foreclosure proceedings. See Maryland Rule 14-208. Accordingly, there no need for this Court to inject itself into that process.

The second is that the appointment of a receiver is "'an extraordinary remedy that is only justified in extreme situations.'" Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993), and DeBoer Structures (U.S.A.), Inc. v. Shaffer Tent & Awning Co., 187 F. Supp.2d 910, 925 (E.D. Ohio 2001). Moreover, the remedy is typically sought by secured creditors, judgment creditors, or plaintiff shareholders in derivative actions, i.e., parties who have an actual interest in property. See Santibanez v. Wier McMahom & Co., 105 F.3d 234, 241 (5th Cir. 1997). The plaintiffs in this case are not shareholders or secured creditors. Thus, the extreme remedy of receivership is unwarranted.

The third reason is that it is highly unlikely that the plaintiffs will prevail on the merits of their fraud claim. As discussed in Section I above, the plaintiffs cannot prove by clear and convincing evidence (i) that they relied on the alleged misrepresentations of

one of the parties regarding a term explicitly dealt with in the parties' contract, especially given the plaintiff, Lancelotta's, contradictory testimony to the Bankruptcy Court; (ii) that the defendants' intent at the time that they entered in the August Venture Agreement was to take over the project, given the more than $2 million NADIF invested in Wyndholme, the efforts NADIF engaged in to find financing, and the questionable activities of the plaintiff, Lancelotta; (iii) that the defendants had any legal duty to disclose Quinn's conviction; (iv) that the statements allegedly made by Fisher regarding the defendants' reputation and experience were statements of material fact relied on by the plaintiffs, given that the statements are by law statements of opinion; and (v) that they were damaged as a result of reliance on any alleged fraud, given that the plaintiffs had no other viable sources of financing.

For these reasons, the Court should deny the plaintiffs' request for the equitable remedies of constructive trust and receivership.

## CONCLUSION

The plaintiffs' claims in this case cannot stand scrutiny. The fraud claim is refuted by the agreement signed by the parties, the illogic of its premise, and the sworn testimony of the plaintiff, himself. The newly minted contract claim is a rehash of the fraud claim and, in any event, its apparent premise is contrary to the parties' express agreement as to remedy. The damage claim is fatally speculative. The recently filed rescission claim is, on its face, legally deficient and barred by collateral estoppel. The constructive trust and receivership remedies are similarly flawed. For all of the reasons addressed here, summary judgment must be entered in favor of the defendants, and against the plaintiffs.

#348933                                   45

/s/   *William C. Sammons*
_____
William C. Sammons, Bar No. 02366
Stephen M. Goldberg, Bar No. 01156
  Tydings & Rosenberg LLP
  100 East Pratt Street
  26th Floor
  Baltimore, Maryland  21202
  (410) 752-9700

Attorneys for Defendants and Counterplaintiffs