IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WYNDHOLME VILLAGE, LLC, *et al.*,          *

    Plaintiffs and Counter-Defendants          *

    v.          *          Civil Action No. L01-3809

NADIF OF WYNDHOLME, LLC, *et al.*,          *

    Defendants and Counter-Plaintiffs          *

              *

    *    *    *    *    *    *    *    *    *

**PLAINTIFFS' RESPONSE AND MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(PAPER NO. 71)**

<u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*Edell & Associates, P.C. v. Law Offices of Peter Angelos*, 264 F.3d 424
(4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>State Cases</u>

*Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296 (1978) . . . . . . . . . 33

*Sullins v. Allstate Insurance Co.*, 340 Md. 503 (1995) . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Weisman v. Connors*, 312 Md. 428 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>Federal Statutes and Rules</u>

18 U.S.C., § 982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed.R.Evid. 801(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>State Statutes</u>

36 Florida Code, §§ 608.422 & 608.4101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Miscellaneous</u>

Restatement of Contracts (2nd), § 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Restatement of Contracts (2nd), § 163 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WYNDHOLME VILLAGE, LLC, *et al*.,  *

  Plaintiffs and Counter-Defendants *

  v.  *  Civil Action No. L01-3809

NADIF OF WYNDHOLME, LLC, *et al*., *

  Defendants and Counter-Plaintiffs *

* * * * * * * * * * * * *

PLAINTIFFS' RESPONSE AND MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(PAPER NO. 71)

  Plaintiffs, Wyndholme Village, LLC, James Lancelotta and Katherine Lancelotta, by their attorneys, Howard J. Schulman and Schulman and Kaufman, LLC, in response and opposition to Defendants' Motion for Summary Judgment (Paper No. 71), state as follows:

<u>INTRODUCTION</u>

  Plaintiffs allege that Defendants acted fraudulently for the purpose of obtaining sole control of the Wyndholme project and then selling the land and development rights of Wyndholme Village to others at a profit of approximately $6.2 million. Defendants misrepresented themselves as successful and reputable developers, who represented that North American Doctors Investment Fund, Inc. had assets in excess of $500 million and had the financial wherewithal to pay off the existing debt and complete the project, when, in fact, North American Doctors Investment Fund, Inc. did not even exist.

Defendants falsely represented  that they intended to obtain construction funding to complete the project from third parties or, alternatively, to fund the construction loan themselves were false. Defendants had no intention of building Wyndholme Village. Rather, Defendants made these false representations for the purposes of gaining control of the project and securing liens on the property, in order to get control of the property and/or contract to purchase the property at foreclosure and then sell or "flip" their contractual interest in the property at a profit of approximately $6.2 million, after eliminating Plaintiffs from the project.  Plaintiffs relied upon the Defendants' representations and would not have otherwise become involved with Defendants, entered any agreement with NADIF or WV I, LCC  or sought a priority or senior lien from the Bankruptcy Court, had Plaintiffs known the truth.

Defendants' entire motion is based on the construction and interpretation of ¶ 10 of the August 31, 1999 Venture Agreement that ¶ 10 did not require NADIF of Wyndholme, LLC to fund the construction.  Thus, the threshold question is:   What were the terms of the contract?   Paragraph 10, however,  clearly and unequivocally required NADIF to get or provide itself the $7 million construction funding:  "NADIF shall cause a commitment or term sheet to be issued for construction financing and shall cause the initial funding under such construction loan which must commence funding 120 days following the funding of the Wyndholme loan" in the amount of $7 million.  There is no dispute that NADIF did not make good on this contractual promise.

2

After devoting a substantial portion of their Memorandum to the course of dealings of the parties leading up to the August Venture Agreement and other parol evidence, Defendants argue that Fisher's statements are not actionable because the terms in ¶ 10 of the August Venture Agreement are explicit and unequivocal, thus unambiguous as not to trigger the need to resort to parol evidence to determine the intent of the parties. Because ¶ 10 is clear and unambiguous, so Defendants reason, Defendants were under no obligation to provide the $ 7 million dollar construction loan. Noticeably absent from Defendants' Memorandum is any discussion or analysis of the exact language in ¶ 10. Defendants' tack is to give lip service to plain meaning but actually rely upon parol evidence of the pre-contract course of dealings between the parties. *See generally Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508 (1995) (where terms are ambiguous, extrinsic and parol evidence may be considered to ascertain the intention of the parties).

Defendants produce no evidence to support their parol evidence argument, as those who participated in the negotiations preceding the agreement do not support Defendants. Quinn could not remember anything at deposition; Zukerman took the Fifth by and large or had no information; and Fisher has, to date, absconded from this case. Thus, Defendants are forced to rely upon the argument of counsel concerning what the parol evidence shows, ignoring much of the background and circumstances of the agreement.

3

It is Plaintiffs' position that the language of ¶ 10 is clear and unambiguous.  To the extent that it is not clear and unambiguous, there is sufficient evidence that the parties intended that NADIF would fund the construction loan, if necessary.  This may be inferred from the statements of the individual Defendants, the understanding of Lancelotta and his counsel and the fact that the language in question was drafted by Defendants' counsel.  *See Sullins* 340 Md., at 508-509 (if no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument).   The affidavit of James Lancelotta is corroborated by the testimony of Curtis Coon, Lancelotta's own attorney who participated in the matter, Howard Rubenstein, Wyndholme Village's bankruptcy attorney, and various documents, such as, for example, Fisher's and Zukerman's own business cards.

## STATEMENT OF FACTS

Plaintiff Wyndholme Village, LLC is a Maryland limited liability company which owns the following parcels of real property located in Baltimore City: (a) 3.88 acres known as 5205 Frederick Avenue; (b) 20.89 acres known as 5241 Frederick Avenue; (c) 1.37 acres known as Lots 18-53, Block 8138J.  Wyndholme Village, LLC had a lease-purchase agreement for 7.687 acres known as 100 South Rock Glen Road.  (Collectively all four of these tracts are referred to as the "Property" or "Wyndholme Village").  The Property is improved with water, sewers, pavements, curbs, gutters, and storm drains.  On

4

December 5, 1996, the Property was approved by Baltimore City as a planned-unit development. The development plans provided for seven separate phases. James C. Feeney, MAI, a certified general real estate appraiser with the firm of Lipman, Frizzell & Mitchell, LLC, real estate appraisers and consultants, 8815 Centre Park Drive, Suite 200, Columbia, Maryland 21045, appraised the Property at Twelve Million Eight Hundred Ten Thousand Dollars ($12,810,000) in its "as is" condition. *See* Lancelotta affidavit attached to Paper No. 8, ¶ 2.

