## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT, is made as of the 14th day of May, 2001 by and between TRITON COMMERCIAL CAPITAL CORPORATION, a New York corporation, hereinafter referred to as "Purchaser" and NADIF OF WYNDHOLME, L.L.C., hereinafter referred to as "Seller". In consideration of the mutual covenants and promises herein set forth, the parties agree as follows:

1. **Purchase and Sale.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller that certain parcel of real property (the "Land") located in Baltimore City, Maryland, as more particularly described in Exhibit "A" attached to this Agreement, together with the following property and rights:

   (a) All improvements (the "Improvements") located on the Land, including buildings, structures and other facilities owned by Seller; the Land and the Improvements are hereinafter collectively referred to as the "Realty."

   (b) All furniture, furnishings, fixtures, equipment, machinery and all other items of personal property, owned by Seller, located on and used in the operation of the Realty (the "Personal Property").

   (c) All transferable licenses, permits (including building permits, certificates of occupancy, and all land use, environmental, and other governmental permits), authorizations, signage rights, development rights and approvals pertaining to the ownership, maintenance and/or operation of the Realty, to the extent same are owned and held by Seller and are assignable (the "Licenses").

   (d) All easements, privileges, rights-of-way, lands underlying any adjacent streets or roads appurtenant to the Land, and all other appurtenances pertaining to or accruing to the benefit of the Realty.

The Realty and all of the other property and rights described in this paragraph 1 shall hereinafter collectively be referred to as the "Property".

2. **Purchase Price.** The Seller agrees to sell the Property to the Purchaser and the Purchaser agrees to purchase the Property from the Seller for a total purchase price of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00), subject to prorations and adjustments as herein provided.

3. **Deposit.** To secure the performance by Purchaser of its obligations under this Agreement, within two business days following execution of this Agreement by both parties, Purchaser shall deliver to Seller the sum of FIVE THOUSAND DOLLARS ($5,000.00) which shall be held as an earnest money deposit hereunder (the "Deposit").

4. **Payment of Purchase Price.** The Purchase Price shall be paid to Seller as follows:

$ 5,000.00    Being the total Deposit referred to in paragraph 3 of this Agreement.

$7,495,000.00  At time of Closing, subject to provisions and adjustments as hereinafter provided, to be paid by wire transfer or bank check.

5. **Title**. Purchaser shall obtain a title insurance commitment (the "Commitment") with a national title insurer, and a policy subsequent to the Closing, at Purchaser's expense and issued by Purchaser's counsel. Purchaser, at Purchaser's expense, may obtain a survey of the Realty (the "Survey"). Purchaser shall accept title to the Property subject to all matters disclosed on the Survey.

Purchaser shall examine the Commitment during the Inspection Period (the "Title Examination Period"). If title to the Property is defective, Purchaser shall, no later than on the last day of the Title Examination Period, notify Seller in writing specifying the defect(s), provided, that if Purchaser fails to give Seller written notice of the defect(s) before the expiration of the Title Examination Period, the defects shown in the Commitment shall be deemed to be waived as title objections to Closing this transaction. If Purchaser has given Seller timely written notice of the defect(s), Seller may, at its discretion, cause such defects to be cured by the date of Closing. At Closing, from, and to the extent of, the net proceeds being paid by Purchaser, Seller shall remove by payment any lien against the Property capable of removal by the payment of money at Closing. At either party's option, the date of Closing may be extended for a period not to exceed ninety (90) days for purposes of eliminating any title defects. In the event that Seller does not eliminate any defects as of the date of Closing as the same may be extended under the preceding sentence, Purchaser shall have the option of either: (i) Closing and accepting the title "as is," without reduction in the Purchase Price and without claim against Seller therefor, or (ii) canceling this Agreement, in which event the Seller shall return the Deposit to Purchaser, whereupon both parties shall be released from all further obligations under this Agreement.

6. **Inspection Period**. Purchaser shall have a period of thirty (30) days from the date of the last signature on this Agreement (the "Inspection Period"), at Purchaser's expense to make such examinations, inspections and investigations of the Property or the use or operation thereof which Purchaser, in Purchaser's sole discretion, may determine to make. In the event Purchaser is not satisfied with any of the foregoing, in Purchaser's sole discretion, Purchaser may cancel this transaction by written notice of cancellation (the "Termination Notice") given to both Seller and Escrow Agent prior to the expiration of the Inspection Period, in which event the Escrow Agent shall return the Deposit and all interest earned thereon to Purchaser, whereupon both parties shall be released from all further obligations under this Agreement, except those obligations that expressly survive termination of this Agreement. In the event Purchaser has not timely delivered the Termination Notice prior to expiration of the Inspection Period, then the foregoing condition precedent shall automatically be deemed to be satisfied in full and Purchaser shall be deemed to be obligated to close the transaction contemplated hereby, subject to the provisions of this Agreement.

7. **Approvals.** Purchaser shall, at Purchaser's expense, apply for all land development approvals necessary for the development of a residential townhouse project consisting of at least 190 townhouse units (said approvals are hereinafter collectively referred to as the "Approvals"). In the event that Purchaser has not obtained the Approvals within five months following the effective date of this Agreement (the "Approvals Period"), Purchaser shall have the right at its sole discretion to either proceed to close without the Approvals or Purchaser may terminate this Agreement by notifying Seller and Escrow Agent on or before the last day of the Approvals Period. If Purchaser elects to terminate this Agreement because of its inability to obtain the Approvals during the Approvals Period, Seller shall return the Deposit to Purchaser, whereupon both parties shall be released from all further obligations under this Agreement, except those obligations that expressly survive termination of this Agreement. Notwithstanding anything herein to the contrary, Purchaser may extend the Approvals Period for an additional sixty (60) days upon paying Seller an extension fee in the amount of $5,000.

