0001

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MARYLAND

2

3   WYNDHOLME VILLIAGE, LLC., et al.,  *

4    Plaintiffs/Counter-Defendants,  *

5               * CIVIL ACTION

6   vs.           * NO. L01-3809

7               *

8   NADIF OF WYNDHOLME, LLC., et al.,  * VOLUME I

9    Defendants/Counter-Plaintiffs.  * (Pages 1-256)

10   * * * * * * * * * * * * * * * * * * * * * * * * *

11

12       The deposition of JAMES M. LANCELOTTA was

13  taken on Thursday, January 16, 2003, commencing at

14  10:00 a.m., at Tydings & Rosenberg, 100 East Pratt

15  Street, Suite 2600, Baltimore, Maryland 21202,

16  before Alfred A. Betz, Notary Public.

17

18   * * * * * * * * * * * * * * * * * * * * * * * * *

19  Reported by:

20      Alfred A. Betz,

21      Registered Merit Reporter

0079

1    A.  Yes.
2    Q.  And had Mr. Coon been your personal
3  attorney?
4    A.  Personal attorney, uh-huh.
5    Q.  Okay.  There's reference here to a Frank
6  Laport.  Can you tell us what your dealings, about
7  your dealings with Mr. Laport in 1999 or before?
8    A.  I was referred to Frank Laport through an
9  attorney who had done my condominium documents,
10  Michael Manness.  I spoke with Mr. Laport on the
11  phone in June.  Mike Manness informed me that he
12  had dealings with Mr. Laport, he was a very, very,
13  he had, he felt very confident Mr. Laport had the
14  funds personally to proceed with Wyndholme if he
15  liked it.  If not, he was in the business.  He had
16  done several transactions with him down here.  And
17  if I'm not mistaken, it was with the Myerberg or
18  Myerhoff families in apartment complexes.  I'm not
19  quite sure which ones.  He came highly recommended
20  by Mike Manness.
21      I spoke with Frank.  He was at the time

0080
1  involved with a major situation in Florida.  He
2  asked me to send him the information but told me
3  his schedule was very hectic.  I did as he asked.
4  And he was very interested.  It continued, I had to
5  send him more information, additional information,
6  up until we made arrangements, I kept
7  communications going with him.  At the time I had
8  also -- well, I kept communications going with him
9  throughout the summer and then flew out to meet him
10  personally August 28th or 29th.  28th.  28th or
11  29th.
12      Q.  Okay.  Let me ask the Reporter to mark
13  the next exhibit.
14          (Whereupon, Deposition Exhibit No.
15  13, document Bates stamped WV03417, marked.)
16      Q.  Mr. Lancelotta, you have in front of you
17  exhibit 13.  Can you identify this for us, please?
18      A.  This is a FAX memo from Frank Laport
19  sending me where to send the books in Florida.
20  Okay.  Yes.  This was sooner than I thought.  Back
21  in February.  I see that now.

0081
```
 1        Q.  Yes, I was going to make that
 2   observation.  This appears to be dated in February
 3   of 1999.
 4        A.  It was.  I was just looking at your sheet
 5   here.  When you said June I thought it was June.
 6        Q.  Does this refresh your recollection --
 7        A.  Yeah.  I had an ongoing rapport with
 8   Frank Laport but never met him.  Like I say, he had
 9   a major situation going on in Florida and -- let me
10    see something.  Yes.  This is prior to me filing
11    bankruptcy.  February 26th.  I was trying my best
12    to find financing and he was very qualified to
13    provide it from what I was told.
14        Q.  So you approached him before you filed
15    for bankruptcy?
16        A.  Yes.  I was mistaken.  I'm sorry about
17    that.
18        Q.  That's okay.  Assuming that this was in
19    fact sent on February 26, 1999, do you believe that
20    that timeframe was the first time you spoke with
21    him or do you think it was back earlier than that?
```