James Lancelotta organized Wyndholme Village, LLC for the purpose of developing the Property as a retirement community primarily for deaf and hard-of-hearing seniors. He was motivated in part by the fact that his maternal grandparents were deaf. He is the principal member of Wyndholme Village, LLC. The bulk of the Property, except for 100 South Rock Glen Road, has been in the Lancelotta family for generations and is known as the Wyndholme Estate. *See* Lancelotta affidavit attached to Paper No. 8, ¶ 3.

As of September 1998, part of the Property was subject to a first lien held by Leeds Federal Savings Bank ("Leeds") in the approximate amount of Two Million Seven Hundred Twenty-Five Thousand Dollars ($2,725,000); a second lien in favor of Metropolitan Bank and Trust ("Metropolitan") in the approximate amount of One Million Five Hundred Thousand Dollars ($1,500,000); and a third lien in favor of Tom Iacoboni/Iacoboni Site Specialists, Inc. ("Iacoboni") in the approximate amount of Five

Hundred Forty Thousand Dollars ($540,000).  *See* Lancelotta affidavit attached to Paper

No. 8, ¶ 4.

In September, 1998, the Plaintiffs obtained a binding commitment in the amount of

$7.1 million from Cornerstone Private Capital LLC of Denver, Colorado, for the purpose

of purchasing 100 South Rock Glen Road, consolidating all of the existing loans, and

providing additional funding for a period of twelve months. In addition, Construction

Lending Corporation of America of Sacramento, California, issued a commitment to

provide the construction funds, subject to closing on the $7.1 million loan.  On September

29, 1998, 17 days prior to the scheduled closing, Cornerstone advised that one of

Cornerstone's senior officers had been terminated as the result of alleged serious financial

improprieties and that Cornerstone could no longer live up to its commitment, thereby

causing the entire financing package to collapse.  *See* Lancelotta affidavit attached to

Paper No. 8, ¶ 5.

On November 9, 1998, Metropolitan made demand for full payment of its loan on

grounds that the maturity date had passed and the loan was in default.  Metropolitan

instituted foreclosure proceedings and scheduled the foreclosure sale for March 17, 1999.

On March 17, 1999,  to avoid foreclosure and to prevent the loss of the properties,

Wyndholme Village, LLC filed a Voluntary Petition under Chapter 11 in the United

States Bankruptcy Court for the District of Maryland  (Northern Division), Case No. 99-

53494.  From that filing, Wyndholme Village, LLC remained in possession of its assets

6

and acted as a Debtor-in-Possession until August 31, 2001, the date on which the United

States Bankruptcy Court entered an order terminating the bankruptcy proceedings in that

case.   *See* Lancelotta affidavit attached to Paper No. 8, ¶ 6.

      In May, 1999, Lancelotta contacted a mortgage broker, Sam Eisenberg, of N.E.

Capital Group, 2302 Nostrand Avenue, Brooklyn, New York 11210, who, after reviewing

information about Wyndholme Village, arranged an appointment for Lancelotta to meet

Philip Pilevsky,  President and Chief Executive Officer of Philips International Realty

Corp., a real estate investment trust.   Eisenberg  told Lancelotta that Pilevsky was in the

same "league" as Donald Trump.  The meeting took place during the first week of June,

1999, at Pilevsky's office in New York City, 417 Fifth Avenue.   With Pilevsky were two

of his real estate advisors (Steven Haber and Marilyn Karpoft) and Sam Eisenberg, the

broker who arranged the meeting.  Pilevsky told Lancelotta that he owned the building at

417 Fifth Avenue and gave Lancelotta an article about himself that was to appear in the

next issue of *Forbes*.  Karpoft, who said she previously had been involved with the deaf

community, expressed her confidence that the development had the makings to be

extremely successful. Pilevsky agreed and informed Lancelotta that he wanted to conduct

"due diligence". Pilevsky said he was directly involved with development of the proposed

Ritz-Carlton Hotel in Baltimore's inner harbor and had associates who were both working

on the project and familiar with the Baltimore real estate market. Pilevsky telephoned one

of these associates in Lancelotta's  presence and requested that he contact Lancelotta the

following day to make arrangements to view the property.   After Pilevsky hung up, he

told Lancelotta he had been speaking with Neil Fisher, one of the Baltimore associates,

who would call Lancelotta the next day and schedule a meeting for the following week.

*See* Lancelotta affidavit attached to Paper No. 8, ¶ 7.

Fisher telephoned Lancelotta the next day and arranged to meet him at Wyndholme

Village on June 8, 1999.   When they met that day, Fisher introduced himself as Stuart

Fisher but told Lancelotta to call him Neil.  Fisher gave Lancelotta his business card,

which identifies Fisher as an attorney and the CEO of the North American Doctors

Investment Fund, Inc., a member of the NADIF Group, "A Real Estate Equity and Development

Fund".   A copy is attached.  With Fisher were two individuals, whom he introduced as

Jack Quinn and Howard Zukerman.   Zukerman also gave Lancelotta a virtually identical

business card, which identified Zukerman as the CFO.  A copy if attached.  Quinn did

not offer a card. Lancelotta gave them a tour of Wyndholme Village and they told him

they were very pleased with what they saw.  *See* Lancelotta affidavit attached to Paper

No. 8, ¶ 8.

During the meeting, Fisher outlined the financial capacity of his group, its ability

to finance the purchase of the note of the lender that had initiated foreclosure on the real

estate (Metropolitan Bank and Trust Company), its willingness to advance capital to

activate the development immediately, and its ability to provide financing to construct

the entire project. Fisher told Lancelotta they were successful developers who had the

financial resources and strength to fund a loan of millions of dollars to Wyndholme

Village for completion of the development of the Property for the project.  He said they

were the individuals who were developing the inner harbor Ritz-Carlton and who

arranged $40 million for Richard Swirnow to complete the inner harbor Harborview

project.  He also told Lancelotta that they had recently developed the Ritz-Carlton in

Coconut Grove, Florida.  Fisher told Lancelotta that they were interested in assisting him

with the development of Wyndholme Village.  In the presence of Quinn and Zukerman,

Fisher told Lancelotta that the three of them were principals of North American Doctors

Investment Fund, Inc. which  had assets in excess of $500 million and in which Pilevsky

was a major investor.  Fisher told Lancelotta that North American Doctors Investment

Fund would be able to obtain the millions of dollars required to pay off the existing debt

and to finance the completion of the project.  Fisher also told Lancelotta that if North

American Doctors Investment Fund could not obtain financing from a third party, North

American Doctors Investment Fund had more than enough assets to make the loan itself.