8. **Default Provisions.** In the event of a default by Purchaser under this Agreement, Seller shall retain the Deposit, as agreed and liquidated damages for said breach, and as Seller's sole and exclusive remedy for default of Purchaser, whereupon the parties shall be relieved of all further obligations hereunder, except those obligations which are expressly stated herein to survive the termination or closing of the transaction set forth in this Agreement. Purchaser and Seller acknowledge and agree that actual damages are difficult or impossible to ascertain and the Deposit, together with all interest earned thereon, is a fair and reasonable estimation of the damages of Seller.

In the event of a default by Seller under this Agreement, Purchaser at its option, shall have the right, as its sole and exclusive remedies to: (i) receive the return of the Deposit, whereupon the parties shall be released from all further obligations under this Agreement, except those obligations which are specifically stated to survive the termination of this transaction, or (ii) seek specific performance of Seller's obligations under this Agreement.

9. **Prorations.** Taxes, assessments, rent, if any, interest, insurance and other expenses or income of the Property shall be prorated through midnight of the day prior to Closing. Cash at Closing shall be increased or decreased as may be required as a result of said prorations.

The provisions of this paragraph shall survive the Closing.

10. **Closing Costs.** The parties shall bear the following costs:

(a) The Purchaser shall be responsible for payment of the following: (i) any and all costs and expenses associated with Purchaser's Inspections, (ii) the cost of any survey obtained by Purchaser, (iii) clerk's recordation fees for recording the warranty deed, (iv) the premiums and any other related fees and costs for the owner's title insurance policy to be issued from the Commitment, and (v) all documentary stamp taxes and surtax in

3

connection with the delivery of the warranty deed. In addition, Purchaser shall be responsible for any and all costs in connection with any financing obtained by Purchaser, although Purchaser's obligation under this Agreement shall not be subject to financing.

(b)    Each party shall pay its own legal fees.

11.    **Closing.**  The Closing shall be held within thirty (30) days following the expiration of the Approvals Period, at the offices of Seller's attorney.

At Closing, Seller shall execute and deliver to Purchaser the following closing documents:

(i)    A special warranty deed.

(ii)   An appropriate mechanic's lien affidavit sufficient in form and content for the Title Company to delete the standard exceptions for mechanic's liens.

(iii)  An affidavit of exclusive possession.

(iv)   A non-foreign affidavit and/or certificate.

(v)    An appropriate bill of sale for all personal property included in this transaction.

(vi)   Assignments of licenses, permits, easements, rights-of-way, guarantees, warranties, and other property rights included in this transaction.

(vii)  Appropriate evidence of authority to sell and convey the Property as may be reasonably required by the Title Company.

(viii) An appropriate "gap" affidavit as required by the Title Company to delete the gap title exception.

At Closing, Purchaser shall deliver to Seller the balance of the Purchase Price. At Closing, Seller and Purchaser shall also each execute counterpart closing statements and such other documents as are reasonably necessary to consummate this transaction.

12.    **Brokers.**  The parties each represent and warrant to the other that there are no real estate brokers, salesmen or finders in connection with the transaction contemplated herein. If a claim for brokerage in connection with the transaction is made by any broker, salesman or finder, claiming to have dealt through or on behalf of one of the parties hereto ("Indemnitor"), Indemnitor shall indemnify, defend and hold harmless the other party hereunder ("Indemnitee"), and Indemnitee's officers, directors, agents and representatives, from all liabilities, damages, claims, costs, fees and expenses

4

whatsoever (including reasonable attorney's fees and court costs at trial and all appellate levels) with respect to said claim for brokerage. The provisions of this paragraph shall survive Closing and any cancellation or termination of this Agreement.

13. **Notices.** Notices and communications hereunder shall be given in writing and shall be deemed to have been given if sent by facsimile with confirmation of transmittal, delivered by hand, sent by recognized overnight courier (such as Federal Express) or mailed by certified mail return receipt requested, in a postage prepaid envelope, and addressed to the other party as follows:

If to the Purchaser c/o:

Triton Commercial Capital Corporation
Attn: Warren W. Sabloff, President
2001 Marcus Avenue
Lake Success, New York 11042
Facsimile: (516) 620-5665 5663

If to the Seller at:

NADIF of Wyndholme, LLC
417 5th Avenue, 3rd Floor
New York, New York 10016

14. **Miscellaneous.**

(a) This Agreement shall be construed and governed in accordance with the laws of the State of New York. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

(b) In the event any term or provision of this Agreement be determined by appropriate judicial authority to be illegal or otherwise invalid, such provision shall be given its nearest legal meaning or be construed as deleted as such authority determines, and the remainder of this Agreement shall be construed to be in full force and effect.

(c) In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and court costs at all trial and appellate levels.

(d) In construing this Agreement, the singular shall be held to include the plural, the plural shall include the singular, the use of any gender shall include every other and all genders, and captions and paragraph headings shall be disregarded. The use of the word "including" shall mean "including, without limitation.".

(e) All of the exhibits attached to this Agreement are incorporated in, and made a part of, this Agreement.

5

15. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties, and there are no other agreements, representations or warranties other than as set forth herein. This Agreement may not be changed, altered or asserted except by an instrument in writing signed by the party against whom enforcement of such change would be sought. This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

**EXECUTED** as of the date first above written in several counterparts, each of which shall be deemed an original, but all constituting only one agreement.

SELLER:

NADIF OF WYNDHOLME, L.L.C.

Authorized Signatory

(CORPORATE SEAL)

PURCHASER:

TRITON COMMERCIAL CAPITAL CORPORATION

By: _____
Warren W. Sabloff, President

(CORPORATE SEAL)

6