0082
```
 1        A.   The reason I believe it's the first time
 2     I spoke with him because that's where he gave me
 3     the address in Florida.  Between his office in
 4     Chicago and going to Florida, he asked me to
 5     forward them there because he'd have time to read
 6     them on the plane.
 7        Q.   Do you recall whether you and Mr. Laport
 8     had any other conversations prior to the bankruptcy
 9     filing about potential lending?
10        A.   No.  I don't.  About potential lenders,
11      you said?
12        Q.   No.  I'm sorry.  About him becoming a
13     potential lender or participating in the deal?
14        A.   No.  I am pretty sure based on what I see
15     that this was the first time that -- I must have
16     spoke to him a day or so before this, obviously.  I
17     don't know when.
18        Q.   Do you recall when you followed up with
19     him after you sent him materials?
20        A.   I'm sorry?
21        Q.   After you sent them the materials?
```

0083
1        A.  Yes.  Uh-huh.
2        Q.  Was he very interested prior to the
3    filing of the bankruptcy?
4        A.  I can't recall.
5        Q.  Okay.  After the filing of the
6    bankruptcy, though, I gather there was renewed
7    contact with Mr. Laport; is that fair?
8        A.  I think it would be fair to say it was
9    continuous contact.
10       Q.  Continuous?
11       A.  Yes.  From when I initially engaged
12    conversation with him.
13       Q.  You testified earlier that it culminated
14    in a, or at least ultimately you had a meeting with
15    him in August?
16       A.  Yes.  The day before I signed another
17    deal.
18       Q.  The deal with the NADIF people; is that
19    correct?
20       A.  Correct.
21       Q.  In fact, you had already signed the deal

0084

1    with the NADIF people in August?
2        A.  Well, the next day, yeah, they called me
3    to tell me they were ready to proceed with the deal
4    and I told them I had signed with NADIF.
5        Q.  Hadn't you already signed a document in
6    July?
7        A.  Yeah.  No.  Oh!  Yes.  Yes.
8        Q.  But when you met with Mr. Laport in
9    August you already had a signed agreement with
10    NADIF; is that right?
11        A.  Yes.
12        Q.  Let me have this marked --
13        A.  However  --
14        Q.  Go ahead.  You want to amplify.
15        A.  There was -- no.  That's my answer is
16    yes.
17            (Whereupon, Deposition Exhibit No.
18    14, document Bates stamped WV03419-25, marked.)
19        Q.  I show you what's been marked as exhibit
20    14, Mr. Lancelotta, and I will represent to you
21    that I don't know for certain whether the first

0085
1    page was originally attached to the back pages.  My
2    guess is it probably was not.  If you would look
3    through it because I will ask you if you can
4    explain it.
5        A.   Okay.  I'm sorry, your question was?
6        Q.   Let me ask you a series of questions.
7    First of all, the first page appears to be a FAX
8    note of some kind.  Is that what it is?
9        A.   Correct.
10       Q.   From you to Mr. Laport; is that correct?
11       A.   Correct.  Yes.
12       Q.   And it is dated August 25, 1999?
13       A.   That's correct.
14       Q.   Is this your handwriting?
15       A.   Yes.
16       Q.   Would you read it into the record for us
17   just to make sure that --
18       A.   Sure.  Thank you.  I'll focus tonight on
19   how to structure this opportunity with you and your
20   affiliates.  I'm very excited about the
21   possibilities that exist and brainstorming with you

0086
1    how to make this work.  Look forward to your call.
2    Respectfully, Jim.
3        Q.   And by make this work, you meant a deal
4    with him with respect to Wyndholme Village; is that
5    right?
6        A.   Yes.  Yes.
7        Q.   Now, the next -- well, the next page is
8    captioned Financial Overview Wyndholme Village
9    1999.  Do you see that?
10       A.   Uh-huh.
11       Q.   Can you identify this page or the
12    subsequent pages to me or for me?
13       A.   I'm sorry?
14       Q.   What is this document, that is, --
15       A.   It's a financial overview.
16       Q.   Is this a document that was prepared by
17    you or somebody at your direction?
18       A.   No.  This appears it was prepared by me.
19       Q.   Do you believe this was a document that
20    was sent to Mr. Laport?
21       A.   I do.