Fisher told Lancelotta that North American Doctors Investment Fund always

operated through single-purpose subsidiaries, which in this case would be NADIF of

Wyndholme, LLC ("NADIF").  Fisher told Lancelotta that North American Doctors

Investment Fund was very successful because of their own individual, personal expertise.

Fisher said he was an attorney and an expert in helping companies in bankruptcy, such as

Wyndholme Village.  He understood the "ins and outs" of bankruptcy proceedings and

9

had the expertise to provide the funding to get Wyndholme Village out of bankruptcy and the development process going again. He told Lancelotta that he was the Chief Executive Officer of North American Doctors Investment Fund, Inc. and would be the Chief Executive Officer of NADIF of Wyndholme, LLC. He added that Quinn was a successful and highly-regarded real estate developer and that Zukerman brought with him particularized financial expertise in implementing financing for a project such as Wyndholme. Neither Fisher, Zukerman nor Quinn, at that time or any other time, informed Lancelotta of Quinn's conviction for real estate securities fraud and making false financial statements concerning a real estate project. Fisher promised that NADIF would make an immediate loan of Seven Hundred Fifty Thousand Dollars ($750,000) to Wyndholme Village, LLC for project start-up funds, and that NADIF would issue a commitment that would provide funds within 120 days for construction of Phase I of the project, in exchange for—among other things—a senior, priority lien on the property. He told Lancelotta that WVI, LLC was a Delaware company that would purchase the Metropolitan loan. He told Lancelotta that ownership of NADIF of Wyndholme, LLC would be: Philip Pilevsky (50%), Neil Fisher ( 16⅔%), John Quinn(16⅔%) and Howard Zukerman (16⅔%). His meeting with Fisher, Quinn, and Zukerman lasted from approximately 8:00 a.m. until lunchtime. Fisher proposed the terms of the agreement. *See* Lancelotta affidavit attached to Paper No. 8, ¶ 9.

Agreeable to what Fisher was suggesting, Lancelotta placed a telephone call to

10

Howard A. Rubenstein, the bankruptcy attorney representing Wyndholme Village, LLC and arranged to take Fisher, Quinn, and Zukerman to Rubenstein's office at 3:00 p.m. on June 8, 1999. Lancelotta did, in fact, go to Rubenstein's office that afternoon with Fisher, Quinn, and Zukerman.  Also present was Lancelotta's personal attorney, Curtis C. Coon.  At this meeting, Fisher reiterated his representations in front of Quinn and Zukerman. Based on Fisher's representations about NADIF's financial wherewithal and pledge to finance the project, as well as his representations about his, Quinn's, and Zukerman's reputation, skill and expertise, Lancelotta, on behalf of Wyndholme Village, LLC, agreed to what would be the July 8, 1999 agreement that would be submitted to the Bankruptcy Court for approval.  After the July 8, 1999 agreement was executed by NADIF, Fisher told Lancelotta that they would advance and, in fact, did at a later date, to Lancelotta personally $100,000 to put his own personal financial situation in order.  *See* Lancelotta affidavit attached to Paper No. 8, ¶ 10.

On July 9, 1999, Wyndholme Village, LLC filed a Motion for Senior Lien on Property of the Estate Already Subject to Liens in the Bankruptcy Court.  In support of their request for approval, Plaintiffs filed the  agreement dated July 8, 1999 between Plaintiff Wyndholme Village, LLC and Defendant NADIF.  A hearing was held on the motion on August 4, 1999 in the Bankruptcy Court before the Honorable E. Stephen Derby, where both Leeds Federal and Metropolitan opposed the Senior Priority Lien. The hearing was continued until September 21, 1999.  *See* Lancelotta affidavit attached

11

to Paper No. 8, ¶ 11.

Fisher subsequently informed Lancelotta that Pilevsky was not going to participate any longer. A short time later, Fisher introduced Lancelotta to Stephen Garchik of Gotham Partners who, Fisher said, would be replacing Pilevsky. Fisher told Lancelotta to give Garchik a tour of the property and answer any questions Garchik had pertaining to the development. Some time after August 4, 2001, Gotham Partners (so Fisher told Lancelotta at the time) provided funds to WVI, LLC to purchase the Metropolitan loan. Fisher told Lancelotta that he was Vice President of WVI, LLC. Fisher then informed Lancelotta that Pilevsky was still involved in the venture. However, Gotham Partners would now be entitled to the 50% share in NADIF of Wyndholme, LLC and Pilevsky would enjoy a smaller percentage. Gotham Partners would be another source for the additional funds called for in a revised agreement. *See* Lancelotta affidavit attached to Paper No. 8, ¶ 12.

After the August 4, 1999 hearing, on various occasions, Lancelotta heard Fisher reiterate his representations about their development experience and financial wherewithal. For instance, on or about August 29 and 30, 1999, Fisher repeated to Lancelotta, Rubenstein, and Coon that Defendants were successful and reputable developers, that NADIF had financial resources and strength to fund a loan of millions of dollars to Wyndholme Village, LLC (to pay off all of the existing debt and to complete development of the Property for the project), and that NADIF would lend

12

Wyndholme $750,000 secured by a super priority or senior loan, lend Lancelotta
$100,000, and issue a commitment that would assure availability of funds for a $7
million construction loan within 120 days of the Bankruptcy Court's approval of the
super priority or senior loan.   Fisher made these statements to Lancelotta at the
Wyndholme Village Sales Center in Baltimore.  Fisher, Quinn and Zukerman were in
Baltimore for, and participated in, the negotiations concerning what would be the August
30, 1999 agreement.[1]

From September 1999 through December 1999, Zukerman was present at
Wyndholme Village approximately three days a week.  In relying on Defendants'
representations about their developmental skills and financial wherewithal and their
pledge to finance the project, Lancelotta agreed to the August 30, 1999 agreement.
Additionally, in relying on Defendants' representations about their developmental skills
and financial wherewithal and their pledge to finance the project, Lancelotta, on behalf
of Wyndholme Village, LLC, agreed that WVI, LLC would pay off Metropolitan, that it
would become the assignee of Metropolitan's rights under its loan, including its lien on
the property, and that it would be substituted for Metropolitan in the bankruptcy
proceedings.  Based on this revised agreement and the representations to its counsel of
Defendants' developmental  skills and financial wherewithal and their pledge to finance

---

[1]The first sheet of the August 30, 1999 agreement appears to reflect the date
August 20, 1999, but what might appear to be a "20" is a sloppy "30".

the project, as well as Defendants' involvement in the development of the project,

Wyndholme Village, LLC urged the Bankruptcy Court's approval of the lien. Lancelotta

saw Fisher sign the August 30, 1999 agreement in the Sales Center Office at Wyndholme

in Baltimore.  *See* Lancelotta affidavit attached to Paper No. 8, ¶ 13.