0087
1       Q.   Is it fair to assume that this was sent
2    to Mr. Laport sometime before the August 25 cover
3    memo on this?
4       A.   It looks like it was, this was five pages
5    with this FAX cover and it looks like there's five
6    here.  I don't know what this last page is.
7       Q.   Okay.  But you had sent Mr. Laport basic
8    information on Wyndholme Village as early as
9    February of '99; is that correct?
10      A.   Uh-huh.  That's correct.
11      Q.   Okay.  Do you know why for the purposes
12   of exhibit 11, the list of lenders, you used June
13   2, 1999 as the date for your connection with Mr.
14   Laport?
15      A.   No, I don't, tell you the truth.  I
16   really don't.  Because obviously it was February my
17   first contact with him.
18      Q.   First contact?
19      A.   Yeah.  As I said, it was continuous from
20   there forward.
21      Q.   From there up until at least August --

0088
1          A.  It's still continuous.  I still talk with
2     Frank Laport.
3          Q.  But in terms of his possible
4     participation in this project at least until
5     sometime in 2000 -- strike that.  After you signed
6     the August 30 agreement with NADIF, and up until,
7     say, February of 2000, that is the six months or
8     so, did you continue to have discussions with Mr.
9     Laport?
10         A.  I had a conversation with Mr. Laport the
11    day after I signed, or the day I signed the
12    agreement with NADIF.  The August 30th agreement.
13         Q.  And what was the gist of that
14    conversation?
15         A.  He tried to reach me -- the August 30th
16    agreement was signed at 3 in the morning the 29th.
17         Q.  Actually I think it was the 31st, but
18    we'll get into that.
19         A.  Whatever day, if you go back on your
20    thing, whatever, Sunday I flew to Chicago, Monday I
21    met with NADIF.  So I mean whatever, if it's the

0089

1   29th, the 30th, whatever it is.  Frank called me to
2   tell me they were ready to move ahead and I said
3   Frank, I finalized the deal with NADIF.  He said
4   I'm sorry to hear that.  But good luck.
5       Q.   What were the terms of the deal with
6   Laport?
7       A.   They were not totally, they were not
8   outlined -- well, some of the terms are mentioned
9   in this agreement.  They were not finalized.
10      Q.   When you say this agreement?
11      A.   If you look at the return, second to the
12  last page.  Suggested investment  --
13          MR. SCHULMAN:  Is there a Bates stamp
14  number?
15      Q.   What's the number?
16      A.   3424.
17      Q.   Let's look at this page, page 3424.  Is
18  this a page that you believe was generated
19  specifically for Mr. Laport's potential
20  participation?
21      A.   This was, as it says at the top,

0090
1    suggested investment return for his, as I guess as
2    a reference point to go off of.
3        Q.  But is this a return that he would have
4    received or that would have been generated under
5    the specific deal that you were proposing with Mr.
6    Laport?
7        A.  It says this was a, basically guidelines.
8    There was not a specific deal put in crystallized.
9    It wasn't done.  He was ready to come and do it.
10    He had the money.  And it was a matter of this was
11    general principle guidelines of where I was coming
12    from.
13        Q.  Okay.  Had this document or the document
14    like it been submitted to other prospective
15    investors or lenders?
16        A.  Not to my knowledge.
17        Q.  Okay.  Do you have anything in writing
18    from Mr. Laport indicating terms in which he would
19    be willing to do this deal?
20        A.  In writing.  Not that I can recall.  I
21    mean, there was a lot of spreadsheets done and

0091
1    things like that.  But most of them were generated
2    by me.
3        Q.   Were they generated by you specifically
4    for a potential Laport transaction?  I'm talking
5    about 1999 now.  Let's focus on that time period.
6    I understand he came into the project later on.
7        A.   No.  Actually, no.  It stopped.  The
8    initial books that went out, and I don't remember
9    what was in them, you can see they were sent in
10    February, once the deal was finalized with NADIF on
11    August 30th this was off the table.
12        Q.   Right.
13        A.   And then it didn't come, and then my
14    conversations with Laport were just keeping -- we
15    got along very well.
16        Q.   What, if any, documents do you have prior
17    to August of 19, prior to August 25, 1999 that
18    evidenced the transaction or the discussions and
19    terms of your discussions with Mr. Laport?  Do you
20    think you have anything?
21        A.   I don't think I have any.  If I do, they