Lancelotta had no information that Fisher, Quinn, and Zukerman were anything

other than what they had represented until he was approached by Joe Matthews of the

Baltimore *Sun* in October, 1999 who advised that he was conducting an investigation of

allegations that had been made about Fisher and Quinn.  Lancelotta was surprised, even

sickened, when he read articles concerning Fisher and Quinn in the *Sun* on November

21, 22 and 23, 1999.  The November 21, 1999 article was captioned, "Ritz Developer:

Grandiose Plans Rarely Realized."  The November 22, 1999 article was captioned, "A

checkered past, few questions asked: Businessman: Baltimore Embraced Neil Fisher and

his ambitious plan for a $100 million dollar Ritz-Carlton Hotel, but his past adventures

were given little scrutiny."  The November 23, 1999 article was captioned, "Fisher record

raises doubt."  Additionally, on October 1, 2001, Lancelotta read in the *Sun* that

Zukerman had pled guilty to tax charges. An October 10, 2001 *Sun* article about

Zukerman was captioned "Key figure in hotel plan to serve prison term, Man who

admitted to tax violations part of financing team."  *See* Lancelotta affidavit attached to

Paper No. 8, ¶ 14 and attachments thereto.

The *Sun* articles chronicled that Fisher held himself out as a matter of course as

14

the president and chief executive officer of North American Doctors Investment Fund, Inc. and the North American Doctors Investment Fund out as a major real estate investment trust that has had numerous successful real estate developments, developing, for instance, various Ritz-Carlton Hotels. As a matter of course, the articles stated, Fisher represented that the North American Doctors Investment Fund is a real estate trust under his control and that it had more than $500 million in assets. Quinn, Fisher and North American Doctors Investment Fund, Inc., the articles detailed, had never completed a construction project and had been sued on numerous occasions for fraud, misappropriation of money and financial misdealings related to their involvement in proposed construction and development projects. According to the articles, Fisher has left a trail of fraud claims, bankruptcies, tax liens, corporate shells and disappointed people through various states. Fisher is a paper pauper without assets in his own name. Fisher has personally declared bankruptcy or placed numerous corporations under his control into bankruptcy and is judgment-proof–and even bragged to the reporters about being judgment proof. Fisher, so the articles continued, has been involved in numerous failed construction and development projects such as Hampton Cove on Long Island, New York, Terra Ceia Isles, Florida, "The Riviera", "Shipwatch" in Charles County, Maryland and "Port America" in Prince George's County, Maryland. The IRS has tax liens against Fisher for over a million dollars. North American Doctors Investment Fund is a shell that emerged from bankruptcy in 1998. Fisher, for example, induced John W.

15

McTigue, M.D., a Washington eye surgeon, to make Fisher his personal money manager,
only to have Fisher misappropriate over $2 million of his money.  Fisher has used monies
from investors intended for use on would-be construction and development projects to
support Fisher's extravagant and flamboyant lifestyle.

Quinn fared little better in the *Sun* articles.  He was described as  Fisher's long-
time business partner in many of Fisher's  projects, including Hampton Cove on Long
Island, New York, Terra Ceia Isles, Florida, "The Riviera", "Shipwatch" in Charles
County, Maryland and "Port America" in Prince George's County, Maryland. The article
described how Quinn pled guilty to real estate securities fraud and making false financial
statements concerning a project known as "Gatsby's Landing" in Glen Cove, New York
and that in 1995, a jury found both Fisher and Quinn personally liable for fraud and
imposed damages of $1.28 million for the Riviera project, a judgment which, as of the
date of the articles, remained uncollected.

After obtaining the lien, Lancelotta was unaware of any appreciable effort by
NADIF to obtain the financing for the payment of the Leeds Federal loan or for
completion of the project.  *See* Lancelotta affidavit attached to Paper No. 8, ¶ 15.

After the Bankruptcy Court lifted the stay of foreclosure as to Leeds Federal,
Defendant, NADIF of Wyndholme, LLC, attempted to purchase the property at the
foreclosure sale on April 30, 2001.  On April 30, 2001, the property at Wyndholme
Village was sold at public auction to NADIF of Wyndholme, LLC for the purchase price

16

of $3,600,000 plus the total outstanding balance of the "super priority loan" which, at

that time, was approximately $900,000. Fisher provided the auctioneer and the Court a

$125,000 deposit. On May 14, 2001, NADIF of Wyndholme, LLC signed a contract to

"flip" the property for $7,500,000 to Triton Capital Corporation, as evinced by contract

dated May 14, 2001. *See* Lancelotta affidavit attached to Paper No. 8, ¶ 17; attached

Triton agreement dated May 14, 2001.

The Defendants, NADIF of Wyndholme, LLC and WV I, LLC, are shell entities,

neither of which is registered to do business in Maryland. NADIF nominally is

supposedly owned and managed under the authority of Gotham-Q Venture I, LLC,

Mountainbrook Trust (Martin Zukerman, trustee) and Jolipenny II Trust (John J. Quinn,

trustee), which are fictitious entities. John J. Quinn is John R. Quinn's son. Gotham-Q

Venture I, LLC was never organized or registered in any state. *See* Quinn deposition, at

97-104, 127-129; affidavit of counsel (Paper No. 54); Zukerman deposition, at 10, 13-

17, 114-21, 123-34. Fisher (at least sometimes), John R. Quinn, Zukerman, David

Klafter of New York City and William Ackman of New York City purport to manage

NADIF of Wyndholme, LLC. However, none of these persons, except Fisher, are listed

anywhere as managing members, as required by 36 Florida Code, §§ 608.422 &

608.4101. *See* McBride deposition, at 24-26; NADIF of Wyndholme, LLC interrogatory

answer No. 6 (Papers No. 53 & 54). Nor is there an operating agreement. According to

the depositions of the corporate designees of NADIF of Wyndholme, LLC (McBride and

Garchik), NADIF and WV I, LLC have no employees, have never filed tax returns and do not maintain financial books and records, and the only asset they own is the August 30, 1999 Venture Agreement and Plaintiffs' liens and liabilities flowing therefrom.   The Defendants in this case have cross-collateralized the Wyndholme project with one located at 1060 Brickell Avenue in Miami, Florida.   *See* McBride deposition, at 84-85; Garchik deposition, at 83-85 & exhibit No. 4 thereto.  (Attached to Paper Nos. 53 & 54).