0092
1    should have been in that record room that you went
2    through.  I had a pile there.  I don't know whether
3    you pulled that one or not.  This must have been in
4    his file.
5        Q.   Well, this came from your documents.
6        A.   Yes.  So the file must have been there.
7        Q.   In your interrogatory answers, Mr.
8    Lancelotta, and it's exhibit 5 --
9        A.   Okay.
10        Q.   -- interrogatory 3, this starts on page 3
11    and carries over to page 4, asks for the
12    identification of documents on which you intend to
13    rely in this case and the answer identifies some
14    documents including  -- oh, where is it?  Number 2.
15    Sub 2.  Information FAXed from and to Frank Laport
16    which included a status report for WV, LLC,
17    financial overview for WV, LLC, current obligations
18    of James Lancelotta, personal/investment/return WV,
19    LLC prior to executing the venture agreement with
20    NADIF dated August 29, 1999.
21        A.   Uh-huh.

0093

1      Q.   Does exhibit 14 appear to be the document
2   to which you refer in your interrogatory answer?
3      A.   Yes.
4      Q.   Are there any other documents that you
5   know of that relate to Mr. Laport on which you
6   intend to rely to support your claims in this case?
7      A.   Exactly how I answered in my
8   interrogatory.  All I have to my knowledge right
9   now is this, what's here.
10      Q.   In an earlier question I think we
11   established that at the time you were meeting with
12   Mr. Laport in Chicago in late August 1999 you had
13   already signed an agreement with NADIF; is that
14   correct?
15      A.   Uh-huh.
16      Q.   Did you have any misgivings about dealing
17   with Mr. Laport after you signed an agreement with
18   NADIF?
19      A.   I'm sorry, say that again.
20      Q.   Did you have any misgivings about
21   continuing to deal with Mr. Laport after you

0094

1    already had an agreement with NADIF?
2        A.  I -- basically, the situation with NADIF
3    at that time in the beginning of August they were,
4    if memory serves me correctly, there were some
5    issues with Neil Fisher and Mr. Pilevsky and they
6    weren't sure, even though they had signed their
7    agreement, the Court had not approved the super
8    priority funding yet, they weren't sure if they
9    were going to proceed anyway.  That was the reason
10    that I actually went out to Chicago.
11        Q.  Okay.  Let's go back to the timeframe of
12    your first meetings with Mr. Fisher and others that
13    later became affiliated with NADIF and Wyndholme
14    just to put it in context, the timeframe, I believe
15    your affidavit refers to meetings on June the 8th.
16        A.  Uh-huh.  I met Mr. Pilevsky.  Yeah, okay.
17    Fisher, okay.
18        Q.  We can look at your affidavit but I think
19    your affidavit talks about a meeting in the morning
20    with Mr. Fisher.
21        A.  Oh, yeah.  Okay.

0178

1      A.   No, it isn't what we agreed to.  They
2    don't have any obligation here.
3      Q.   Do you have any recollection, sitting
4    here today, why the language would have changed so
5    significantly in this agreement compared to the
6    prior agreement?
7      A.   You have to ask Mr. Fraga that.  He's the
8    one that drafted it.
9      Q.   Okay.
10      A.   Maybe he wanted to see if I was reading
11    them or not.
12      Q.   Were you?
13      A.   Of course.  I might add one thing on
14    that, too.  If you read the cover on the front,
15    Neil Fisher has not read this.  This was done by
16    Fraga himself.  Please provide a copy of enclosed
17    to Neil upon his arrival since he has not had an
18    opportunity to review same.  That's probably why
19    that blatant mistake was in there.
20      Q.   Next exhibit.
21           (Whereupon, Deposition Exhibit No.