On September 8, 1999, Zukerman was indicted on eight counts of tax fraud in *United States of America v. Zukerman* (Case No. 99-CR-836 (E.D. N.Y.) (Uniondale)) and pled guilty to four of the counts on April 30, 2001.  At present, Defendant Zukerman has IRS and New York State tax liens levied against him in amounts totaling $327,110. *See* true test copies submitted as Exhibits in non-ECF form. (Paper No. 54).   On  April 16, 2002,  Zukerman was also indicted in *United States of America v. Hundley, et al.* (Case No. 02-CR-441-5 (S.D. N.Y.) (White Plains), for using straw and shell entities to defraud five financial institutions of $42.4 million and tax evasion.  Pursuant to 18 U.S.C., § 982, the Government seeks in the indictment to hold Zukerman and his five co-defendants jointly and severally liable for the $42.4 million and the forfeiture of all personal assets to the extent of the $42.4 million.  Superseding indictments were subsequently filed on July 11, 2002 and November 21, 2002.   This case is still pending. *See* attachment to Paper No. 54 filed in non-ECF form).

On May 19, 1994, Quinn filed a Voluntary Petition under Chapter 7 in the United

States Bankruptcy Court for the Southern District of Florida (Case No. 94-21941). He

listed approximately $2.8 million in debt, including an IRS lien in the amount of

$1,792,546.11. He was discharged on August 14, 1997. On August 17, 2000, Quinn

filed a Voluntary Petition under Chapter 7 in the United States Bankruptcy Court for the

Eastern District of Virginia (Alexandria) (Petition No. 00-13441), in which he listed

$3,810,519.53 in debt, including New York State and IRS tax claims totaling

$2,727.268.69. He was discharged on December 12, 2000. *See* true test copies attached

to Paper No. 54 submitted as Exhibits in non-ECF form.

On August 14, 1995, Fisher filed a Voluntary Petition under Chapter 7 in the

United States Bankruptcy Court for the Eastern District of New York (Brooklyn)

(Petition No. 95-16927). Among the $16,649,806.05 in total liabilities, Fisher listed $2.4

million owed to the Internal Revenue Service and $175,000 to the State of Virginia

Department of Taxation. On August 20, 2001, Fisher again filed a Voluntary Petition

under Chapter 7, albeit in the United States Bankruptcy Court for the Middle District of

Florida (Gainesville) (Petition No. 01-00539), and was discharged on December 20,

2001. Fisher listed a $1,028,228.48 claim by the Internal Revenue Service of the total

$1,053,928.48 in liabilities. Fisher also filed a Chapter 11 proceeding in the United

States Bankruptcy Court for the Western District of Virginia (No. 90-00414). *See* true

test copies submitted as Exhibits attached to Paper No. 54 filed in non-ECF form.

Fisher, according to his most recent bankruptcy filing, has no real or personal

property or assets titled in his own name.  Fisher appears to maintain his business assets

in the name of his wife, Tamara J. Fisher, in single purpose entity corporations and

limited liability companies, such as, for example,  One Harborview, Inc. (formerly

NADIF of Florida, Inc.) and Harbor Holdings, Inc. (formerly NADIF of Inner Harbor,

Inc.), Brickell Realty Investors, LLC,  and Palm Realty Ventures, LLC.   The signature

of Tamara Fisher reflected in the Florida Department of State records for these entities

appears to be that of Stuart Fisher.   (Attached to Paper No. 54).

Neither Fisher nor Quinn listed their respective interests in the instant transaction

or in the Brickell Avenue venture as assets in their bankruptcy filings in Case Nos. 00-

13441 and 01-00539.  Stuart Fisher performed the services related to the Brickell

Avenue venture, but the name of Tamara Fisher appears on the papers. *See* McBride

deposition, at 26-32.   (Attached to Paper No. 54).

Attached to Paper No. 54 are Florida Department of State records for some of the

entities reflected on the cross-collateralization agreement.  The Articles of Organization

for Brickell Realty Investors, LLC reflect that John J. Quinn is the managing member.

Similarly, the Articles of Organization for Palm Realty Ventures, LLC reflect that

Tamara J. Fisher is the managing member. The 2003 Limited Liability Company

Uniform Business Report for Brickell Realty Investors, LLC reflects that its managing

members are John J. Quinn and Tamara J. Fisher.  The 2003 Limited Liability Company

Uniform Business Report for Palm Realty Ventures, LLC reflects that Tamara J. Fisher

20

now remains as the managing member.  The Articles of Organization for Plaza of

Sarasota, LLC reflects that its managing member is Howard D. Zukerman.   (Attached to

Paper No. 54).

Quinn, according to his deposition, has no personal real property or assets in his

own name.  Quinn maintains his assets in the name of his son, John J. Quinn, and

receives compensation from what he terms trusts and side agreements.  *See* Quinn

deposition, at 97-104. (Attached to Paper No. 54).  Quinn also testified that his son

"takes good care of" him and pays for his residence, car and expenses.  *See* Quinn

deposition, at 128-29.  Quinn did not file a tax return in 1999, had not filed one in at least

five years and could not remember at deposition when he last filed a tax return.  *See*

Quinn deposition, at 195-96.  Quinn, according to his deposition, received, along with

Fisher, a several hundred thousand dollar fee for the Baltimore Inner Harbor project,

ostensibly through Tamara Fisher and John J. Quinn.[2]  *See* Quinn deposition, at 123-28.

Based on this alone, one could reasonably conclude that the individual Defendants, who

are managers of NADIF of Wyndholme, LLC,  have secreted their assets and income for

purposes of hiding them from the Bankruptcy Courts, the Internal Revenue Service and

other creditors.  Based on this and the fact that fictitious entities own and operate NADIF

---

[2]The Project has yet to come to fruition, and litigation is on-going concerning it.
On information and belief, the individual Defendants obtained a piece of the ownership
in the same fashion as here and then "hung the deal up" until they were bought out.

of Wyndholme, LLC, one could reasonably conclude that the Defendants are using

NADIF of Wyndholme, LLC to hide their assets from the Bankruptcy Courts, the

Internal Revenue Service and other creditors.   (Attached to Paper No. 54).

<u>ARGUMENT</u>

Paragraph 10 states:

>Wyndholme Construction Loan Commitment/Term Sheet. On or before the date of a hearing before the U.S. Bankruptcy Court for the District of Maryland held for the purpose of approving this Agreement, **NADIF shall cause a commitment or a term sheet to be issued for construction financing and the initial funding under such construction loan which must commence funding within 120 days following the funding of the Wyndholme Loan** (such construction loan shall be in an amount of approximately $7,000,000.00, on market terms considering the particular circumstances of this transaction to develop Phase IA of Wyndholme Village pursuant to the applicable plans and specs (said commitment or term sheet is hereinafter referred to as the "Phase 1A Loan Commitment"). **The Phase 1A Loan Commitment shall provide that a precondition to the making of such loan is satisfying the 60% pre-sale requirement for Phase 1A (the sale of at least 33 units in Phase 1A within four months following the funding of the Wyndholme Loan**, for no less than the prices set forth in the Minimum Required Sales Pace/Price/Development pursuant to Exhibit H attached hereto (as revised and amended on August 30, 1999).

>In addition, provided that Wyndholme satisfied the 60% pre-sale requirement for Phase 1B (the sale of at least 33 units in Phase 1B within sixteen months following the funding of the Wyndholme Loan, for no less than the prices set forth in the Minimum Required Sales Pace/Price/Development), NADIF shall cause a commitment or a term sheet to be issued for construction financing in an amount of approximately

22

$7,000,000.00, on market terms considering the particular circumstances of this transaction, to develop Phase 1B of Wyndholme Village pursuant to the applicable plans and specs (the "Phase 1B Construction Loan"). Upon the initial funding of the Phase 1A Construction Loan, the original assignment of 40% of the membership interest in Wyndholme to NADIF shall be delivered to NADIF (said original being held in escrow by Curtis C. Coon, Esq. prior to such time), however, subsequently, in the event that the 60% pre-sale requirement for Phase 1B is timely satisfied, and NADIF is unable to obtain/provide the Phase 1B Construction Loan, NADIF shall transfer 25% of the membership interest in Wyndholme, owned by NADIF, to Lancelotta, thereby reducing NADIF's aggregate ownership interest in Wyndholme from 50% to 25%. (Emphasis supplied).

Curtis Coon testified at length about the pre-agreement discussions with Defendants (Tr. 18-119), and that the construction financing was the "singular largest thing" in importance to the project. The construction financing, Coon testified, was the focus of the Wyndholme project and its primary long-term goal. (Tr. 24-27). Coon also testified:

**So the construction financing had been the focus of the Wyndholme Village project from the time that I was introduced up to the time of this meeting as being the primary long-term goal.** And what Zukerman and Fisher -- and, as I say, I don't think Quinn said a whole lot, but he was there. **What Zukerman and Fisher were doing was showing that they had the financial strength, the wherewithal to make absolutely certain that this financing would be available, to the point where I recall very, very clearly, because it impressed me as being a basis to move forward -- knowing as much as I'm a lawyer that nothing means anything unless people are willing to perform – when they said that if they had to, they could write a check for it,** you know. There was talk

23

about different alternatives in terms of going forward, but the basic proposition was that they had the strength to go forward and make a loan for a, what subsequently became a super priority loan.  Also, there was some concern raised by Stuart Fisher, Neil Fisher.  I believe it was he who raised the question that they wanted to feel as though Mr. Lancelotta was himself not in a position where he couldn't afford to keep his own house in order.  So there was some discussion about that as well at that meeting.  And I believe that it was there or shortly thereafter that talk was had with the Fisher side of the table about making some sort of a loan also to Mr. Lancelotta individually.  Their concern was he was the point guy, he was going to be the guy on the site, and they did not want him to be in a situation where he was having his house foreclosed or what-have-you.  (Tr. 25-26).  (Emphasis supplied.)

Coon also testified (Tr. 108-113) that the language in ¶ 10 of the August 30, 1999

agreement was intended by the parties to state that NADIF would provide the funding:

> **What was important was the funding.  And as long as they were to provide the funding, you know, that's what made the difference, and that was what was explained to me.**  And I think this goes back to the earlier provisions or -- not provisions, but renditions where the first time we saw a term sheet pop up on one of these agreements, whether it's your exhibit or whether it's something in my file, that discussion initiated right then and there that a commitment letter was what we wanted.  And they said, well, in this day and age no bank issues a real commitment letter anymore, to which I had to pretty much agree, frankly.  Banks don't really generally give commitment letters.

> So my position to argue with that was diminished somewhat by the custom in the banking industry as I understand it, which is the banks generally issue letters that are not firm, solid, hard commitments.  **On the other hand, what was important and what was the basis in my mind all along of the bargain with the Fisher group from the beginning was that the funding would be there for construction.**  And that was because it was necessary to get out of the well the project was in.

>       At the very beginning it could have been, we'll buy out
> Leeds, do this, that and the other, but as matters progressed, it
> was clear that Leeds was not amenable to being bought out at
> a discount, for example.  That Leeds was going to hold fast to
> its position, you know, like a -- I mean, they were like fly
> paper once they stuck to a position.  So the idea of the
> alternate ideas went by the wayside, and it became a question
> of, okay, we've got to have construction financing to
> construct this first phase to get the project back up on its feet.
> (Tr. 109-111).   (Emphasis supplied.)

The documents engaged by the parties reflect that the language was drafted by

Defendants' attorney, Ricardo Fraga.  *See also* Lancelotta deposition, at 178.

James Lancelotta's affidavit on file with this Court, ¶¶ 8, 9 & 13 (Paper No. 8),

reflects that, based on Fisher's representations, NADIF, particularly given its financial

wherewithal, would fund the construction loan if others did not.  Lancelotta testified at

deposition to the same effect.[3]  *See, e.g.,* Tr.  104-05, 115, 245-46, 318-320 (Copies

attached to Paper Nos. 53 & 54).   Lancelotta's testimony is corroborated by the

deposition testimony of Curtis C. Coon (Tr. 25-42), who was personal counsel to Mr.

Lancelotta, and by Howard Rubenstein (Tr.15, 111-112, 114-15), who was bankruptcy

counsel to Wyndholme Village, LLC.   Copies of these portions are attached to Paper

Nos. 53 & 54.

James The bankruptcies filed by Fisher and Quinn belie their representations to

---

[3]Fisher's cards which he distributed to Messrs. Lancelotta, Coon and Rubenstein
stated The NADIF Group to be a real estate equity and development fund.  *See*
Rubenstein deposition, at 114-15; Lancelotta, at 104-05.  A copy of the card is attached.

25

Lancelotta that they were successful and highly-regarded real estate developers. Fisher, the managing agent of NADIF, has refused so far to answer interrogatories, respond to requests for production of documents and appear at depositions in this case. This is to say that Fisher, the managing agent of NADIF of Wyndholme, LLC and WV I, LLC, has absconded and taken flight instead of answering the allegations in the complaint. Fisher, thus, has refused to testify about the North American Doctors Investment Fund and "The NADIF Group, A Real Estate Equity and Development Fund". His failure to do so should be construed against NADIF of Wyndholme, LLC since he is still the managing member, according to the Florida Department of State. *See* Florida Department of State files No. H9900003986 attached to Paper No. 54. Likewise, Zukerman's indictment and conviction for failing to file tax returns are evidence that he was not the successful CFO that was represented to Lancelotta. *See* papers from Cr 99-Cr-836 & 02-Cr-441-5; Lancelotta deposition, at 105 (attached to Paper No. 54).

       None of the other Defendants have been able to produce any information concerning the assets of the North American Doctors Investment Fund, Inc. although it appears without dispute in this case that both Fisher and Zukerman provided Lancelotta, Coon and Rubenstein with their business cards from North American Doctors Investment Fund, Inc. Although his card reflected that he was the Chief Financial Officer of North American Doctors Investment Fund, Inc., Zukerman testified at deposition that he had no information concerning the assets of that entity. *See* attached portions of Zukerman

deposition, Tr. 94-100, and attached business cards. (Paper No. 70). Plaintiffs have found no evidence that North American Doctors Investment Fund, Inc. existed in 1999 or thereafter. *See* attachments to Papers 53 & 54. Additionally, although Fisher held himself out as an attorney, Plaintiffs have been unable to find any evidence that he has ever been admitted to practice law in any jurisdiction.

The cases cited by Defendants that stand for the proposition that an action for fraud will not lie based on clear and unambiguous terms do not apply in this instance. The cases cited by the Defendants make a point of distinguishing clear and unambiguous language before them from those instances in which there is an ambiguity. Plaintiffs' interpretation concerning the contract is not inconsistent with the fraud alleged, i.e., NADIF of Wyndholme, LLC and the individual Defendants had access to substantial funds through the North American Doctors Investment Fund, Inc. by which they could fund the project if a third-party lender would not. Clearly, the individual Defendants' pre-contract statements are completely consistent with the plain meaning of ¶ 10 or, alternatively, with what the parties understood would be NADIF's obligation to fund the construction loan.

Defendants state that the Plaintiffs did not rely upon Fisher's statements. They select a portion of the bankruptcy proceeding, quoting that portion at page 18 of the memoranda. This portion of the proceeding in the Bankruptcy Court refers to NADIF of Wyndholme, LLC, which itself was a single purpose entity through which North

American Doctors Investment fund, Inc. operated.   Nonetheless, it was Plaintiffs'
understanding from the beginning that NADIF of Wyndholme, LLC, based on what
Fisher had told Lancelotta, did not intend to use its own funds to finance the Wyndholme
Village project but, nonetheless, funds of North American Doctors Investment Fund, Inc.
would be available as a last resort.   Fisher, Zukerman and Quinn made it clear to
Lancelotta from the outset that North American Doctors Investment Fund, Inc. had no
intention of funding a construction loan but if, for any reason, the resources did not
secure the required financing, North American Doctors Investment Fund, Inc. would
provide the funding. That was why ¶ 10 was worded as it was.   Thus, Lancelotta's
testimony here is not inconsistent with that of either his affidavit or deposition testimony
in this case.   Furthermore, the questioning at this portion of the transcript is far from
clear.[4]

        Defendants argue that Plaintiffs cannot prove that Defendants intended to defraud
the Plaintiffs. There is no question that the Defendants represented themselves as
something they were not.   The individual Defendants represented that they were
successful real estate developers.   Fisher and Zukerman represented that they were,
respectively, the Chief Executive Officer and Chief Financial Officer of a real estate
equity and development fund and that this fund had comparatively unlimited resources

---

        [4]The portion of the bankruptcy proceeding from transcript page 234 is more
accurately "No, I was never under the opinion they would issue the commitment."

with which to fund this relatively small project.  The financial wherewithal of North

American Doctors Investment Fund, Inc. was certainly material to Plaintiffs' decision to

contract with NADIF.  Plaintiffs were not making NADIF a partner in the project as a

finder's fee for only the initial funding.

An attempt to defraud can be inferred from the string of bankruptcies filed by

Fisher and Quinn and their track record of fraud, which the Defendants do not dispute

for purposes of their Motion.[5]   It can be inferred from Zukerman's testimony at

deposition that although he handed out business cards identifying himself as the Chief

Financial Officer of the NADIF group, he had no information or knowledge of its assets.

*See* Zukerman deposition, Tr. 94-100 (attached to Paper No. 70).  It can be inferred from

Zukerman's involvement in fraudulent tax schemes and straw corporations. *See*

Zukerman testimony, Tr. 10, 13-17, 114-21, 123-34 (attached hereto).  Clearly, one

representing himself as something he is not is a fraudulent act when that representation is

something that another relies upon and is induced by to enter a relationship with the

misrepresenting party.  For example, Comment a, Illustration 1, Restatement of Contracts

(2nd), § 162, (when a misrepresentation is fraudulent or material), gives the example of

one providing a false statement concerning their financial condition.  Comment a,

Illustration 1 to Restatement § 163 (when a misrepresentation prevents formation of a

---

[5]So that there is no misunderstanding, Plaintiff James Lancelotta and Plaintiffs'
counsel have attached Rule 56(f) Affidavits.

contract) gives an example of one representing that they are a well-known millionaire.

Defendants argue that there was no obligation to reveal Quinn's conviction for securities fraud. Quinn participated in the meetings at which Fisher represented that Quinn was a successful developer.   As such, Fisher's representations were those in which Quinn had a duty to speak and not ratify those statements by acquiescence in them. Clearly, Quinn's bankruptcies and convictions for securities fraud and participation in straw entities are evidence of a fraudulent state of mind. *See* Fed.R.Evid. 801(d)(2)(B),(C), (D), (E).[6]

---

[6]Fed.R.Evid. 801(d)(2) states:
(d) Statements which are not hearsay. A statement is not hearsay if--
(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

*See also* Advisory Committee Notes.

Defendants argue that Fisher's statements were merely opinion and "puffery".
The gravamen of the fraud here, however, is that the individual Defendants through
North American Doctors Investment Fund, Inc. had the financial wherewithal to fund the
project. Fisher, Quinn and Zukerman were imposters and what they said was false
statement of existing and past fact.   Furthermore, Defendants' statements were not
simply statements of prediction, opinion or expectation, because they controlled the
future events, i.e., whether they had the wherewithal to provide the construction
financing.  *Edell & Associates, P.C. v. Law Offices of Peter Angelos*, 264 F.3d 424, 444-
46 (4th Cir. 2001)(promissory or predictive statements, made with the present intention
not to perform, satisfy the first and second elements of a claim for  intentional
misrepresentation); *Weisman v. Connors*, 312 Md. 428, 440, 454-56 (1988)(discussing
present intent & false statement of fact).

Defendants argue that Fisher's statements were not those of material fact.
Defendants point to a quote of  Lancelotta in a November 22, 1999 *Sun* article.   What
else could Lancelotta say?  He was stuck, by virtue of the super priority loan ownership
of the Metropolitan loan by WV I, LLC and an unsecured loan, with Fisher and had no
choice at this juncture but to be optimistic.  NADIF had the priority lien and control of
the project.   No reasonable person would have contracted with the Defendants had the
truth about their background been known.  In the meanwhile, Lancelotta himself had
previously turned down alternative financing that had become available from another

31

source in August 1999.   *See* Lancelotta deposition, at 79-94 attached.

Defendants argue that the Court should grant summary judgment based on contract because the contract did not require NADIF to fund the construction phase of the project. There clearly is a material dispute of fact in this regard.   Defendants also argue that the agreement provided for Plaintiffs' remedy should NADIF fail to provide the construction financing, i.e., NADIF would not receive an additional 40% ownership in Wyndholme Village, LLC.   All that this provision stands for is that Plaintiffs were not willing to give up the additional 40% until NADIF came through with the construction financing.  This, however, is no remedy whatsoever.   It does not address Plaintiffs' right to seek damages or other relief as a consequence of Defendant NADIF's breach of contract.

Defendants argue the doctrine of equitable estoppel. They state that they were misled when Lancelotta told them not to pursue financing other than at First Mariner. Defendants' bargain was that NADIF would provide the construction funding if not available from other sources.  Certainly, had the individual Defendants really had access to the funds they claimed, First Mariner would not have been a problem whatsoever. There is no evidence that the individual Defendants ever geared up, other than perhaps in the testimony of Zukerman, a convicted tax felon, who is presently being prosecuted by the Government again for a multitude of federal crimes, including the use of shell corporations, such as in this instance.   *See* Zukerman deposition, Tr. 10, 13-17, 114-21,

32

123-34.   Furthermore, as Defendants note in their Memorandum, one who relies upon the doctrine of equitable estoppel must deal in good faith.

Defendants state that Plaintiffs' claims for damages should be dismissed because they are speculative.   Clearly, while Lancelotta might not have been able to document lost profits, he lost land worth $13 million which had been in the family for years. Additionally, Plaintiffs lost the benefit of the contract and the $7 million, the absence of which caused the project to really go "into the tank".   It is elementary that one who has caused the loss cannot complain if the loss is incapable of being ascertained with a specific degree of certainty.   *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 321-22 (1978).   Furthermore, Plaintiffs have incurred additional interest charges as a consequence of the failure of Defendant NADIF to perform.   Defendants also ignore the immeasurable harm to the project caused by November *Sun* articles. What reasonable lender would associate itself with the Wyndholme project, given the exposé about Fisher's, Quinn's and Zukerman's checkered past and string of land development frauds?  *See* newspaper articles attached to Paper No. 8 (affidavit of James Lancelotta).

Defendants argue that Plaintiffs' equitable claims for rescission should be dismissed on the ground that Plaintiff delayed in seeking his remedy.   Defendants' arguments, however, would leave Plaintiffs with no remedy whatsoever.   This result would work an injustice that would benefit those who clearly should not benefit from their corrupt, if not criminal acts.   Defendants raise the issue that rescission of the August

33

30, 1999 agreement would cast a cloud on the foreclosure sale to Leeds Federal.

Plaintiffs agree that  they should not be permitted to challenge in this case the foreclosure

sale to Leeds Federal.  Indeed, that foreclosure sale is presently being challenged in state

court.  What this Court may do, however, in the exercise of its equitable powers is to

rescind the agreement for any indebtedness to NADIF of Wyndholme, LLL and WVI,

LLC  beyond the foreclosure sale.  These Defendants cannot claim prejudice because the

fraud was not known until after the transaction was consummated by the parties and

Plaintiffs received the monies.

      The Defendants have pointed in their Memorandum to the "guarantee" provision

in ¶ 9 of the July 8, 1999 Joint Venture Agreement in comparison to the language in ¶ 10

of the August 30, 1999 Venture Agreement.   In the course of the discussions

immediately prior to  the August 30, 1999 Venture Agreement, Mr. Coon and Fisher

insisted that NADIF's agreement to guarantee a construction loan to a would-be lender

would be meaningless to assuring that financing for the construction loan was put in

place.  Thus, the language in ¶ 10 of the August 30, 1999 Venture Agreement "shall

cause a commitment or a term sheet to be issued for construction financing and the initial

funding under such construction which must commence within 120 days..." was written

by Ricardo Fraga, Defendants' counsel, in order to meet Coon's and Lancelotta's

concerns that NADIF would fund the project if it could not find another source for the

funding.  *See* Supplemental Affidavit of James Lancelotta, ¶ 4.

34

Defendants also argue that Plaintiffs failed to allege or even offer to tender Defendants all of the consideration and benefits received under the contract. Defendants' own conduct, however, prevented Plaintiffs from doing so. The failure of Defendants to provide the $7 million in construction financing was a material breach. Furthermore, Plaintiffs did not learn of the fraud until after the Bankruptcy Court had given its blessings to the August 30th Venture Agreement.

Defendants raise a Rule 19 issue, arguing that Leeds Federal should be joined as a party to the case.   Leeds Federal would necessarily have to be aligned with the Defendants in this matter, thereby breaking diversity.  Nonetheless, Leeds did not purchase the property at foreclosure until December, 2002, well after this litigation started.  It did not seek to intervene or any other relief from this Court.

Defendants argue, based on Zukerman's testimony, that Gotham had presented Lancelotta with the opportunity of its providing the project with a $2,000,000 letter of credit in December 1999 and that Lancelotta rejected this would-be line of credit. Lancelotta disputes this assertion in his attached supplemental affidavit, ¶ 3.

<u>CONCLUSION</u>

Even assuming that the language is not plain that NADIF of Wyndholme, LLC had an obligation to fund the construction of the Wyndholme project, there is more than ample parol evidence supporting Plaintiffs' understanding that the August 30, 1999 Venture Agreement required as a last resort that NADIF of Wyndholme, LLC, through

35

North American Doctors Investment Fund, Inc., fund the construction of the Project.

Additionally, there is clear and convincing evidence that there was fraud material to the

transaction.

_____

Howard J. Schulman
Schulman & Kaufman, LLC
One Charles Center, Suite 600
100 N. Charles Street
Baltimore, Maryland 21201
(410) 576-0400
Attorneys for Plaintiffs and
Counter-Defendants

36